UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK, etc.,

     Plaintiff,

v.                         CASE NO.  8:12-CV-1837-T-17MAP

MARVIN I. KAPLAN, etc.,
et al.,

     Defendants.

_____/

MARVIN I. KAPLAN, etc.,
et al.,

   Counterclaim/Crossclaim Plaintiffs,

v.

REGIONS BANK, etc., et al.,

   Counterclaim/Crossclaim Defendants.

_____/


ORDER

This cause is before the Court on:

| | |
|---|---|
| Dkt. 19 | Motion to Dismiss (Bridgeview) |
| Dkt. 36 | Motion to Dismiss (Starr) |
| Dkt. 37 | Amended Motion to Dismiss (Regions) |
| Dkt. 38 | Motion to Dismiss (Shaw) |
| Dkt. 41 | Motion to Dismiss (Wells Fargo) |
| Dkt. 42 | Motion to Dismiss (FBA) |
| Dkt. 52 | Response |
| Dkt. 53 | Response |
| Dkt. 54 | Response |

Case No. 8:12-CV-1837-T-17MAP

| | | |
|---|---|---|
| Dkt. 55 | Response | |
| Dkt. 56 | Response | |
| Dkt. 62 | Reply | |
| Dkt. 63 | Reply | |
| Dkt. 76 | Notice | |

The Complaint was filed in Sarasota County Circuit Court on February 23, 2012, and was removed on August 31, 2012.  The Counterclaim/Crossclaim was filed on May 30, 2012.  Counterclaim/Crossclaim Plaintiffs are Marvin Kaplan ("Kaplan"), R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing LLC and BNK Smith LLC (the "Investment Companies").

The Counterclaim/Crossclaim Defendants are Regions Bank ("Regions"), Robert Nicholas Shaw ("Shaw"), The Florida Bankers Association, Inc. ("FBA"), Bridgeview Bancorp, Inc. ("BBI"), Charles L. Starr, III a/k/ Larry Starr ("Starr"); Wells Fargo Bank, N.A.("Wells Fargo"),  Smith Advertising & Associates, Inc. ("SAA"); G. Todd Smith a/k/a Todd Smith ("G. Smith"); Gary T. Smith ("T. Smith")("the Smiths") and Lucy B. Smith ("L. Smith").

The Counterclaim/Crossclaims (Dkt. 3) of Counterclaim/Crossclaim Plaintiffs include:

| | | |
|---|---|---|
| Count I | Fraud | Starr, T. Smith, SAA |
| Count II | Conspiracy to Defraud | Starr, T. Smith, G. Smith, L. Smith, BBI, SAA |
| Count III | Negligent Misrepresentation | Starr, T. Smith, SAA |
| Count IV | 18 U.S.C. 1962, 1964 | Starr, T. Smith, G. Smith, L. Smith, BBI, SAA |
| Count V | F.S. 772.103, 772.104 | Starr, T. Smith, G. Smith, L. Smith, BBI, SAA |

Case No. 8:12-CV-1837-T-17MAP

| | | |
|---|---|---|
| Count VI | F.S. 772.11 | T. Smith, G. Smith, L. Smith, SAA |
| Count VII | Conversion | T. Smith, G. Smith, L. Smith, BBI, SAA |
| Count VIII | F.S. 501.201, FDUTPA | T. Smith, B. Smith, L. Smith, BBI, SAA |
| Count IX | F.S. 68.05 | SAA |
| Count X | Breach of Contract | SAA, T. Smith, G. Smith |
| Count XI | Breach U.C.C. 4-302(A) | BBI |
| Count XII | Breach U.C.C. 4-302(A) | Wells Fargo |
| Count XIII | Breach 12 C.F.R. Pt. 229 | BBI |
| Count XIV | Breach 12 C.F.R. Pt. 229 | Wells Fargo |
| Count XV | Negligence | BBI |
| Count XVI | Negligence | Wells Fargo |
| Count XVII | Fraud | BBI |
| Count XVIII | Negligent Misrepresentation | BBI |
| Count XIX | Defamation per se | Regions, FBA, Shaw |
| Count XX | Invasion of Privacy | Regions, FBA, Shaw |
| Count XXI | Negligence/Negligent Misrepresentation | Regions |

## I. Background

The claims in this case are based on an alleged investment scheme in which Marvin Kaplan and the Investment Companies lent money on a short term basis to SAA, in exchange for payment of interest and incentives. The alleged purpose of the short term loans was to enable SAA to take advantage of discounts on private printing contracts. According to the Counterclaim/Crossclaims, Starr explained to Kaplan:

> 30. ......the Smiths and SAA were requesting that investors advance half of the required early payment for any given print contract and that the Smiths and/or SAA would advance the other half.

3

Case No. 8:12-CV-1837-T-17MAP

31. According to Starr, this money would be immediately paid to the vendor to obtain the 10% discount.

32. Under the plan, the investor would immediately receive his share of the 10% discount by a check from SAA. The investor would also receive a promissory note or notes guaranteed by G. Smith and T. Smith and one or more checks representing the return of principal, which were to be cashed after the thirty (30) day period had expired and SAA had received payment from the customer.

33. The investor would then wait the thirty (30) days until SAA received the payment back from the customer and then would deposit the checks.

In August, 2009, Marvin Kaplan met with the Smiths and SAA, and discussed investing with them; in those discussions the Smiths/SAA repeated Starr's representations. At that time, Kaplan made an initial investment of $50,000, which was successful. After that, Kaplan caused the Investment Companies (owned by Kaplan) to being investing with Smiths/SAA. All went as expected for a time. The Smiths/SAA continued to offer more investments and to "renew" the old ones, urging Kaplan through the Investment Companies, to take new contracts upon the expiration of each prior contract, leaving the principal sum to "ride" from contract to contract. Instead of depositing the checks when they were due, the Investment Companies would hold them, if the checks had not expired, or discard the checks if they had expired, and Smiths/SAA would issue new checks. Over time, the Smiths/SAA would consistently urge Kaplan to reinvest both the returns that the Investment Companies had made as well as "new money" in to the deals. By November, 2011, the Investment Companies had over $7,000,000 invested with the Smiths/SAA.

4

Case No. 8:12-CV-1837-T-17MAP

In November, 2011, T. Smith proposed a different and "better" method to earn larger returns to Kaplan and the Investment Companies, which required larger investments. Kaplan and the Investment Companies agreed to the "new arrangement" and infused additional capital into the investment scheme. The new scheme required the Investment Companies to wire funds from their bank accounts to SAA's account at BBI. The Smiths and SAA would fedex contracts and checks for the new transactions, to be received by the Investment Companies on the day they sent the wire(s) to the Bridgeview account. The contract would provide for the deposit of the checks thereafter, after SAA had gotten the customer payment. Because of the large wire transfers, the Investment Companies opened an account at Regions Bank in November, 2011. For each successive deal, the Investment Companies wired funds to BBI as Regions Bank would advise them that the checks from the prior deal cleared and the money was in the bank to wire. From November, 2011 through January 20, 2012, the Investment Companies continued to invest and, through the infusion of new capital and the "returns," their total investment grew to approximately $22,000,000. Counterclaim/Crossclaim Plaintiffs have attached sixty-seven promissory notes between the respective Investment Companies and Smith Advertising and Associates as to loans made by the Investment Companies to be paid in full during January, 2012; the promissory notes are signed by G. Todd Smith, COO/Owner, Smith Advertising & Associates, and are signed by Gary T. Smith, Personal Guarantee, and G. Todd Smith, Personal Guarantee.

On January 20, 2012, the Investment Companies wired $9,700,000 from their accounts at Regions Bank to SAA's account at BBI. They received checks for repayment and for payment of interest and incentives, which were deposited on January 20, 2012 at Regions Bank. (pars. 86, 87). On January 23, 2012, Kaplan, on behalf of the Investment Companies, reviewed the accounts and found that Regions had cleared all of the previously deposited checks and that the funds were in the bank. On January 23, 2012, the Investment Companies wired $10,450,000 to SAA's accounts

Case No. 8:12-CV-1837-T-17MAP

at BBI.   The Investment Companies received checks for repayment, and for payment of interest and certain incentives. (par. 93).   The Investment Companies deposited the checks on January 23, 2012, but Regions Bank placed a hold on the checks and declined to credit them that day.   On January 24, 2012, the Investment Companies agreed to invest in another deal, using the funds that remained at BBI, $9,950,000 since the deposited checks were on hold.   The Investment Companies received checks for repayment, and for interest and incentives.   Kaplan did not deposit the checks on January 24, 2012. On January 24, 2012, R1A, LLC, one of the Investment Companies, wired $2,000,000 to SAA's account at BBI. (par. 103).

On January 24, 2012, T. Smith and SAA called Kaplan and advised that BBI had frozen all of SAA's accounts.  On January 25, 2012, Linda Carlson, a manager with Regions Bank, advised Kaplan and the Investment Companies that the checks deposited on January 20, 2012 had not cleared, and the checks were being return "Refer to Maker." (pars. 112, 114). Kaplan called T. Smith and SAA, who advised Kaplan that BBI wrongfully placed a hold on the SAA accounts, and asked Kaplan and the Investment Companies to be patient. (par. 115).   Robert Nicholas Shaw, with Regions Bank' security, called Kaplan, who arranged a telephone conference with Smith/SAA that day.  Thereafter, T. Smith/SAA advised Kaplan and the Investment Companies that a new set of checks for the first and second deals drawn on an account at Wells Fargo would be sent by a special air flight that day.  The checks arrived on January 25, 2012, and included only replacement for the second deal checks.  Kaplan and the Investment Companies deposited the checks in Regions Bank on January 25, 2012.

On January 26, 2012, the Investment Companies received written notice from Regions Bank of the return of twenty-eight checks that had been returned from BBI with the designation "Refer to Maker." (pars. 136, 137). On January 27, 2012, the Investment Companies received written notice from Regions Bank of the return of thirty-

Case No. 8:12-CV-1837-T-17MAP

two checks that had been returned from BBI with the designation "Refer to Maker." (par. 138, 139).   On January 30, 2012, Shaw called Kaplan and the Investment Companies to advise that the checks drawn on Wells Fargo Bank had not cleared.

On January 30, 2012, Regions Bank obtained an ex parte temporary injunction to enjoin the transfer of up to $2,775,000 from an account at Wells Fargo Bank, N.A. in the name of Lighthouse Pointe, LLC, to which Kaplan had transferred $2,775,000 resulting from the scheme.  (Dkt. 1-7, pp. 24-30).

On January 31, 2012, the Investment Companies received written notice from Regions Bank of the return of twenty-one checks that had been returned from Wells Fargo with the designation "Refer to Maker."  (par. 147, 148).   One check was returned with the designation "NSF" for insufficient funds.

Counterclaim/Crossclaim Plaintiffs allege that Regions, through Shaw and other representatives began to tell other parties, including Wells Fargo, the Florida Bankers Association and the general public that Kaplan and his wife engaged in criminal conduct, illegal activities and were "check kiters." (par. 153).   Counterclaim/Crossclaim Plaintiffs allege that Shaw published an alert bulletin to the Florida Banker's Association with Kaplan and his wife's social security number in it, accusing them of fraud, check kiting and criminal conduct. (par. 155).   Counterclaim/Crossclaim Plaintiffs further allege that Shaw and Regions sued Kaplan individually without actually bringing a claim against him and therein repeated the false accusations of check kiting and fraud (par. 156) and reported Kaplan to the Secret Service and law enforcement for a crime that did not occur. (par. 159).

Regions' Amended Complaint (Dkt. 2) includes:

Case No. 8:12-CV-1837-T-17MAP

Count I       Imposition of Constructive Trust
Count II      Imposition of Equitable Lien
Count III     Breach of Deposit Agreement (R1A)
Count IV      Breach of Deposit Agreement (Triple Net)
Count V       Breach of Deposit Agreement (BNK Smith)
Count VI      Breach of Deposit Agreement (MK Investing)
Count VII     Claim for Damages for Value of Dishonored
              Checks (Smith Advertising)

Kaplan, an individual, is named as a Defendant.  Kaplan is further identified as: 1)  a
manager of R1A and an authorized signer on accounts titled in R1A at Regions; 2) a
manager of Lighthouse and, on information and belief, an authorized signer on an
account titled in Lighthouse at Wells Fargo; 3) an authorized signer on accounts titled in
Triple Net at Regions; 4) a manager of MK Investing and an individual signer on
accounts titled in MK Investing at Regions: 5) a manager of BNK Smith and an
authorized signer on accounts titled in BNK Smith at Regions.

Kaplan, R1A Palms, LLC and Lighthouse Point, LLC stipulated to the transfer of
$2,775,000 from Wells Fargo to Regions Bank on February 22, 2012.  Upon receipt,
Regions Bank released an administrative hold on six accounts at Regions Bank on
which Kaplan was an authorized signer.  (Dkt. 1-9, pp. 34-36).  A final judgment in favor
of Regions Bank and against SAA was entered on May 18, 2012. (Dkt. 1-4, pp. 22-34).

In the Amended Complaint filed on February 23, 2012, Regions Bank alleges:

13.  Upon information and belief, the Kaplan Defendants and Smith
Advertising are involved in what appears to be a scheme of check kiting,
as set forth more fully below.

II. Standard of Review

A.  Personal Jurisdiction - Federal Question

In analyzing a motion to dismiss for lack of personal jurisdiction, the Court

Case No. 8:12-CV-1837-T-17MAP

determines whether the applicable statute potentially confers jurisdiction over the defendant, and then determines whether the exercise of jurisdiction comports with due process. <u>Go-Video, Inc. v. Akai Electric Co., Ltd.</u>, 885 F.2d 1406, 1413 (9th Cir. 1989)(federal question case).

When a jurisdictional motion to dismiss depends on the assertion of a right created by a federal statute, a court should dismiss for lack of jurisdiction "only if the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit so as not to involve a federal controversy.'" <u>Garcia v. Copenhaver, Bell & Assocs.</u>, 104 F.3d 1256 (11th Cir. 1997).

B.  Fed. R. Civ. P. 12(b)(6)

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required, <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555 (2007), but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," <u>Id.</u>, at 570.   A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Id.</u>, at 556.  Two working principles underlie <u>Twombly</u>.  First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. <u>Id.</u>, at 555.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense. <u>Id.</u>, at 556.  A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.  When there are

Case No. 8:12-CV-1837-T-17MAP

well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1955-1956 (2009)(quoting Bell Atlantic v. Twombly, 550 U.S. 544 (2007).

C.  Fed. R. Civ. P. 9(b)

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  To satisfy the Rule 9(b) standard, RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud.  Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1380-81 (11th Cir. 1997).  In Brooks, the Eleventh Circuit Court of Appeals concluded that the complaint alleging a RICO claim did not meet the Rule 9(b) particularity standard because it was devoid of specific allegations with respect to each defendant; the plaintiffs lumped together all of the defendants in their allegations of fraud. Id. at 1381. "[I]n a case involving multiple defendants ... the complaint should inform each defendant of the nature of his alleged participation in the fraud." Id.

D.  Fed. R. Civ. P. 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, can be a facial attack or a factual attack.  A facial attack on the complaint "requires the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the factual allegations of the Complaint are taken as true. Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990).  In a factual attack, the Court may consider matters outside the Complaint,

Case No. 8:12-CV-1837-T-17MAP

and is free to weigh evidence and satisfy itself as to the existence of its power to hear the case. In a factual attack, the allegations of the Complaint are not presumptively true. Where the attack on jurisdiction implicates the merits of the plaintiff's federal cause of action, the Court should find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case, proceeding under Rule 12(b)(6) or Rule 56. The exceptions to this rule are narrowly drawn, and are intended to allow jurisdictional dismissals only in those cases where the federal claim is clearly immaterial or insubstantial. See Williamson v. Tucker, 645 F.2d 404 (5th Cir.), cert. denied, 454 U.S. 897 (1981).

E. Consideration of Documents Attached to the Complaint or Incorporated

The Court limits its consideration to well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed. La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004). The Court may consider documents which are central to plaintiff's claim whose authenticity is not challenged, whether the document is physically attached to the complaint or not, without converting the motion into one for summary judgment. Speaker v. U.S. Dept of Health and Human Services Centers for Disease Control and Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010); SFM Holdings, Ltd. v. Banc of America Securities, LLC, 600 F.3d 1334, 1337 (11th Cir. 2010); Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005); Maxcess, Inc. v. Lucent Techs., Inc., 433 F.3d 1337, 1340 n. 3 (11th Cir. 2005).

III. Discussion

A. Preliminary Issues

1. Shotgun Complaint

11

Case No. 8:12-CV-1837-T-17MAP

Each count of the Counterclaim/Crossclaim incorporates the 169 general factual allegations.  In some counts, Counterclaim/Crossclaim Plaintiffs include additional factual allegations.  In <u>Anderson v. District Board of Trustees of Central Florida Community College</u>, 77 F.3d 364, 368 (11th Cir. 1996), the Eleventh Circuit Court of Appeals states:

> "Anderson's complaint is a perfect example of "shotgun" pleading, see <u>Pelletier v. Zweifel</u>, 921 F.2d 1465, 1518 (11th Cir.), <u>cert. denied</u>, 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991), in that it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.   Under the Federal Rules of Civil Procedure, a defendant faced with a complaint such as Anderson's is not expected to frame a responsive pleading. Rather, the defendant is expected to move the court, pursuant to Rule 12(e), to require the plaintiff to file a more definite statement.... Where, as here, the plaintiff asserts multiple claims for relief, a more definite statement, if properly drawn, will present each claim for relief in a separate count , as required by Rule 10(b), ... and with such clarity and precision that the defendant will be able to discern what the plaintiff is claiming and to frame a responsive pleading.  Moreover, with the shotgun pleading out of the way, the trial judge will be relieved of "the cumbersome task of sifting through myriad claims, many of which [may be] foreclosed by [various] defenses." <u>Fullman v. Graddick</u>, 739 F.2d 553, 557 (11th Cir. 1984).   Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." (Footnotes omitted).

<u>See also</u> <u>Davis v. Coca Cola Bottling Co. Consol.</u>, 516 F.3d 955, 979-985 (11th Cir. 2008).

As long as a complaint is minimally sufficient to put a defendant on notice of the claims against him, the complaint will not fail for mere surplusage.  <u>Bailey v. Janssen Pharmaceutica, Inc.</u>, 288 Fed. Appx 597 (11th Cir. 2008).   The Court discourages pleading in which it is not clear which facts support which cause of action.  However,

Case No. 8:12-CV-1837-T-17MAP

the Court will overlook the extraneous factual allegations where possible, treating extraneous allegations as background, in adjudicating the pending motions.

2)  Wrong Party

In the Crossclaim, Crossclaim Plaintiffs allege:

> 11. Bridgeview is, upon information and belief a Delaware corporation doing business nationally and in Sarasota County, Florida. The tortious acts alleged in this complaint were performed by the Bridgeview in Sarasota County, Florida.

Defendant BBI argues that Crossclaim Plaintiffs have named the wrong party. If Crossclaim Plaintiffs have named the parent holding company instead of a related entity which conducts banking activities and in which SAA maintained checking accounts and decide to amend the Counterclaim/Crossclaims, Crossclaim Plaintiffs are granted leave to file an amended complaint within fourteen days to name the correct party.

B.  Subject Matter Jurisdiction

Starr argues that Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC were not incorporated at the time of the Starr/Kaplan conversation in August 2009, and therefore they do not have standing to bring a claim against Starr for fraud or negligent misrepresentation.

To have standing, each Crossclaim Plaintiff must show: 1) it suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; 2) the injury is fairly traceable to Starr's conduct; and 3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision. Kelly v.

Case No. 8:12-CV-1837-T-17MAP

Harris, 331 F.3d 817, 819-20 (11th Cir. 2003).


The factual allegations in paragraphs 21 through 35 encompass the alleged representations and conduct of Starr in August, 2009, made to Kaplan.  In Count II, Crossclaim Plaintiffs allege a conspiracy to defraud that commenced at some time prior to August 2009 and ended in January, 2012.  Each act done in pursuance of the conspiracy by one of several co-conspirators is an act for which each is jointly and severally liable.  Nicholas v. Kellin, 481 So.2d 931, 935 (Fla. 5th DCA 1985).

The Court may take judicial notice of public records.  The above entities were incorporated during the time that the alleged conspiracy to defraud was being carried out.

Starr could not have made any representations to the designated Investment Companies.  After consideration, Starr's Motion to Dismiss (Dkt. 36) for lack of standing as to Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC on Count I, fraud, and Count III, negligent misrepresentation is **granted**.

C.  Personal Jurisdiction

BBI moves to dismiss for lack of personal jurisdiction.  This case was removed on the basis of federal question jurisdiction.  (Dkt. 1).

1.  RICO

Section 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found.  When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction.  In re Chase and

Case No. 8:12-CV-1837-T-17MAP

Sanborn Corp., 835 F.2d 1341, 1344 (11th Cir. 1988), rev'd on other grounds sub nom.
Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989).

## 2. Due Process

The due process clause of the Fifth Amendment constrains a federal court's
power to acquire personal jurisdiction via nationwide service of process.

### a. Purposeful Availment

The relevant forum under the Fifth Amendment is the United States. Where a
defendant is incorporated in the United States, that defendant has purposefully directed
its activities at the United States.

### b. Minimum Contacts

Once it is established that a defendant has purposefully directed its activities at a
particular forum, the Court determines whether the assertion of personal jurisdiction
would comport with "fair play and substantial justice." Madara v. Hall, 926 F.2d 1510,
1517 (11th Cir. 1990).

Minimum contacts with the forum state are not constitutionally required. Where
the relevant forum is the United States, the aggregate contacts with the United States
are of significance.

### 1. Fairness

In this context, "fairness" involves the consideration of whether litigating in this
forum will impose an unreasonable burden on the defendant. The Court balances the

Case No. 8:12-CV-1837-T-17MAP

burdens on the individual defendant against the federal interest involved in the litigation. The Court considers a defendant's contacts with the nation as a whole rather than contacts with the individual forum state. <u>United States Securities and Exchange Commission v. Carrillo</u>, 115 F.3d 1540 1543-44 (11th Cir. 1997).

When a defendant makes a showing of constitutionally significant inconvenience, the exercise of jurisdiction comports with due process only if the federal interest in litigating the dispute in the chosen forum outweighs the burdens imposed on the defendant. <u>Republic of Panama v. BCCI Holdings (Luxembourg), S.A.</u>, 119 F.3d 935, 948 (11th Cir. 1997).

Litigation in a forum in which a corporate defendant does not do business or have an office imposes burdens. However, "[m]odern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum." <u>Chase and Sanborn</u>, 835 F.2d at 1346. The burden is on the defendant to establish that the assertion of jurisdiction in this forum will make litigation so gravely difficult that the defendant will be at a severe disadvantage in comparison to his opponent. <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 478 (1985).

In this case, BBI has not established that litigation in this forum will put BBI at a severe disadvantage in comparison to Counterclaimants. Because BBI has not shown inconvenience of constitutional significance, it is not necessary for the Court to balance the burden on BBI with the federal interest involved in this case.

After consideration, the Court **denies** the Motion to Dismiss (Dkt. 19) for lack of personal jurisdiction.

D. Count I   Fraud

16

Case No. 8:12-CV-1837-T-17MAP

Starr moves to dismiss under Fed. R. Civ. P. 9(b), which requires that the circumstances constituting the fraud or mistake shall be stated with particularity.

Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.' " Ziemba v. Cascade International, 256 F.3d at 1202 (citing Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1371(11th Cir. 1997)).  A list containing allegations of fraud describing the nature and subject of statements has been found to be sufficient, even where precise words used were not alleged. Brooks, 116 F.3d at 1371 (citing Seville Indus. Machine Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3rd Cir.1984)).

The factual allegations in paragraphs 21 through 35 encompass the alleged representations and conduct of Starr in August, 2009, made to Kaplan.  In paragraph 38, Counterclaim/Crossclaim Plaintiffs allege that "the Conspirators would then take some or all of the money or compensation for themselves, constantly cycling and floating what remained among the many victims to maintain the illusion that the fictional investments were paying off and to induce still more investment into the scheme."

Based on the allegations within the Counterclaim/Crossclaims, it is undisputed that Kaplan and the Investment Companies discussed the proposed investments with the Smiths/SAA, after which Kaplan and the Investment Companies decided to make their investments.  There are no allegations as to Starr's direct participation in the alleged scheme other than the representations identified above.  Based on the promissory notes attached to the Counterclaim/Crossclaims, the transactions were

17

Case No. 8:12-CV-1837-T-17MAP

between the Investment Companies and Smiths/SAA.  Starr was not a party to the
transactions.

After consideration, the Court **grants** Starr's Motion to Dismiss as to Count I.

E.  Count II    Conspiracy to Defraud

BBI and Starr move to dismiss Count II for failure to state a claim.

A civil conspiracy requires: (a) an agreement between two or more parties; (b) to
do an unlawful act or to do a lawful act by unlawful means; (c) the doing of some overt
act in pursuance of the conspiracy; and (d) damage to the plaintiff as a result of the
acts done under the conspiracy.   Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla. 3d DCA
1997).   An actionable conspiracy claim requires an actionable underlying tort or wrong.
Wright v. Yurko, 446 So.2d 1162, 1164 (Fla. 5th DCA 1984).

In a criminal case, the purpose of a charge of conspiracy is to punish the act of
agreement itself; there is no need to prove that the conspiracy led to an injury-causing
criminal activity.  In a civil case, the purpose of a civil conspiracy claim is to impute joint
liability to all the members of the conspiracy. Beck v. Prupis, 162 F.3d 1090, 1099 (11th
Cir. 1998).  In a civil conspiracy, a plaintiff must prove that someone in the conspiracy
committed a tortious act that proximately caused plaintiff's injury; the plaintiff can then
hold other members of the conspiracy liable for the injury.  Every member of an alleged
conspiracy may carry out a different part of the conspiracy, but all share in the liability
for the tortious acts done in furtherance of the conspiracy.  The presence of a
conspiracy is often established by circumstantial evidence rather than direct evidence.
Under Florida law, a civil conspiracy may be established by circumstantial evidence
only when the inference sought to be created by such circumstantial evidence
outweighs all reasonable evidence to the contrary.  See Diamond v. Rosenfield, 511

18

Case No. 8:12-CV-1837-T-17MAP

So.2d 1031, 1034 (Fla. 4th DCA 1987).  A person who joins a conspiracy with
knowledge of its actual purpose and scope may be held liable for activity in furtherance
of the conspiracy which took place before they joined it.  See James v. Nationsbank
Trust Co. (Florida) National Association, 639 So.2d 1031, 1033 (Fla. 5th DCA 1994).

From the allegations of the Counterclaim/Crossclaims, the Court understands
that the alleged conspiracy to defraud commenced at some point prior to August, 2009
and continued until January 24, 2012, when SAA's account(s) at BBI were frozen.
Agreement to participate in the Ponzi scheme in exchange for money is the essence of
the civil conspiracy claim.

1.  Starr

Starr's alleged role was to act as the "pitch man" to lure Kaplan and the
Investment Companies into the fraudulent scheme and then to hand them off to the
Smiths/SAA.  Counterclaim/Crossclaim Plaintiffs allege generally that Starr, as a
conspirator, received money for his acts in furtherance of the conspiracy.
Counterclaim/Crossclaim Plaintiffs have included no factual allegations as to when and
how Starr obtained Starr's alleged knowledge of the purpose and scope of the alleged
conspiracy, when and how Starr joined the alleged conspiracy, and how Starr received
anything for his alleged participation.

2.  BBI

Crossclaim Plaintiffs allege that BBI allowed the other conspirators to utilize BBI
as a repository and accounting system in exchange for compensation.  BBI is a banking
company; this allegation could mean that BBI entered into an account agreement with
SSA for a general deposit account or accounts, and BBI charged typical monthly
service fees associated with the accounts.  The Court "may infer from the factual

19

Case No. 8:12-CV-1837-T-17MAP

allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the Court to infer." American Dental Association v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010).  The above allegation could also mean that BBI maintained SAA's checking accounts, and was paid extra compensation to perform unidentified services specifically related to the Ponzi scheme.  The allegation that BBI provided "conscious and knowing support" to other Conspirators and allowed the Conspirators to maintain accounts is an allegation of aiding and abetting rather than direct participation.

Counterclaim/Crossclaim Plaintiffs allege that SAA maintained accounts at BBI, that BBI transferred funds between accounts, and that BBI "floated" checks.  It is unclear whether Plaintiffs are alleging that an employee at BBI arranged and carried out transfers, or BBI permitted SAA to maintain checking accounts for which access to online services was provided, and the account holders electronically carried out transfers, which is the obvious alternative explanation.

The Court understands the allegation that "BBI 'floated' checks" to mean that BBI extended provisional credit on a routine basis to SAA.  The alleged fraudulent scheme in Count I was the inducement of Kaplan and Investment Companies to invest in an alleged business opportunity which was fictional.  After Counterclaim/Crossclaim Plaintiffs accepted each offer to invest, promissory notes were signed and sent by SAA, money was transferred to SAA's accounts by a wire transfer, and checks were sent to Counterclaim/Crossclaim Plaintiffs the same day, which Counterclaim/Crossclaim Plaintiffs then deposited in their accounts.  To outward appearances, the repetition of the cycle of transfers and checks is a routine activity.  The authorized extension of provisional credit does not necessarily involve fraud or check kiting, but the systematic and recurrent use of provisional credit could indicate the presence of a fraudulent scheme.  At this point it is unclear what the account activity of SAA's accounts or other records would reveal, if anything.

Case No. 8:12-CV-1837-T-17MAP

Counterclaim/Crossclaim Plaintiffs further allege that BBI "induced investors to wire funds by manipulating and false statements." It is unclear whether Counterclaim/Crossclaim Plaintiffs are alleging that BBI's employees made representations to Counterclaim/Crossclaim Plaintiffs or whether Counterclaim/Crossclaim Plaintiffs are relying on transactions in accounts to which Counterclaim/Crossclaim Plaintiffs had electronic access. While it is not necessary for the specific person at BBI to be identified at this stage, the Court expects some identification of time, place and content. If Counterclaim/Crossclaim Plaintiffs are referring to the fact that BBI returned checks to Regions Bank which were marked "Refer to Maker" the Court needs to know that is the factual basis on which Counterclaim/Crossclaim Plaintiffs are relying. The Counterclaim alleges the Investment Companies made wire transfers to BBI on January 20, 2012, January 23, 2012, and January 24, 2012. The Crossclaim further alleges that Regions Bank notified the Investment Companies on January 25, 2012 that checks were returned marked "Refer to Maker." Therefore, the returned checks marked "Refer to Maker" did not induce the Investment Companies to make wire transfers to BBI.

After consideration, the Court **grants** Starr's and BBI's Motions to Dismiss as to Count II, with leave to file an amended Counterclaim/Crossclaims within fourteen days.

F. Count III   Negligent Misrepresentation

Starr moves to dismiss Count III for failure to state a claim.

To state a cause of action for negligent misrepresentation, a plaintiff must show:
1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false;

(2) the defendant was negligent in making the statement because he should have known the representation was false;

Case No. 8:12-CV-1837-T-17MAP

(3) the defendant intended to induce the plaintiff to rely and [sic] on the misrepresentation; and

(4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.

See Specialty Marine & Industrial Supplies, Inc. v. Venus, 66 So.3d 306, 309 (Fla. 1st DCA 2011).

Based on the allegations of the Counterclaim/Crossclaims, and the attachments, it is undisputed that Kaplan and the Investment Companies discussed the proposed investments with Smiths/SAA, and entered into transactions only with Smiths/SAA. Starr was not a party to the transactions.

After consideration, the Court **grants** Starr's Motion to Dismiss as to Count III.

G.  Count IV  18 U.S.C. Sec. 1962, 1964

Starr moves to dismiss Count IV for failure to state a claim.

18 U.S.C. Sec. 1962(c) provides:

**(c)**   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In Count IV, Counterclaim/Crossclaim Plaintiffs allege:

185.   Starr, T. Smith, G. Smith, L. Smith, Bridgeview and SAA were employed by or associated with an enterprise, namely the Ponzi scheme related above, and engaged in the activities referenced above with full knowledge of their purpose to defraud.

Case No. 8:12-CV-1837-T-17MAP

186.   The Ponzi scheme affected interstate commerce insofar as it made use of interstate mails and wires to commit fraud.

187.   Starr, T. Smith, G. Smith, L. Smith, Bridgeview and SAA conducted or participated directly or indirectly, in the conduct of the Ponzi scheme's affairs through a pattern of racketeering activity in which all were knowingly engaged.

188.   The racketeering activities engaged in by Starr, T. Smith, G. Smith, L. Smith, Bridgeview and SAA are indictable under 18 U.S.C. Sec. 1341 and 18 U.S.C. Sec. 1343.

189.   There are two or more acts of such racketeering activity.

190.   As a proximate and factual result of the racketeering activity, the Investment Companies have suffered damages and/or injuries to their business interest and/or property.

The allegations of Count IV track the provisions of 18 U.S.C. Sec. 1962(c).  The Court understands Count IV to be a claim only under 18 U.S.C. Sec. 1962(c), and not under 18 U.S.C. Sec. 1962(d), which provides:

(d)   It shall be unlawful for any person to conspire to violate (a), (b) or (c) of this section.

In a civil RICO claim, the plaintiff must allege and prove injury from a predicate racketeering act.  In this case, the predicate acts are mail fraud and wire fraud.

The factual allegations of the Counterclaim/Crossclaims indicate that Starr's alleged role in the Ponzi scheme was to explain the investment to Kaplan in August, 2009.  There is no allegation that Starr participated in the predicate acts of mail fraud and wire fraud. Counterclaim/Crossclaim Plaintiffs have not alleged a RICO conspiracy claim.  If Counterclaim/Crossclaim Plaintiffs intend to assert a RICO conspiracy claim, it should be stated in a separate count.

Case No. 8:12-CV-1837-T-17MAP

After consideration, the Court **grants** Starr's Motion to Dismiss as to Count IV, with leave to amend within fourteen days.

## H. Count V   F.S. 772.103, 772.104

Starr moves to dismiss Count V for failure to state a claim.

<u>Florida</u> <u>Statute</u> 772.103(3) provides that it is unlawful for any person :

(3) employed by or associated with any enterprise to conduct or participate, directly or indirectly, in such enterprise, through a pattern of criminal activity or the collection of an unlawful debt.

The analysis applied to federal RICO claims applies equally to Florida RICO claims.  <u>Jackson v. Bellsouth Telecommunications</u>, 372 F.3d 1250 (11th Cir. 2004).

For the same reason stated in Count IV, the Court **grants** Starr's Motion to Dismiss as to Count V, with leave to amend within fourteen days.

## I. Count VIII FDUTPA

This claim is addressed to T. Smith, G. Smith, L. Smith, SAA and BBI.  BBI moves to dismiss for failure to state a claim.

BBI argues that Counterclaim/Crossclaim Plaintiffs have not pled the necessary facts to establish a breach of FDUTPA by BBI.  BBI contends that the only deceptive act alleged is the withholding, converting or misappropriating of Counterclaim/Crossclaim Plaintiffs' funds.  BBI argues that the deceptive acts alleged are those of the Smith Defendants, and their inducements to the Investment Companies.

24

Case No. 8:12-CV-1837-T-17MAP

BBI argues that the only representations made by BBI were the dishonorment of fraudulent checks, and those representations were made to Regions Bank when it returned the checks marked "Return to Maker". BBI argues that the representations are not deceptive, and are truthful, appropriate and expressly contemplated by 12 C.F.R. Pt. 229.30(d). BBI further argues that Crossclaim Plaintiffs do not show how BBI's actions caused the damage complained of.

Counterclaim/Crossclaim Plaintiffs respond that they pled that the Ponzi scheme is a consumer transaction within the meaning of FDUTPA, and that BBI and the conspirators withheld, converted and misappropriated the funds invested by the Investment Companies, which directly and proximately caused actual damages.

The representation "Refer to Maker" is expressly contemplated by 12 C.F.R. Pt. 229.30(d); this is an "obvious alternative explanation" which suggests lawful activity. If the fraudulent scheme is the inducement of Counterclaim/Crossclaim Plaintiffs to enter into a fictional investment which caused Counterclaim/Crossclaim Plaintiffs' losses, it is not clear how BBI's conduct caused Counterclaim/Crossclaim Plaintiffs' losses.

After consideration, the Court **grants** BBI's Motion to Dismiss as to Count VIII, with leave to amend within fourteen days.

J. Count XI   Breach UCC 4-302(A)

BBI moves to dismiss Count XI for failure to state a claim.

Florida has adopted the U.C.C. Regulation CC, governing Availability of Funds and Collection of Checks, 29 C.F.R. Pt. 229, supersedes any inconsistent provisions of the U.C.C. as adopted by any state, but only to the extent of the inconsistency. See 29