UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK,
etc.,
        Plaintiff,

v.                                     CASE NO.  8:12-CV-1837-T-17MAP

MARVIN I. KAPLAN, etc.,
et al.,
        Defendants.

_____/

MARVIN I. KAPLAN, etc.,
et al.,

        Counterclaim/Crossclaim
        Plaintiffs,

v.

REGIONS BANK, etc.,
et al.,

        Counterclaim/Crossclaim
        Defendants.

_____/

ORDER

This cause is before the Court on:

Dkt. 258     Motion for Reconsideration
Dkt. 268     Response
Dkt. 279     Notice of Supplemental Authority

Crossclaim Defendant Charles Larry Starr III ("Starr") moves for reconsideration of the Court's Order denying his Motion to Dismiss Counts II, IV, V, VI and VII.

Crossclaim Plaintiffs Marvin I. Kaplan, R1A Palms, LLC, Triple Net Exchange,

Case No. 8:12-CV-1837-T-17MAP

LLC, MK Investing, LLC, and BNK Smith, LLC oppose the Motion for Reconsideration.

In the Court's initial Order (Dkt. 84) on Motions to Dismiss
Counterclaim/Crossclaim, the Court ruled as follows:

| Count I | Fraud | granted dismissal without leave to amend |
|---|---|---|
| Count II | Conspiracy to Defraud | granted dismissal with leave to amend |
| Count III | Negligent Misrepresentation | granted dismissal without leave to amend |
| Count IV | Violation of 18 U.S.C. Sec. 1962(c) and 1964 | granted dismissal with leave to amend |
| Count V | Violation 772.103, 772.104, Fla. Stat. | granted dismissal with leave to amend |

As to Count II, the Court granted dismissal based on the absence of allegations explaining when and how Starr obtained knowledge of the purpose and scope of the conspiracy, when and how Starr joined the conspiracy, and how Starr received anything for his participation.

As to Count IV, the Court granted dismissal based on the absence of an allegation that Starr participated in the predicate acts of mail fraud or wire fraud. The Court also directed that any RICO conspiracy claim should be stated in a separate count.

As to Count V, the Court granted dismissal for the same reason as Count IV.

2

Case No. 8:12-CV-1837-T-17MAP

Counterclaim/Crossclaim Plaintiffs filed the Amended Counterclaim/Crossclaim (Dkt. 93), which named Counterclaim Defendant Starr in the following Counts:

| Count I | Fraud |
|---|---|
| Count II | Conspiracy to Defraud |
| Count III | Negligent Misrepresentation |
| Count IV | Violation of 18 U.S.C. Sec. 1962(c) and Sec. 1964 |
| Count V | Violation of 18 U.S.C. Sec. 1962(d) and Sec. 1964 |
| Count VI | Violation of Sec. 772.103(3) and 772.104, Fla. Stat. |
| Count VII | Violation of Sec. 772.103(4) and 772.104, Fla. Stat. |

General factual allegations of the actions of Counterclaim Defendant Starr are stated in Paragraphs 17-65.

"The Smiths" includes G. Todd Smith, Gary T. Smith, Lucy B. Smith and Smith Advertising & Associates, Inc. Counterclaim/Crossclaim Plaintiffs allege that the Smiths committed the torts alleged in Sarasota County, Florida, the contracts were entered into in Sarasota County, Florida and were to be performed in Sarasota County, Florida. The Court understood the following facts to be true for the purpose of ruling on Starr's Motion to Dismiss:

At some time prior to 2009 the Smiths operated a legitimate printing business. (Par. 38)

The Smiths are believed to have met Starr during that time, after Starr moved to Florida and worked for the Sarasota Tourism Convention and Visitors Bureau. (Par. 41).

During that time Starr and the Smiths realized that the Smiths' prior legitimate business could be used to jointly create a Ponzi scheme generating large returns for them. (Par. 42).

Starr either participated in developing or actually developed the fraudulent scheme himself, using his knowledge of the industry as a base and then

Case No. 8:12-CV-1837-T-17MAP

creating exaggerated contracts to take in money for the scheme. (Par. 58).

Starr and the Smiths agreed to pitch the investment scheme to Kaplan and R1A. (Par. 43).

Prior to August, 2009, Kaplan did not know Starr. (Par. 20).  In August, 2009, Kaplan moved his office to a building owned and managed by Starr. (Par. 18).

The office space arrangement was in the nature of an executive office which shared and pooled secretarial and other functions for a number of people or entities.  (Par. 19).

In August, 2009, Starr explained the investment scheme to Kaplan and R1A, and offered to introduce Kaplan to the Smiths. (Pars. 21-35).

As Starr explained, the investor would immediately receive his share of the 10% discount by a check from SAA.  The investor would also receive a promissory note or notes guaranteed by G. Smith and T. Smith and one or more checks representing the return of the principal, which were to be cashed after thirty days had expired and SAA received payment from the customer.  (Par. 32).

Kaplan met with the Smiths, and made an investment of personal funds ($50,000.00).  The investment was successful, and Kaplan continued to invest.  (Pars. 68-72).

All of Starr's and Smiths' statements to Kaplan and the Investment Companies were false, and they knew them to be false as all were direct participants in the fraud and received undisclosed compensation and kickbacks from bringing money into the scheme.  (Par. 37).

Starr's role in the alleged conspiracy was to pitch the investment scheme to new sources of money, and lead those sources to the Smiths, with false promises of large returns on what appeared to be a legitimate business model.  (Par. 45).

Starr and the other conspirators took money or compensation for themselves, while maintaining the illusion that the fictional investments were paying off, and to induce more investment in the scheme.  (Par. 46).

Starr and the Smiths selected Bridgeview Bank to effectuate the scheme.

4

Case No. 8:12-CV-1837-T-17MAP

(Par. 51).

Starr, in collusion with the Smiths, targeted individuals such as Kaplan, and offered the investment scheme in order to steal money. (Par. 56).

Starr knew that the printing contracts and customers involved in the investment deals the Smiths offered to Kaplan did not exist. (Par. 57).

During the time the Kaplan Parties invested in the scheme, the conspirators continuously lured new investors, and continuously stole a large portion of the invested money, leaving only enough to fund fluctuations in investment and cloak the fraud. (Pars. 60-63).

As to Count II, Counterclaim/Crossclaim Plaintiffs alleged:

The Conspirators entered into an agreement between themselves to unlawfully defraud the Investment Companies, engaged directly and overtly in the above-described conduct in pursuance of the conspiracy, and the Investment Companies were damaged by the unlawful conduct. (Pars. 193-195).

As to Count IV, Counterclaim/Crossclaim Plaintiffs alleged:

Starr, the Smiths and Bridgeview were associated with an enterprise, and engaged in the above activities with knowledge of their purpose to defraud. (Par. 202).

Starr participated directly in the acts of mail fraud insofar as he actually monitored and tracked with a log the mailings as they came and went from Kaplan's office, assisting the Smiths to track the transactions to ensure payment of his commissions. He also participated by drawing off commissions and compensation as the investments occurred. (Par. 203).

The Ponzi scheme affected interstate commerce insofar as it made use of interstate mails and wires to commit fraud. (Par. 204).

Starr, the Smiths and Bridgeview conducted or participated, directly or indirectly in the conduct of the Ponzi scheme's affairs through a pattern of racketeering activity in which all were knowingly engaged. (Par. 205).

The racketeering activities engaged in by Starr, the Smiths and

Case No. 8:12-CV-1837-T-17MAP

Bridgeview are indictable under 18 U.S.C. Sec. 1341 and 18 U.S.C. 1343. (Par. 206).

There are two or more acts of such racketeering activity. (Par. 207).

As a proximate and factual result of the racketeering activity, the Kaplan Parties suffered damages and/or injuries to their business interests and/or property. (Par. 208).

As to Count V, Counterclaim/Crossclaim Plaintiffs allege:

Starr, the Smiths and Bridgeview entered into and conducted a conspiracy to violate 18 U.S.C. Sec. 1962(c) . (Par. 210).

As a proximate and factual result of the racketeering activity, the Investment Companies have suffered damages and/or injuries to their business interests and/or property. (Par. 211).

As to Count VI, Counterclaim/Crossclaim Plaintiffs allege:

Starr, the Smiths and Bridgeview were associated with an enterprise and engaged in the activities referenced above with full knowledge of their purpose to defraud. (Par. 213)

Starr, the Smiths and Bridgeview conducted or participated, directly or indirectly in the conduct of the Ponzi scheme's affairs through a pattern of racketeering activity in which all were knowingly engaged. (Par. 214).

The criminal activities engaged in by Starr, the Smiths and Bridgeview included engaging or conspiring to engage in acts of fraud and in mail and wire fraud and violation of Sec. 812.014, Fla. Stat. (Par. 215).

Starr participated directly in the acts of mail fraud insofar as he actually monitored and tracked with a log the mailings as they came and went from Kaplan's office, assisting the Smiths to track the transactions to ensure payment of his commissions. He also participated by drawing off commissions and compensation as the investments occurred. (Par. 216).

There are two or more acts of such criminal activity. (Par. 217).

As a proximate and factual result of the criminal activity, the Investment

Case No. 8:12-CV-1837-T-17MAP

  Companies suffered damages an/or injuries to their business interests
and/or property. (Par. 218).

  As to Count VII, Counterclaim/Crossclaim Plaintiffs allege:

  Starr, the Smiths and Bridgeview entered into and conducted a conspiracy
to violation Sec. 772.103(3), Fla. Stat. (Par. 220).

  As a proximate and factual result of the racketeering activity, the
Investment Companies suffered damages and/or injuries to their business
interests and/or property.

  Attachments to Amended Counterclaim/Crossclaim:

  Promissory notes that state date of loan by each company, [1/20/2012,
1/23/2012, 1/24/2012] and date loan will  be repaid in full.  (67 Exhibits).

I. Standard of Review

  The decision to grant a motion for reconsideration is within the sound discretion
of the trial court and will only be granted to correct an abuse of discretion. Region 8
Forest Serv. Timber Purchases Council v. Alcock, 993 F.2d 800, 806 (11th Cir. 1993).
There are three bases for reconsidering an order: " (1) an intervening change in
controlling law; (2) availability of new evidence; and (3) the need to correct clear error or
prevent manifest injustice.  Sussman v. Salem, Saxon & Nielsen, P.A., 153 F.R.D. 689,
694 (M.D. Fla. 1994). See also Lamar Adver. of Mobile, Inc. v. City of Lakeland, 189
F.R.D. 480, 489 (M.D. Fla. 1999).

  Furthermore, a motion for reconsideration does not provide an opportunity to
simply reargue, or argue for the first time, an issue the Court has once determined.
Court opinions are "not intended as mere first drafts, subject to revision and
reconsideration at a litigant's pleasure." Quaker Alloy Casting Co. v. Gulfco Indus., Inc.,

Case No. 8:12-CV-1837-T-17MAP

123 F.R.D. 282, 288 (N.D. Ill. 1988). The reconsideration of a previous order is an "extraordinary remedy" and "must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." Ludwig v. Liberty Mutual Fire Ins. Co., 2005 WL 1053691 (citing Lamar, 189 F.R.D. at 489 (M.D. Fla. 1999)).

II. Discussion

Starr contends that the Court committed clear error in failing to apply binding Eleventh Circuit precedent that mandates dismissal of the Amended Crossclaims. Starr argues that:  1) the Court impermissibly inferred facts that Rule 9(b) required Crossclaim Plaintiffs to specifically plead; 2) Crossclaim Plaintiffs did not plead the specifics of the alleged fraud; 3) the Amended Crossclaims impermissibly "lump together" the conduct of all defendants; 4) the Court wrongly concluded that "given the above factual scenario, there are factual issues present that could affect the Court's determination and which the Court cannot evaluate at this stage." (Dkt. 244, p. 15); 6) Crossclaim Plaintiffs still do not plausibly show that Starr committed any mail or wire frauds.

Crossclaim Plaintiffs respond that Starr merely disagrees with the Court's application of the law to the facts of this case, and Crossclaim Plaintiff have included sufficient facts to maintain their causes of action against Starr.

A. Plausible Showing that Starr Committed Mail or Wire Frauds

In American Dental Ass'n v. Cigna Corp., 605 F.3d 1283 (11th Cir. 2010), the Eleventh Circuit Court of Appeal held that the plaintiff's complaint did not plausibly or particularly allege a pattern of racketeering activity predicated on a scheme to commit acts of mail and wire fraud, and plaintiffs failed to plausibly allege a conspiracy to commit RICO violations.   The plaintiffs failed to plausibly allege a conspiracy to

8

Case No. 8:12-CV-1837-T-17MAP

commit RICO violations "where plaintiffs merely offered conclusory allegations of
agreement accompanied by statements of parallel behavior, which just as easily
suggest independent, lawful action." Id at 1296.


The Court has examined the factual allegations of the Amended
Counterclaim/Crossclaim as to the sufficiency of the allegations of mail fraud and wire
fraud, the predicate acts of the RICO and Florida RICO counts.


The Court begins by considering the scope of alleged scheme. Schmuck v.
United States, 489 U.S. 705 (1989)(affirming mail fraud conviction; mailing preserved
the appearance of propriety in furtherance of scheme). Starr devised the scheme, or
Starr and the Smiths devised the scheme, and agreed to present it to Kaplan. Starr
and the Smiths selected Bridgeview Bank to effectuate the scheme. Starr pitched the
scheme to Kaplan in August, 2009. Thereafter, the Smiths pitched the scheme to
Kaplan, who decided to invest. After the initial investment of $50,000.00 was
successful, Kaplan directed the Investment Companies to make investments with the
Smiths. The Investment Companies invested by making loans to the Smiths, who sent
checks and contracts to the Investment Companies. The checks were deposited in the
accounts of the Investment Companies; as time passed the Investment Companies
"rolled over" the principal "invested" to make new investments on a regular basis. By
November 2011, the Investment Companies had over seven million dollars
($7,000,000.00) collectively invested with the Smiths.  Thereafter, the Smiths
contacted Kaplan to offer a new investment idea involving larger "consolidated" deals
offering the same returns as the previous investments. Pursuant to the new scheme,
the Smiths sent contracts and checks by fedex to the Investment Companies, and on
the same day the Investment Companies wired funds from their Regions Bank
accounts to the Smith's Bridgeview account. The Investment Companies wired funds
for each successive deal as Region Bank advised them that the checks from the prior
deal cleared and the money was in the bank to wire. From November, 2011 through

Case No. 8:12-CV-1837-T-17MAP

January 20, 2012, the Investment Companies continued to invest in the contracts; the total investment grew to twenty-two million dollars ($22,000,000.00). The final investments included checks sent to the Investment Companies from the Smiths by federal express, after which the Investment Companies wired funds to the Smiths' Bridgeview account. After Regions put a hold on some checks, the Smiths wired funds to accounts of the Investment Companies at Regions Bank. Later, the Smiths sent checks to the Investment Companies via a special courier air flight. The Investment Companies deposited the checks in their Regions Bank accounts, but the checks were returned by Bridgeview. The scheme ended soon after Bridgeview froze the Smiths' account.

1) Mail fraud

18 U.S.C. Sec. 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T.

Case No. 8:12-CV-1837-T-17MAP

Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)),
or affects a financial institution, such person shall be fined not more than
$1,000,000 or imprisoned not more than 30 years, or both.

The elements of mail fraud and wire fraud include: 1) intentional participation in a
scheme or artifice to defraud another of money or property; and 2) the use or a
participant "causes" the use of the mails or wires for the purpose of executing the
scheme or artifice.   A "scheme to defraud" is defined in case law to mean "the
deprivation of something of value by trick, deceit, chicane, or overreaching."   United
States v. Pendergraft, 297 F.3d 1198 (11th Cir. 2002).   Mail and wire fraud are specific
intent crimes, requiring that a defendant act with a bad purpose to disobey or disregard
the law.   Ray v. Spirit Airlines, Inc., 767 F.3d 1220 (11th Cir. 2014).

A scheme to defraud need not contemplate the use of the mails [or wires] as an
essential part of the scheme as long as mailing is incident to an essential part of the
scheme.....Where one does an act with knowledge that the use of the mails [or wires]
will follow in the ordinary course of business, or where such use can be reasonably
foreseen, even though not actually intended, then he 'causes' the mails to be used."
Pereira v. U.S., 347 U.S. 1, 8-9 (1954).

The substance of the scheme is the offer to Crossclaim Plaintiffs of what was
portrayed to be a legitimate investment providing high returns to the investor, but which
the offeror knew was not a legitimate investment, and instead was merely a scheme to
induce the offeree to part with large amounts of money which the offeror took for
himself.  The scheme was initiated in August, 2009 and thereafter continued, with the
Investment Companies periodically making investments, until November, 2011, when
the form of the scheme changed.  In its second incarnation, the scheme continued from
November 2011 through January, 2012.

11

Case No. 8:12-CV-1837-T-17MAP

    As to the initial scheme, the Court has looked for a factual allegation of how the contracts and checks were sent from the Smiths to the Investment Companies, and how the Investment Companies made their investments with the Smiths.    Crossclaim Plaintiffs allege that after the initial investment was successful, the Investment Companies participated in more and more contracts with the Smiths, and over this time the Smiths continued to offer more and more investments and to renew the old ones, urging Kaplan through the Investment Companies to take new contracts upon the expiration of each prior contract, leaving the principal sum to "ride" from contract to contract  (Par. 72).   The Investment Companies held the checks from the investments, instead of depositing them.   (Par. 73).  The Smiths urged Kaplan to reinvest the returns and invest new money into the deals, until the Investment Companies had over seven million dollars invested with the Smiths. (Par. 75).  Crossplaintiffs allege a time span, but there are no specific allegations of when each investment was made, and the contracts for those investments are not attached to the Amended Counterclaim.  There is no factual allegation of how the Smiths sent the contracts and checks to the Investment Companies, or how the Investment Companies made their investments. Where there is no allegation that the scheme to defraud uses the mail or wires, or the scheme's participants cause the mail or wires to be used, the allegations do not amount to mail fraud or wire fraud.  The above allegations are not sufficient for a RICO claim based on acts of mail fraud or wire fraud.

    As to the second phase of the scheme, there are sufficient factual allegations of the use of private and commercial interstate carriers to deliver checks to the Investment Companies and the Investment Companies's subsequent use of wires to transfer funds to the Smiths, both in furtherance of the scheme to defraud.

    The allegations of the second phase of the investment scheme identify particular acts of mail fraud.  In order to prove a pattern of racketeering in a civil or criminal RICO case, a plaintiff must show at least two racketeering predicates that are related, and

12

Case No. 8:12-CV-1837-T-17MAP

that they amount to or pose a threat of continued criminal activity. H.J., Inc. v. NW Bell Tel. Co., 492 U.S. 229, 240 (1989). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." Id., at 242.

Continuity refers to either a closed period of repeated conduct, or to past conduct that by its nature projects in the future with a threat of repetition. In an open-ended case that relies on allegations of a threat of repetition, a plaintiff can meet his burden by establishing either that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future or that the predicate acts of offenses are part of an ongoing entity's regular way of doing business.

The relevant period for determining continuity is the time during which the predicate acts take place, not the time during which the entire scheme to defraud takes place. Coquina Investments v. TD Bank, N.A., 760 F.3d 1300 (11th Cir. 2014). This case involves a closed period of repeated conduct. The acts of mail fraud extended from November, 2011 through January, 2012. Courts have found that a period of time less than twelve months does not constitute a substantial period of time. Jackson v. Bellsouth Communications, Inc., 372 F.3d 1250 (11th Cir. 2004).

Crossclaim Plaintiffs alleged that Starr formulated the scheme to defraud, explained the scheme to defraud and steered Crossclaim Plaintiffs to the Smiths. The Smiths "signed up" Crossclaim Plaintiffs. The Smiths owned the Bridgeview account, signed the checks, and signed the contracts that stated the terms of Crossclaim Plaintiffs' investments, and which guaranteed the investments. Crossclaim Plaintiffs do not allege that Starr mailed or caused to be mailed any specific item or made any wire transfers.

13

Case No. 8:12-CV-1837-T-17MAP

Crossclaim Plaintiffs have not alleged mail fraud as to the scheme that extends
from August, 2009 to November, 2011, or identified particular transactions during that
time. The transactions which took place from November 2011 through January, 2012
are identified with particularity, but the time span is too short to be considered a
substantial amount of time. After consideration, the Court **grants** Crossclaim
Defendant Starr's Motion for Reconsideration as to Count IV (RICO) and Count VI
(Florida RICO).

Where a plaintiff fails to state a substantive RICO claim, and the conspiracy
count adds no additional allegations, the conspiracy claim necessarily fails. Rogers v.
Nacchio, 241 Fed. Appx. 602, 609 (11th Cir. 2007). Since the Court has found that the
allegations are insufficient to state a RICO claim under 18 U.S.C. Sec. 1962(d), and the
conspiracy count does not add additional allegations, the Court also **grants** the Motion
for Reconsideration as to Count V and Count VII.

B. The Specifics of the Alleged Fraud

Starr argues that Crossclaim Plaintiffs do not allege: 1) the statements,
documents or misrepresentations made; 2) time, place and person responsible for the
statement; 3) content and manner in which the statements misled the plaintiffs; 4) what
the defendants gained by the alleged fraud.

The Amended Counterclaim/Crossclaim includes allegations of alleged
statements made by Starr to Kaplan in August, 2009. Crossclaim Plaintiffs allege that
Starr explained the investment to Kaplan, represented that Starr was a long term friend
of the Smiths and had a twenty year history with them, and offered to introduce Kaplan
to the Smiths. These statements preceded Crossclaim Plaintiffs' decision to enter into
agreements with the Smiths. Because Counts I and III are dismissed, the Court did not
discuss these statements.

14

Case No. 8:12-CV-1837-T-17MAP

The Court notes that the Amended Counterclaim/Crossclaim includes additional factual allegations which indicate Starr's intentional participation in the scheme to defraud:   1)  Starr or Starr and the Smiths together conceived of using the Smiths' legitimate business to carry out a Ponzi scheme;  2)  Starr and the Smiths agreed to present the scheme to Kaplan as a legitimate investment when Starr knew it was not; 3) Starr's alleged role in the ongoing scheme was to target new investors and lead them to the Smiths;   4) Starr continuously lured new investors and received money . The receipt of proceeds from a scheme to defraud is circumstantial evidence of intent to participate in the scheme.

After consideration, the Court **denies** the Motion for Reconsideration as to Count II.

C.  Conduct of All Defendants Lumped Together

The Amended Counterclaim/Crossclaims do lump together the conduct of all Crossclaim Defendants by incorporating all factual allegations into all counts of the Complaint.   As the Court previously noted (Dkt. 84, p. 12), the Court elected to ignore extraneous facts as to each claim.

The Amended Counterclaim/Crossclaim includes many separate paragraphs of general allegations (Pars. 17-186).  Some of the allegations are vague and some are not; Crossclaim Plaintiffs allege that the "Conspirators" (identified as Starr, the Smiths, and Bridgeview) lured Kaplan and others to invest money in the scheme, while siphoning off money for their own use, presented new contracts to their "marks" to replace old ones, constantly pitched new contracts to induce investors to invest more "new money," which the Conspirators stole.  Other factual allegations make it clear that the Smiths entered into contracts with investors (Attachments)  and had the Bridgeview account; the Smiths signed the checks.  Bridgeview is identified as a "small Illinois bank

Case No. 8:12-CV-1837-T-17MAP

with no branches or offices in North Carolina, Florida or any other place that the Smiths or Starr were known to do business." (Par. 52).   Bridgeview's function, through its alleged complicit employee, was to be the out of town bank, with the attendant brief delay in check clearing that allowed the scheme to continue.

Crossclaim Plaintiffs have included factual allegations of the role allegedly performed by Starr, as noted above.  This is not a case in which Crossclaim Plaintiffs allege that "everyone did everything."

D.  Court's Conclusion

In determining a motion to dismiss, the Court only evaluates the sufficiency of the facts alleged in the pleading.   At a later stage, the Court evaluates the evidence to determine the presence of material disputed factual issues.

The Court has granted reconsideration as to Counts IV, V, VI and VII and denied reconsideration as to Count II.

E.  Impermissible Inference of Facts Crossclaim Plaintiffs Were Required to Plead

Starr argues that the Court impermissibly inferred that the Smiths had an office in Sarasota.

In the Amended Counterclaim/Crossclaim, Crossclaim Plaintiffs allege that the Smiths committed the torts alleged in Sarasota, entered into the contracts in Sarasota, and the contracts were to be performed in Sarasota.  The Court may have impermissibly inferred that the Smiths had an office in Sarasota in an attempt to understand how the alleged scheme operated.  This inference is a harmless error as to Count II, and reconsideration has been granted as to the other Counts asserted against

16

Case No. 8:12-CV-1837-T-17MAP

Starr.

F. Pleading on Information and Belief

By signing a pleading, the attorney or unrepresented party certifies to the Court
that, to the best of the person's knowledge, information and belief, formed after inquiry
reasonable under the circumstances, the factual contentions have evidentiary support,
or, if specifically so identified will likely have evidentiary support after a reasonable
opportunity for further investigation or discovery. Fed. R. Civ. P. 11(b)(3).   A party may
make factual contentions which are identified as made on information and belief, but
this does not relieve the party from the obligation to conduct an appropriate
investigation into the facts that is reasonable under the circumstances.   This rule is not
a license to make claims that have no factual basis or justification.   If the party who
makes the allegation does not obtain evidentiary support, the party has a duty not to
persist with that contention.

A complaint may justifiably be dismissed because of the conclusory, vague and
general nature of the allegations of conspiracy. Fullman v. Graddick, 739 F.2d 553,
557 (11th Cir. 1984).    Crossclaim Plaintiffs alleged that Starr knew the Smiths for
some time prior to 2009, represented to Crossclaim Plaintiffs that there was a long
history of friendship between Starr and the Smiths, had knowledge of the printing
industry, developed the scheme to defraud  himself or along with the Smiths, pitched
the scheme to Crossclaim Plaintiffs, steered Crossclaim Plaintiffs to the Smiths, and
received money from the scheme.   The Court has found that the allegations state a
claim for civil conspiracy. Accordingly, it is

ORDERED that the Motion for Reconsideration is **denied** as to Count II and
**granted** as to Counts IV, V, VI and VII.

Case No. 8:12-CV-1837-T-17MAP

**DONE and ORDERED** in Chambers in Tampa, Florida on this 30th day of March, 2015.

ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record