UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK, etc.,

        Plaintiff,

v.                          CASE NO.  8:12-CV-1837-T-17MAP

MARVIN I. KAPLAN, et al.,

        Defendants.

_____/

MARVIN I. KAPLAN, etc., et al.,

        Counterclaim/Crossclaim
        Plaintiffs,

v.

REGIONS BANK, etc., et al.,

        Counterclaim/Crossclaim
        Defendants.

_____/

ORDER

This cause is before the Court on:

| | |
|---|---|
| Dkt. 252 | Notice of Filing Declaration of M. Scott Newberger |
| Dkt. 538 | Notice of Filing Documents in Support (Bank Parties) |
| Dkt. 539 | Sealed Exhibits in Support of Joint Statement of Undisputed Facts |
| Dkt. 540 | Notice of Filing Deposition Transcripts and Exhibits in Support of Joint Statement of Undisputed Facts (Bank Parties) |
| Dkt. 541 | Notice of Filing Affidavits, Declarations and Exhibits in Support of Joint Statement of Undisputed Facts (Bank Parties) |
| Dkt. 542 | Joint Statement of Undisputed Facts (Bank Parties) |
| Dkt. 543 | Motion for Summary Judgment against Kaplan Entities (Regions Bank) |
| Dkt. 582 | Sealed Exhibits (Bank Parties) |

Case No. 8:12-CV-1837-T-17MAP

| | |
|---|---|
| Dkt. 583 | Notice of Filing (Kaplan Parties) |
| Dkt. 584 | Statement of Undisputed Facts re Dkt. 542 (Kaplan Parties) |
| Dkt. 586 | Response in Opposition |
| Dkt. 601 | Corrected Statement of Undisputed Facts in Opposition to Bank Parties Joint Statement of Undisputed Facts (Kaplan Parties) |
| Dkt. 602 | Corrected Response to Dkt. 543, Motion for Summary Judgment (Kaplan Parties) |
| Dkt. 596 | Sealed Exhibits (Kaplan Parties) |
| Dkt. 597 | Sealed Exhibits (Kaplan Parties) |
| Dkt. 598 | Sealed Exhibits (Kaplan Parties) |

Plaintiff Regions Bank moves for summary judgment against Defendants R1A Palms, LLC ("R1A"), Triple Net Exchange, LLC ("TNE"), MK Investing, LLC ("MKI"), and BNK Smith, LLC ("BNK") on the following Counts of the Second Amended Complaint (Dkt. 190):

| | |
|---|---|
| Count I | R1A's Breach of Deposit Agreement |
| Count II | R1A's Obligation of Reimbursement under F.S. 674.207(2) |
| Count III | R1A's Obligation of Refund under F.S. 674.2141(1) |
| Count IV | R1A's Obligation as Indorser under F.S. 673.4151(1) |
| | |
| Count VIII | TNE's Breach of Deposit Agreement |
| Count IX | TNE's Obligation of Reimbursement under F.S. 674.207(2) |
| Count X | TNE's Obligation of Refund under F.S. 674.2141(1) |
| Count XI | TNE's Obligation as Indorser under F.S. 673.4151(1) |
| | |
| Count XV | MKI's Breach of Deposit Agreement |
| Count XVI | MKI's Obligation of Reimbursement under F.S. 674.207(2) |
| Count XVII | MKI's Obligation of Refund under F.S. 674.2141(1) |
| Count XVIII | MKI's Obligation as Indorser under F.S. 673.4151(1) |
| | |
| Count XXII | BNK's Breach of Deposit Agreement |
| Count XXIII | BNK's Obligation of Reimbursement under F.S. 674.207(2) |
| Count XXIV | BNK's Obligation of Refund under F.S. 674.2141(1) |
| Count XXV | BNK's Obligation as Indorser under F.S. 673.4151(1) |

Case No. 8:12-CV-1837-T-17MAP

Counterclaim Defendant Regions Bank also seeks dismissal of Count XXIII, Negligence/Negligent Misrepresentation, of the Amended Counterclaim/Crossclaim (Dkt. 93). In Count XXIII, R1A, TNE, MKI and BNK allege:

316.    The Investment Companies were customers of Regions and Regions owed to them a duty of ordinary care and a duty to act in good faith in accordance with Fla. Stat. §674.103.

317.    Regions breached its duties to the Investment Companies by representing to the Investment Companies that the funds that they wired to SAA were cleared funds and not provisionally credited funds and thereby expressing an intent contrary to Fla. Sta. §674.201(a).

318.    At the time of the wire transfers on January 20th, 23rd and 24th, 2012, after direct inquiry by Kaplan on behalf of the Investment Companies to be certain that funds would only be wired to SAA if the previously deposited checks had fully cleared Bridgeview, both the head teller and the branch bank manager of the Regions bank branch located at 1626 Ringland [sic] Boulevard, Sarasota, Florida specifically advised Kaplan and the Investment Companies that the funds from the previously deposited checks referred to above had cleared Bridgeview and were not provisionally credited.

319.    Moreover, on January 20th and 23rd, 2012, with regard to both TNE and BNK, the wires were not made directly to SAA.

320.    With respect to those transactions, after specifically advising the Investment Companies that the funds from the previously deposited checks referred to above had cleared Bridgeview, Regions electronically transferred funds from the TNE and BNK accounts to the RI A account, which then wired the funds to SAA.

321.    Thus, to the extent that the wires to SAA on those dates contained funds from TNE and BNK, such funds were not governed by Fla. Stat. §674.201 because they were not

Case No. 8:12-CV-1837-T-17MAP

"items" within the meaning of Fla. Stat. §674.104 .

322.  Regions also breached its duty to The Investment
Companies by extending credit to the Investment
Companies despite the fact that all parties, through the
representatives described above, clearly expressed the
intent that provisional credits would not be relied upon for
these transactions as it was clear that the wires were only
to be sent if the funds were cleared and not provisional.

323.  The Investment Companies relied upon the material mis-
representations of Regions.

324.  As a direct and proximate result, the Investment Companies
were damaged insofar as they suffered the loss of the
amounts wired in reliance upon the supposedly cleared
funds.

I. Standard of Review

Summary judgment should be rendered if the pleadings, the discovery and
disclosure materials on file, and any affidavits, show that there is no genuine issue as to
any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(c).

"The plain language of Rule 56(c) mandates the entry of
summary judgment after adequate time for discovery and
upon motion, against a party who fails to make a showing
sufficient to establish the existence of an element essential
to that party's case, and on which that party will bear the
burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The appropriate substantive law will guide the determination of which facts are
material and which facts are...irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  All reasonable doubts about the facts and all justifiable inferences are

Case No. 8:12-CV-1837-T-17MAP

resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson, 477 U.S. at 248. But, "[i]f the evidence is merely colorable...or is not significantly probative...summary judgment may be granted." Id. at 249-50.

II. Background

The material recited facts are drawn from the Parties' Statements of Facts and other record evidence; the facts are either undisputed or taken in the light most favorable to Defendants. The Bank Parties' Statement of Undisputed Facts identifies the facts which apply to the respective Motion for Summary Judgment of each Party (Regions Bank, Bridgeview Bank Group, Wells Fargo Bank, N.A.). Kaplan Parties have filed a Statement of Disputed Facts in response (Dkt. 601).

A. Demand Deposit Accounts of R1A, TNE, MKI, BNK

The Parties have stipulated that all bank records (statements, wire transfer receipts, checks, deposit slips) are authentic copies of originals and are not hearsay evidence. (Stipulation at Grzenia Deposition, May 11, 2015, 57:5-59:24).

R1A, TNE, MKI and BNK had demand deposit accounts at Regions Bank:

R1A Account xxxx0211
TNE Account xxxx4180
MKI Account  xxxx4105
BNK Account xxxx9817

(Dkts. 541-3, 541-4, 541-5, 541-6, Account statements).

5

Case No. 8:12-CV-1837-T-17MAP

On December 21, 2011, Defendant Melvin Kaplan opened the R1A Account.  He signed the signature card, by which R1A acknowledged receiving and agreed to each and every term, condition, and provision of the Deposit Agreement, and related disclosures for the Account.  On December 22, 2011, Defendant Kaplan signed an exhibit to the Wire Transfer Agreement, authorizing Defendant Kaplan to initiate wires for R1A. (Kaplan Depo., 202-03, Ex. 30).  The exhibit lists the specific accounts from which funds could be transferred by the signatory, Defendant Melvin Kaplan, or an "Authorized Representative" in accordance with the Wire Transfer Agreement; this exhibit contains a line for "Special Instructions" which was left blank.

On September 12, 2011, Defendant Melvin Kaplan opened the TNE Account.  On the same date, Defendant Kaplan opened a personal account for himself and his wife, signing a signature card acknowledging receipt of the Deposit Agreement, and Defendant Kaplan opened a corporate account for MKI. (Newberger Declaration I, 4-5, Ex. 252-1).  On November 8, 2011 and December 22, 2011, Defendant Kaplan signed the Wire Transfer Agreement, authorizing Defendant Kaplan to initiate wires for TNE. (Kaplan Depo., 202-03, Exhibits 29, 30).  The Wire Transfer Agreement incorporates the Deposit Agreement:

> **3. Deposit Account Agreement**.  You acknowledge and agree that any demand deposit account you maintain with us is an integral part of the services offered by us and that all transactions initiated or processed pursuant to this agreement are subject to our terms and conditions governing accounts in effect from time to time (the "deposit agreement")......; provided that the terms and conditions of this agreement shall control over any inconsistent terms and conditions of the deposit agreement.  You acknowledge that you have signed and executed all agreements,....signature cards and forms governing your demand deposit account required by us.  If you have not signed the foregoing forms required by us, by signing any of this agreement, you acknowledge that you have read the contents of and agree to be bound by the terms of those forms, agreements and documents, and adopt and ratify, as an authorized signatory(s), the signature(s) of any person(s) who has signed

6

Case No. 8:12-CV-1837-T-17MAP

a signature card or any check on your account.

Wire Transfer Agreement (Exhs. 29, 30).

On October 28, 2011 and December 22, 2011, Defendant Melvin Kaplan signed an exhibit to the Wire Transfer Agreement authorizing Defendant Kaplan to initiate wires for MKI. (Exhs. 29, 30).

In October, 2011, Defendant Kaplan opened the BNK Account in the name of BNK Smith, Inc.   On October 28, 2011, Defendant Kaplan signed a Business Name Change Maintenance Request, changing the account owner to BNK Smith, LLC, and "ratif[ied]...all contracts to which the business is signed and...acknowledged under the Previous Name, including but not limited to the Regions Deposit Agreement..." (Kaplan Depo., 203-04, Exh. 28; Newberger Decl. I at 8; Exh. 1, Dkt. 252-2).

B.  Terms of the Deposit Agreement

The Deposit Agreement provides:

**1. Acceptance of This Agreement.**   By signing a signature card when you open an account, by signing any signature maintenance card or other account document for an account, by opening or modifying an account electronically, by depositing funds, or withdrawing funds from, any account, by being named as a beneficiary or joint owner by an existing account owner of an account, by using an account with us, or permitting anyone else to get access to your account through any of our electronic banking services, or by maintaining an account after our sending or providing to you by any reasonable means (including but not limited to: by mail to the mailing address we have for you on our records; by e-mail to the e-mail address we have for you on our records; by making available or publishing on or with the periodic statement of an account; by publishing on our official Web site at http://www.regions.com or any subsequent official Regions Bank Web site; or by making publicly available at any of our locations at the time you open or modify an account) this Agreement or any amendment(s) to this Agreement or by your receipt of same by any

7

Case No. 8:12-CV-1837-T-17MAP

means, you agree to the terms of this Agreement, our pricing schedule, funds availability policy as posted, and any supplemental provisions we print concerning your account, which are applicable.  All these documents together are a contract between you and us.

We may also provide you with agreements and disclosure statements ("Disclosure Statements") governing certain services associated with your account, including, but not limited to, ATM or debit card services, telephone or online banking services, preauthorized funds transfer services, and wire transfer services.  Both this Agreement and the Disclosure Statements govern those services.  If, however, any provision of this Agreement conflicts with any provision of a Disclosure Statement, then the conflicting provision of the Disclosure Statement shall prevail with respect to the corresponding service.  To the fullest extent permitted by law, we may provide you notices and disclosures by electronic means. You agree that, unless otherwise expressly agreed by us in writing, the deposits in your account are general deposits.  You further agree that the relationship between us and you with respect to any account covered by this Agreement, including one titled as a "trust account" or similar designation, is solely that of debtor and creditor, and that we are not acting as your fiduciary.

The Deposit Agreement further includes the following provisions:

You should read this Agreement carefully and keep it with your other account records.  The following terms and definitions apply when used in this Agreement:

......

*Item* - includes, without limitation, a check, draft, negotiable order of withdrawal, note, withdrawal slip, oral payment, transfer or withdrawal order made by telephone or in person, and/or withdrawal, payment or transfer order initiated through an automated teller machine (ATM) or point of sale (POS) terminal or other electronic device, means or network, and/or a check or draft you have authorized a third party to charge to your account, whether by any manual or any electronic means.

......

## 3. Deposits; Deposit of Substitute Checks

Case No. 8:12-CV-1837-T-17MAP

......

In addition to warranties provided elsewhere in this Agreement or provided by law, you warrant that all items, whether paper or electronic, deposited by you for collection by us are properly payable.

......

**4. Collection of Items**.  In receiving items for deposit or collection, we act as your collection agent and assume no responsibility beyond the exercise of ordinary care.  Special instructions for handling an item are effective only if made in a separate writing and given to us along with the item.  Any special instructions are subject to acceptance by us in our sole discretion, and, in any event, you must give us reasonable notice and opportunity to act on any special instructions you give us...Items and their proceeds may be handled in accordance with applicable Federal Reserve rules, clearinghouse rules, funds transfer system rules, and contractual agreements with other financial institutions.  All items are credited subject to final payment, and our receipt of cash or its equivalent.  Without prior notice to you, we may charge back any dishonored item at any time, before or after final payment by the drawer's bank, even if doing so results in an overdraft in the account.  We may exercise charge-back whether the item is returned or not, and whether it is returned by electronic or other means.  You will be liable for any overdraft created by the charge-back, including applicable overdraft fees.

......

**12. Service Charges.**   You agree to pay all service charges and fees that apply to your account or transactions within or affecting your account......you agree to pay all expenses, including reasonable attorney's fees, involved in the collection of fees, charges, overdrafts, or the enforcement of any other of our rights and remedies in relation to your account.

......

**17.  Wire Transfers**.  We have established rules and security procedures for initiating and receiving funds transfers not subject to the Electronic Fund Transfer Act or Regulation E.  These include a requirement that you sign a Funds Transfer Agreement before we initiate certain funds

9

Case No. 8:12-CV-1837-T-17MAP

transfers. In the event you do not execute our Funds Transfer Agreement and in consideration of our handling your funds transfers, you agree to abide by our established rules and security procedures for funds transfers which include, without limitation, the following:

......

**Final Payments**. Except for FEDWIRE funds transfers, any credit we give you is provisional until we receive final payment. If we do not receive final payment, you agree that we may reverse the credit to your account or that you will otherwise reimburse us if funds in your account are not sufficient.

......

By using any of our funds transfer services, you acknowledge and agree that our methods and procedures for the authorization and authentication of funds transfers constitute commercially reasonable security procedures under applicable law.

........

**19. Insufficient Funds and Overdrafts.** If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item......You agree to pay the overdraft amount and applicable fee.......

......

**35. Indemnification; Waiver of Consequential Damages.** To the extent allowed by law, you waive the right to recover consequential damages for our action or inaction in handling your deposit account. If we take any action with respect to your account in accordance with your instructions or orders, or in accordance with this Agreement, or if you breach any warranty provided in this Agreement or by law, and we incur any loss, liability, damage, cost or expense (including reasonable attorney's fees) as a result of any claim, demand, action, suit or proceeding brought or made by any party, you agree to indemnify and

Case No. 8:12-CV-1837-T-17MAP

hold us harmless from and against such loss, liability, damage, cost or expense and to reimburse us for the amount thereof.

......

**37. Changing This Agreement.** ......This Agreement may not be altered, modified or amended by you in any way without our express written agreement signed by our authorized officer.  Any attempt by you to alter, modify or amend this Agreement without our express written agreement signed by our authorized officer shall be void and shall have no legal effect.  You acknowledge and agree that no practice or course of dealing between you and us, nor any oral representations or communications by you and/or any of our agents, employees or representatives, which vary the terms and conditions of this Agreement shall constitute a modification or amendment of the terms and conditions of this Agreement.......You acknowledge and are aware that our current customer agreement, pricing schedule and funds availability policy are available to you upon request at our offices.

......

**43. Applicable Law.**   This Agreement and your deposit relationship with us will be governed by the substantive laws (excluding laws of conflict) and regulations of the United States and the state in which your account is established, except that Alabama law will govern the maximum interest rate that will be payable to us.  We reserve all of our rights with respect to the preemptive effect of any applicable federal laws and/or regulations.  Our rights under this Agreement and applicable law are cumulative and not exclusive.

**44. Conflicts With Applicable Law and Disclosures.**    To the extent this Agreement conflicts with any applicable provision of the Uniform Commercial Code, this Agreement shall control; otherwise, this Agreement supplements  but does not displace the Uniform Commercial Code.  If any provision of this Agreement conflicts with any applicable disclosure statement we have given you pursuant to the requirements of any law, such as the federal Electronic Fund Transfer Act, the federal Truth-in-Savings Act, the federal Expedited Funds Availability Act, or the Check 21 Act, the provisions of such disclosure statement shall control.

**45. Entire Agreement; Other Programs and Services.** You agree to be bound by any and all operating rules, circulars and regulations imposed by

Case No. 8:12-CV-1837-T-17MAP

any networks, funds transfer systems (including, without limitation, the Federal Reserve), and/or clearinghouses in which we participate and/or which process transactions that affect your account.  You further agree to be bound by any agreements we have with other financial institutions with respect to the processing or handling of transactions that affect your account.  This Agreement constitutes the current and entire deposit agreement between you and us with respect to the account(s) for which this Agreement has been delivered, and any and all prior general deposit agreements with respect to such account(s) are superseded by this Agreement.  Additional and/or specific rules, regulations, disclosures, and/or agreements may be applicable to certain or particular accounts or specialized account programs and/or to bank services linked to an account, such as electronic or online banking.  You agree that the terms and conditions set forth in such rules, regulations, disclosures, and other agreements continue in effect and are intended to be in addition to and not in substitution of the terms and conditions set forth in this Agreement. To the extent that there is a conflict, the terms and conditions set forth in such rules, regulations, disclosures , and other agreements shall govern unless otherwise required by applicable law.

Section IV of the Deposit Agreement spells out Regions Bank's  "Funds Availability Policy."

C.  Wire Transfer Agreement

It is undisputed that Defendant Kaplan initiated all of the outgoing wires at issue by telephone to the Money Transfer Department at Regions Bank in Birmingham, Alabama.

The Wire Transfer Agreement provides:

**1. Introduction**.   ......When you sign this funds transfer agreement, you are agreeing to be bound by the terms and conditions of the agreement. The agreement is a legally binding contract that can only be changed as provided below.

12

Case No. 8:12-CV-1837-T-17MAP

**2. Definition.** The following words or terms have the designated meaning for purposes of this agreement:

......

"Available funds" means funds that are on deposit in an authorized account and that are available for withdrawal under our funds availability schedule for funds transfers.

......

In addition, words or phrases that are defined in Article 4A of the Uniform Commercial Code or "UCC" have the defined meanings when used in the agreement.

......

**5. Execution or Acceptance of Payment Orders.** You authorize us to execute or accept any payment order that we receive in your name, but agree that we are not obligated to execute or accept any particular payment order.  If we decide to accept or execute a payment order that we receive in your name, we will verify that payment order in accordance with the security procedures......

......

**7. Security Procedures and PINs.**

(a) We will verify all payment orders and other funds transfer communications we receive in your name in accordance with the relevant security procedures agreed to between you and us.  You represent that you have carefully considered the circumstances of your use of this service and the transactions and activity that you will effect through this service, and you acknowledge and agree that the security procedures, including (without limitation) any security devices used in connection therewith, constitute commercially reasonable security procedures under applicable law in light of your circumstances and the type, number, size and frequency of the payment orders you contemplate sending us.  You authorize us to accept or execute any payment order initiated using applicable security procedures unless and until you have notified us, according to notification procedures prescribed by us, that the security procedures or any security device has been stolen, compromised, or

Case No. 8:12-CV-1837-T-17MAP

otherwise become known to persons other than an authorized representative and until we have had a reasonable opportunity to act upon such notice. You agree that the initiation of a payment order using applicable security procedures constitutes sufficient authorization for us to accept or execute such payment order notwithstanding any particular signature requirements identified on any signature card or other documents relating to your account, and you agree and intend that the submission of payment orders using the security procedures shall be considered the same as your written signature in authorizing us to execute such transaction. You acknowledge and agree that you shall be bound by any and all payment orders effected through the service through the use of such security procedures, whether authorized or unauthorized, and by any and all payment orders otherwise initiated by authorized representatives, to the fullest extent allowed by law. You acknowledge that the security procedures are designed to verify the authenticity of payment orders and other funds transfer communications that we receive. You further acknowledge and agree that the security procedures are not designed to detect errors in the payment order made through the service and that you bear responsibility for detecting and preventing such error. As a result, you agree we have no liability for failing to detect any error or duplication in any payment order or other funds transfer communications that we receive.

......

(f)      We reserve the right to establish from time to time, in our discretion, limitations and restrictions with respect to payment order amounts, frequency of payment order, the types of accounts that are eligible as authorized accounts, and other matters relating to this service based on factors deemed significant by us in its (sic) sole discretion. You agree to abide by and be bound by all limitations and restrictions imposed from time to time by us, and you acknowledge and agree that such limitations and restrictions are for the sole protection of us.

......

**11. Prohibited Transactions.**     You agree not to use or attempt use the services (a) to engage in any illegal purpose or activity or to violate any applicable law, rule or regulation; (b) to breach any contract or agreement by which you are bound, or (c) to engage in any internet or online gambling transaction, whether or not gambling is legal in any applicable

14

jurisdiction, or (d) to engage in any transaction or activity that is not specifically authorized or permitted by this agreement.  You acknowledge and agree that we have no obligation to monitor your use of the services for transactions and activity that is impermissible or prohibited under the terms of this agreement; provided, however, that we reserve the right to decline to execute any transaction or activity that we believe violates the terms of this agreement.

......

**16. Debits and Overdrafts**.    ....Nothing in the agreement and no course of dealing between you and us constitutes a commitment on our part to lend you money or obligates us to extend any credit to you or otherwise advance funds to execute a payment order that exceeds the amount of the *available funds* contained in an authorized account....If we elect, in our sole discretion, to execute one or more payment orders that exceed the balance of available funds in an authorized account, we may debit the authorized account for the amount of all payment orders that we execute, even if the debit creates or increased an overdraft in the authorized account.  In that event, you agree to deposit sufficient available funds to cover the overdraft into the authorized account by the close of that funds transfer business day.  Any overdraft existing at the close of a funds-transfer business day is immediately due and payable without notice or demand, together with interest at the rate set forth below.   In addition, each payment order we receive in your name that exceeds the available balance in an authorized account is subject to a fee, whether we execute the payment order or not.

......

**29. Amendments and Service Notifications**.

(a) We may change or add to the terms of the agreement by giving you ten days written or electronic notice of the changed or new terms.  Any other amendment must be in writing and signed by both you and us.

......

**35. Entire Agreement**.  The agreement constitutes the entire agreement and understanding between you and us with respect to the services.  It completely replaces any prior written or oral agreements and understandings relating to the services.  No representation or statement

Case No. 8:12-CV-1837-T-17MAP

that is not expressly set forth in the agreement is binding upon us.

**36. Other Agreements.** The terms and conditions of the agreement are in addition to, and do not modify or otherwise affect, the terms and conditions of any deposit or other written agreement between us, except that the terms of the agreement shall govern with respect to the services contemplated hereby to the extent of any inconsistency.

**37. Governing Law.** The agreement is governed by and should be interpreted in accordance with applicable federal laws and the internal laws of the State of Alabama. You consent to the exclusive jurisdiction and venue of any court located in that state.

......

**41. Remedies.** The rights, powers, remedies and privileges provided for you in the agreement are your sole and exclusive rights, powers, remedies and privileges with respect to the services or any failure by us to perform the services in accordance with the terms of the agreement. The rights, powers, remedies and privileges provided for us in the agreement are in addition to any rights, powers, remedies and privileges with respect to the services or any failure by you to comply with the terms of the agreement that we have under applicable law or otherwise, and we may exercise any or all of those rights, powers, remedies and privileges in any order.

The Court notes that Sec. 670.101, et seq., Florida Statutes, controls funds transfers. Sec. 670.102, Florida Statutes, Official Comment, states:

In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers

16

Case No. 8:12-CV-1837-T-17MAP

> need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

> Funds transfers involve competing interests–those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interest and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

Other courts have looked only to the clear and unambiguous language of the controlling statute in adjudicating claims within the scope of the funds transfer statute, and have determined that the statutory scheme may preempt a common law cause of action which alleged the breach of a bank's duty of care to follow the accepted banking practice of the community. See Corfan Banco Asuncion Paraguay v. Ocean Bank, 715 So.2d 967 (Fla. 3d DCA 1998). In Corfan, the Court reversed the judgment of the trial court which granted summary judgment to Ocean Bank on count one of the complaint, for violation of Sec. 670.207, Florida Statutes, and affirmed the dismissal of count two for negligence, for breach of the duty of care to follow the accepted banking practice in the community.

The Court further notes Sec. 670.104, Florida Statutes, Off. Cmt. 3:

......The function of banks in a funds transfer under Article 4A is

17

Case No. 8:12-CV-1837-T-17MAP

comparable to the role of banks in the collection and payment of checks in
that it is essentially mechanical in nature. The low price and high speed
that characterize funds transfers reflect this fact. Conditions to
payment...other than time of payment impose responsibilities on that bank
that go beyond those in Article 4A funds transfers....

D. Deposition Testimony

In his deposition, Defendant Kaplan testified:

Q.    What conversations did you have with whomever you dealt
       with on or about September 12 of 2011 concerning the
       operation of the account?

A.    On any of my accounts, not just these, any of the, the only
       account—I mean, conversations were, if there were any
       problems with the account, please let me know, as far as
       checks coming back or anything like that. You know,
       certainly do not wire any money that is uncollected.

Q.    So before or at about the time that you opened the MK
       Investing LLC account September 12, 2011, you had a
       conversation with a Regions' employee whom you can't
       remember who it was?

A.    Well, I remember having a conversation. I don't know if it
       was on—you asked on this account, I don't remember.

......

Q.    Did you have a conversation with a Regions' employee prior
       to 9-12-2011 on behalf of MK Investing LLC with respect to
       that same subject matter, not wiring out funds that were
       uncollected?

A.    Again, I don't remember, you know, what other account it
       was. I had a conversation, but I don't remember when. It
       was when I started doing business with Regions.

18

Case No. 8:12-CV-1837-T-17MAP

Q.   I understand, but I'm focusing on MK Investing LLC in
     particular.  So I would like to know if you can recall any
     conversations with anyone at Regions prior to 9-12-2011
     where you instructed that person not to wire out uncollected
     funds?

A.   I can't speak exactly to MK Investing.  My instructions were
     on any of my accounts.

Q.   These were your so-called standing instructions?

A.   That was given to the manager, yes.

Q.   I'm sorry?

A.   That was given to the manager.  That conversation was with
     the manager.  I don't know if it was on this date.

     ......

Q.   So is it your testimony, however, that you cannot recall
     whether you had this conversation with Linda Council or
     about 9-12-2011 in connection with the MK Investing
     Account?

A.   I don't remember.

Q.   Don't remember?

A.   That's my testimony.  I don't remember.

Q.   What about Triple Net Exchange, which opened its account
     on 9-13-2011, who did you deal with in opening the
     account?

A.   I don't remember.

     ......

Q.   It might have.  Do you recall who it was, whether it was
     Linda or Maria?

19

Case No. 8:12-CV-1837-T-17MAP

A.     No. I've spoken to both of them.

Q.     But you can't remember–

A.     I remember speaking with Linda telling her. Did I ever tell
       Maria Tringali? I might have also spoke to her. I don't
       remember if she opened the accounts or Linda did.
       Sometimes I'd start something with Linda and Maria would
       finish it up.

Q.     Do you have a specific recollection of having a conversation
       with Ms. Tringali where you gave her the oral instruction not
       to wire out uncollected funds on behalf of BNK Smith LLC?

A.     Again, not specifically BNK Smith, but I'm sure I had that
       conversation with Maria Tringali at some point about my
       accounts.

Q.     What date? When did you have that conversation?

A.     You know, sometime in 2011. I don't know when it was, but
       it could have been earlier, also. It could have been in
       August. It could have been in September. I'm not sure.

Q.     How could it have been in August when you didn't open your
       first account at Regions until September 12, 2011?

A.     I had other accounts at Regions.

Q.     Other–okay. But then the conversation, the oral instruction
       that you would have given would not have related to
       either–in August, either MK Investing, Triple Net Exchange,
       BNK Smith, or R1A Palms because they didn't have deposit
       relationships yet?

A.     You misinterpreted. My instructions were for all my
       accounts, all related accounts. You're trying to pin me down
       to a date. I can't give you an exact date I did it. It could
       have been October. It could have been December. I don't
       know. You're asking me to remember something four years
       ago. It's not going to happen.

Case No. 8:12-CV-1837-T-17MAP

Q.    Do you remember having that conversation at or about the time that you opened the account or accounts, these four accounts, or after you opened these four accounts once you started to wire?

A.    I'm sure it was probably when I opened the accounts. You're asking me if I remember specifically. I'm sure it was–I was in the bank every day, so I'm sure it was right about when I opened the accounts.

Q.    Okay. But you don't–

A.    It could have been prior to the opening of the accounts, right before I was opening the accounts.

Q.    But you don't have a specific recollection of a particular day when you had this conversation?

A.    I don't have the particular day, no.

Q.    All right. In connection with opening these deposit accounts, you were provided with a deposit agreement, correct?

A.    Yes.

Q.    All right.

A.    I believe so.

Q.    Did you have the opportunity to review and read that agreement?

A.    I remember that I looked over it. I don't think I actually read it. It's pretty much boilerplate.

Q.    Boilerplate. You were familiar with deposit agreements based on your vast experience with banking relationships?

A.    Vast. No, I'm familiar with boilerplate, and usually you just don't read it.

Case No. 8:12-CV-1837-T-17MAP

Q.   Okay.  But you were familiar with deposit agreements in general, you had received one, for instance, in connection with your Wells Fargo accounts, right?

A.   I'd seen them before.

......

Q.   Okay.  But in this particular one, the Regions' deposit agreement, notwithstanding you didn't maybe study it cover to cover, did you read portions of it?

A.   Not that I remember.

Q.   Did you not read it at all?

A.   I might not have.  I don't remember.

(Dkt. 540-1, pp. 244- 251).


In deposition, Defendant Kaplan testified he did not remember speaking with a Regions' representative, Linda Council or Maria Tringali, on Friday, January 20, 2012 (Dkt. 540-1, pp. 82-85).


As to the reason for wiring funds, Defendant Kaplan testified:


Q.   I understand.   It's none of Regions' business to know what your business is doing at that moment, right?  Is it–is it Regions' right to know what you are doing with respect to this business?

A.   What are you asking me, David.  I don't understand what you are asking me.

Q.   In your view, did Regions have a right to know–

A.   Someone in the bank has no right to know what my–that I

22

Case No. 8:12-CV-1837-T-17MAP

> am going to make money or lose money. All I'm doing is
> sending a wire.

(Dkt. 540-1, p. 288).

As to the outgoing wires on January 23, 2012:

Q. Did Regions make any representations to you regarding the status of your account when you called to initiate outgoing wires?

A. Regions made----Regions made representations to me all along that–and I spoke to them about it, about not wiring on uncollected funds.

Q. Sir, I'm going to ask you a yes-or-no question.

A. Okay.

Q. And you're entitled to explain your answer. Okay? But I need you to answer "yes" or "no."
Yes or no: Did Regions make any representations to you on the phone when you called to initiate the outgoing wires of January 23, 2012?

A. Neither yes, neither no. They took my wire instructions. If it would have been "no," they wouldn't have wired, so–

Q. So–

A. They never told me yes or no on the phone, so they just take the information.

Q. Neither yes and neither no is not an acceptable answer.

A. No.

Q. No.

A. Okay.

23

Case No. 8:12-CV-1837-T-17MAP

> Q.    Did you ask if the funds that were going to be wired out were
>       provisional as opposed to cleared funds?
>
> A.    No.
>
> Q.    No.
>
> A.    I wouldn't ask that.

(Dkt. 540-1, pp. 86-87).

III. Discussion

## A. Breach of Deposit Agreement  Counts I, VIII, XV, XXII

Regions Bank seeks entry of summary judgment against Defendants R1A, TNE, MKI, and BNK for the overdrafts created when Regions Bank provided next-day availability on the First Deal Checks deposited on January 20, 2012, which Defendants used for internal transfers and outgoing wires to SAA, causing the overdrafts when BBG dishonored the First Deal Checks.  Regions Bank argues that Defendants R1A, TNE, MKI and BNK are liable under the account agreements.

The Deposit Agreement and Defendants' relationship with Regions Bank is governed by federal law and regulations and Florida law.

The elements of a breach of contract claim are: 1) a valid contract; 2) a material breach, and 3) damages.

1. Principles of Florida Contract Law

In the construction of written contracts, it is the duty of the court, as near as may

Case No. 8:12-CV-1837-T-17MAP

be, to place itself in the situation of the parties, and from the consideration of the surrounding circumstances, the occasion, and the apparent object to the parties, to determine the meaning and intent of the language employed.   Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Finance Corp., 302 So.2d 404, 407 (Fla. 1974).

Contract interpretation is for the court as a matter of law, rather than the trier of fact, only when the agreement is totally unambiguous, or when any ambiguity may be resolved by applying the rules of construction to situations in which the parol evidence of the parties' intentions is undisputed or non-existent. See Lambert v. Berkly South Condominium Assoc., 680 So.2d 588 (Fla. 4th DCA Sept. 11, 1996). Questions of fact arise only if there is an ambiguity in a contract term. Lawyers Title Ins. Corp. v. JDC (America) Corp., 52 F.3d 1575, 1580 (11th Cir. 1995).

Where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing. See OBS Co., Inc. v. Pace Cons. Corp., 558 So. 2d 404 (Fla. 1990). When two or more documents are executed by the same parties at or near the same time, in the course of the same transaction, and concern the same subject matter, they will be read and construed together. KRC Enterprises, Inc. v. Soderquist, 553 So. 2d 760 (Fla. 2d DCA 1989).

The purpose of integration clauses is to affirm the parties' intent to have the parol evidence rule apply to their contracts. Centennial Mortgage, Inc. v. SG/SC, Ltd., 772 So. 2d 564 (Fla. 1st DCA 2000). "Under the Florida parol evidence rule, evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract. Johnson Enterprises of Jacksonville, Inc. V. FPL Group, Inc., 162 F.3d 1290 (11th Cir. 1998). Florida recognizes a "fraudulent inducement" exception to this rule, allowing admission of an oral misrepresentation that

Case No. 8:12-CV-1837-T-17MAP

allegedly induced the execution of a written contract, even though that statement may vary, change or reform the instrument. (Citations omitted).  However, the "fraudulent inducement" exception to the parol evidence rule is not applicable where the alleged oral agreement relates to the identical subject matter embodied in the written agreement, and directly contradicts the express terms of that agreement.  Ungerleider v. Gordon, 214 F.3d 1279 (11ᵗʰ Cir. 2000)(citing Linear Corp. v. Standard Hardware Co., 423 So.2d 966 (Fla. 1ˢᵗ DCA 1982)......The logic underpinning this rule is that reliance on a fraudulent representation is unreasonable as a matter of law where the alleged misrepresentation is inconsistent with the express terms of the ensuing written agreement.  Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp., 850 So.2d 536, 542-43 (Fla. 5ᵗʰ DCA 2003)...." Regions Bank v. Old Jupiter, LLC, 2010 U.S. Dist. LEXIS 131443 *7-8 (S.D. Fla. Dec. 13, 2010), aff'd 2011 U.S. App. LEXIS 25291 (11ᵗʰ Cir. Dec. 19, 2011).

"The parol evidence rule does not operate as a bar against admission of evidence of a subsequent, post-contract agreement that alters, modifies or changes the former existing agreement between the parties.  J. Lynn Construction, Inc. v. The Fairways at Boca Golf & Tennis Condominium Association, Inc., 962 So.2d 928 (Fla. 4ᵗʰ DCA 2007)...[E]vidence relating to a subsequent oral modification or course of dealing may be admissible, even where the written contract contains a merger clause.  Linear Corp. v. Standard Hardware Co., 423 So.2d 966 (Fla. 1ˢᵗ DCA 1982)." Regions Bank v. Old Jupiter, LLC, 2010 U.S. Dist. LEXIS 131443 *9-10 (S.D. Fla. Dec. 13, 2010).

It is an accepted principle of law that when parties contract upon a matter which is the subject of statutory regulation, the parties are presumed to have entered into their agreement with reference to such statute, which becomes a part of the contract, unless the contract discloses a contrary intention.   Grant v. State Farm Fire and Cas. Co., 638 So. 2d 936 (Fla. 1994).  Sec. 670.101, et seq., Florida Statutes, applies to funds

Case No. 8:12-CV-1837-T-17MAP

transfers.  Sec. 671.101 et seq., Florida Statutes, states the general provisions of the

Uniform Commercial Code. Sec. 673.1011, et seq., Florida Statutes, applies to

negotiable instruments.  Sec. 674.101, et seq., Florida Statutes, applies to bank

deposits and collections.

Sec. 674.101, Off. Cmt. 1-3 explains:

1.  The great number of checks handled by banks and the country-wide
nature of the bank collection process require uniformity in the law of bank
collections. There is needed a uniform statement of the principal rules of
the bank collection process with ample provision for flexibility to meet the
needs of the large volume handled and the changing needs and
conditions that are bound to come with the years. This Article meets that
need.

2.  ......An important goal of the 1990 revision of Article 4 is to promote
the efficiency of the check collection process by making the provisions of
Article 4 more compatible with the needs of an automated system and, by
doing so, increase the speed and lower the cost of check collection for
those who write and receive checks.  An additional goal of the 1990
revision of Article 4 is to remove any statutory barriers in the Article to the
ultimate adoption of programs allowing the presentment of checks to
payor banks by electronic transmission of information captured from the
MICR line on the checks.  The potential of these programs for saving the
time and expense of transporting the huge volume of checks from
depositary to payor banks is evident.

3.  Article 4 defines rights between parties with respect to bank deposits
and collections.  It is not a regulatory statute.  It does not regulate the
terms of the bank-customer agreement, nor does it prescribe what
constraints different jurisdictions may wish to impose on that relationship
in the interest of consumer protection.  The revisions in Article 4 are
intended to create a legal framework that accommodates automation and
truncation for the benefit of all bank customers......

Sec. 671.201, Florida Statutes, defines "agreement" and "contract".  A "contract," as

27

Case No. 8:12-CV-1837-T-17MAP

distinguished from "agreement," means the total legal obligation that results from the parties' agreement as determined by this code and as supplemented by any other applicable laws.  See Sec. 671.201(12), Florida Statutes.

Sec. 674.103(1) , Florida Statutes, provides that the parties to an agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure.  However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.  Sec. 674.103(3), Florida Statutes states the standard for ordinary care as to bank deposits and collections:

> (3) Action or nonaction approved by this chapter or pursuant to Federal Reserve regulations or operating circulars is the exercise of ordinary care; and, in the absence of special instructions, action or nonaction, consistent with clearinghouse rules and the like or with a general banking usage not disapproved by this chapter is prima facie the exercise of ordinary care.

Sec. 670.105(1)(f), Florida Statutes, provides that, as to funds transfers, good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

2. Acceptance of the Deposit Agreement by TNE and BNK

Defendants argue that Regions has provided no admissible evidence to show that TNE and BNK signed the Deposit Agreement.  Defendants argue that Regions Bank cannot enforce the Deposit Agreement without proof it was signed by TNE and BNK.

28

Case No. 8:12-CV-1837-T-17MAP

distinguished from "agreement," means the total legal obligation that results from the parties' agreement as determined by this code and as supplemented by any other applicable laws.  See Sec. 671.201(12), Florida Statutes.

Sec. 674.103(1) , Florida Statutes, provides that the parties to an agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure.  However, the parties may determine by agreement the stands by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.  Sec. 674.103(3), Florida Statutes states the standard for ordinary care as to bank deposits and collections:

> (3) Action or nonaction approved by this chapter or pursuant to Federal Reserve regulations or operating circulars is the exercise of ordinary care; and, in the absence of special instructions, action or nonaction, consistent with clearinghouse rules and the like or with a general banking usage not disapproved by this chapter is prima facie the exercise of ordinary care.

Sec. 670.105(1)(f), Florida Statutes, provides that, as to funds transfers, good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

2.  Acceptance of the Deposit Agreement by TNE and BNK

Defendants argue that Regions has provided no admissible evidence to show that TNE and BNK signed the Deposit Agreement.  Defendants argue that Regions Bank cannot enforce the Deposit Agreement without proof it was signed by TNE and BNK.

28

Case No. 8:12-CV-1837-T-17MAP

Regions Bank has provided copies of signature cards as to MKI and R1A (Dkt. 2-1, pp. 49-50; Dkt. 252-3). As to BNK, there is a written agreement which ratifies the prior Deposit Agreement (Dkt. 252-2). As to TNE, Regions has provided copies of written agreements which incorporate the Deposit Agreement (Kaplan Depo, Exhs. 29, 30). Regions has not produced the signature cards for BNK and TNE, but Regions has established that BNK and TNE have expressly ratified the Deposit Agreement for each account.

It is undisputed Defendant Kaplan deposited checks into the TNE and BNK accounts, and Defendant Kaplan transferred funds from those accounts.   In his deposition, Defendant Kaplan acknowledged receipt of the Deposit Agreement as to the subject accounts. Based on the signature cards, the Wire Transfer Agreements and exhibits thereto, other forms executed by Defendant Kaplan, the records of deposits into Defendants' accounts, transfers between accounts, and wire transfers out of Defendants' accounts, Defendant Kaplan's deposition testimony, and the availability of the Deposit Agreement at Regions' location, the Court finds that the Deposit Agreement is enforceable as to R1A, TNE, MKI and BNK.

3. Failure to Mitigate Damages

As an affirmative defense, Defendants alleged:

7.   Plaintiff failed to mitigate its damages by wiring funds to
     Bridgeview Bank even though it knew or should have known
     that there were insufficient funds in the various accounts to
     cover those transfers.

(Dkt. 272, p. 17).

29

Case No. 8:12-CV-1837-T-17MAP

Defendants argue that genuine issues of material fact preclude the entry of summary judgment on the Regions' breach of contract claims, based on disputed issues of fact on whether Regions took adequate steps to mitigate damages.

Defendants argue that the record shows that Regions exercised discretion to provide provisional credit on the SAA checks under circumstances that created a massive risk, but Regions did nothing to mitigate its foreseeable losses. Defendants look to the record of frequent deposits of numerous SAA checks drawn on BBG during a short time frame, significant increases in the balances of Defendants' accounts, the existence of a 4 day "float" created through Regions' policy, and Defendants' receipt of SAA checks that vastly exceeded the amounts of outgoing wires to SAA on a daily basis. Defendants further argue that Regions' automated system provided no safeguards to protect against losses, as Regions' system does nothing to determine funds in the account have cleared.

The Court notes that, in general, depository banks "have no duty to investigate transactions made by authorized agents of the account holder." Lamm v. State St. Bank & Trust, 749 F.3d 938, 948 n.7 (11th Cir. 2014); O'Halloran v. First Union Nat'l Bank of Fla., 350 F.3d 1197, 1205 (11th Cir. 2003); Wiand v. Wells Fargo Bank, N.A., 86 F.Supp.3d 1316 (M.D. Fla. Feb. 9, 2015). The bank's responsibility extends only to confirming that the agent, at the time of the transaction, has the authority to make the transaction. See O'Halloran, 350 F.3d at 1205 ("The bank is responsible only for making sure that the employee, at the time of the withdrawal, has the authority to make withdrawals on behalf of the accountholder entity."). At the time the wire transfers were executed, it is undisputed that Regions had no actual knowledge of SAA's Ponzi scheme or of a check-kiting scheme.

Defendants further argue that Defendant Kaplan verbally instructed Regions not to wire funds on uncleared BBG checks before opening Defendants' accounts, and this

30