UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK, etc.,

        Plaintiff,

v.                               CASE NO.  8:12-CV-1837-T-17MAP

MARVIN I. KAPLAN, etc., et al.,

        Defendants.

_____/

MARVIN I. KAPLAN, etc., et al.,

        Counterclaim/Crossclaim
        Plaintiffs,

v.

REGIONS BANK, etc., et al.,

        Counterclaim/Crossclaim
        Defendants.

_____/

ORDER

This cause is before the Court on:

| | |
|---|---|
| Dkt. 252 | Notice of Filing Declaration |
| Dkt. 538 | Notice of Filing Documents |
| Dkt. 539 | Sealed Exhibits |
| Dkt. 542 | Statement of Undisputed Facts (Bank Parties) |
| Dkt. 545 | Notice of Filing Affidavit (Kaplan) |
| Dkt. 551 | Statement of Undisputed Facts as to Kaplan Parties' Motion for Summary Judgment |

Case No. 8:12-CV-1837-T-17MAP

| Dkt. 553 | Motion for Summary Judgment of Kaplan Parties (Kaplan, R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC, BNK Smith, LLC) |
|---|---|
| Dkt. 573 | Notice of Filing in Support of Joint Counter-Statement of Undisputed Material Facts (Bank Parties) |
| Dkt. 574 | Joint Counter-Statement of Undisputed Facts (Bank Parties) |
| Dkt. 575 | Response re Statement of Undisputed Facts (Dkt. 551)(Regions) |
| Dkt. 576 | Opposition to Motion for Summary Judgment (Regions) |
| Dkt. 577 | Opposition to Motion for Summary Judgment (Bridgeview Bank Group) |
| Dkt. 578 | Corrected Joint Counter-Statement of Undisputed Material Facts in Opposition to Kaplan Parties' MSJ |
| Dkt. 579 | Opposition to Motion for Summary Judgment (Wells Fargo, N.A.) |

The Motion for Summary Judgment (Dkt. 553) of Kaplan and R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC ("R1A, TNE, MKI, BNK") is directed to 4 Counts asserted by them in the Amended Counterclaim/Crossclaim (Dkt. 93) and to the non-statutory claims asserted against them by Regions Bank in the Second Amended Complaint (Dkt. 190),

I.  Background

A.      RTM Counts of ACC (Dkt. 93)

The material recited facts are drawn from the Parties' Statements of Undisputed Facts and other record evidence; the facts are either undisputed or taken in the light most favorable to non-movants Counterclaim/Crossclaim Defendants.

Three sets of checks are at issue:

| "First Deal" Checks | $10,857,300. |
|---|---|
| "Second Deal" Checks | $11,956,035. |
| WFB Replacement Checks | $ 9,850,000. |

Case No. 8:12-CV-1837-T-17MAP

WFB Replacement Check 1409 was returned "NSF."  Crossclaim/Counterclaim
Plaintiffs do not dispute that Check 1409 was properly returned.


The record evidence includes consideration of the following exhibits within Dkt.
539, among others:

Exh. 75
Exh. 78
Exh. 79
Exh. 80
Exh. 81
Exh. 82
Exh. 83
Exh. 88
Exh. 90
Exh. 91
Exh. 92
Exh. 93
Exh. 94
Exh. 95
Exh. 96
Exh. 126
Exh. 128
Exh. 129
Exh. 130
Exh. 131
Exh. 132
Exh. 232
Exh. 233
Exh. 234
Exh. 235
Exh. 238
Exh. 286


Bridgeview Bank Group ("BBG") is the Illinois bank where Smith Advertising and
Associates ("SAA") had checking accounts; Account *8201 is the checking account
involved in this case.  In general, after R1A Palms. LLC ("R1A"), Triple Net Exchange,
LLC ("TNE"), MK Investing, LLC ("MKI") and BNK Smith LLC ("BNK") agreed to enter

Case No. 8:12-CV-1837-T-17MAP

into "investments" consisting of short term loans to Smith Advertising and Associates ("SAA"), SAA would send checks to those entities, which represented interest, incentives, and return of principal. Counterclaim/Crossclaim Plaintiff Kaplan deposited checks from SAA into checking accounts of R1A, TNE, MKI and BNK at Regions Bank. Kaplan, on behalf of the Kaplan Entities, wired funds from Regions Bank to SAA's account at BBG to participate in ongoing "deals." The "Refer to Maker" ("RTM") claims against BBG arise from BBG's dishonor of SAA checks drawn on BBG. (Dkt. 542, pars. 79(a)-(ff)).

On Friday, January 20, 2012, Counterclaim/Crossclaim Plaintiff Kaplan wired out $9,700,000.00 (R1A: $8,600,000; MKI: $1,100,000) (Dkts. 541-3, p. 9; 541-6, p. 4) to SAA. On Friday, January 20, 2012, Counterclaim/Crossclaim Plaintiff also deposited checks totaling $10,857,300.00 ("First Deal" Checks) to the accounts of R1A, TNE, MKI and BNK at Regions. (Exhs. 78, 81, 82, 83). The notes sent to Counterclaim/Crossclaim Plaintiffs totaled $9,500,000.00. Regions presented the First Deal Checks to BBG on Monday, January 23, 2012. BBG dishonored the First Deal Checks and notified Regions that the Checks were dishonored on Tuesday, January 24, 2012.

On Monday, January 23, 2012, Counterclaim/Crossclaim Plaintiff Kaplan wired out $10,450,000.00 (R1A: $9,200,000.00; MKI: $1,250,000.00)(Exh. 90) to SAA. Counterclaim/Crossclaim Plaintiff Kaplan, by an agent, deposited checks in the amount of $11,956,035.00 ("Second Deal" Checks) into the accounts of Counterclaim/Crossclaim Defendants on Monday, January 23, 2012. (Exhs. 91, 94, 95, 96). The notes Counterclaim/Crossclaim Plaintiff Kaplan received totaled $10,550,000.00. Regions presented the Second Deal Checks to BBG on Tuesday, January 24, 2012. BBG dishonored the Second Deal Checks and notified Regions that the Checks were dishonored on Wednesday, January 25, 2012.

4

Case No. 8:12-CV-1837-T-17MAP

SAA maintained a checking account at Wells Fargo Bank, N.A. ("WFB") (Account No. xxxx-xxxx-3952). On Wednesday, January 25, 2012, SAA wired $1,406,035.00 from its SAA WFB 3952 Account to R1A's account at WFB. (Dkt. 538-3, p. 6 shows a wire transfer from Wells Fargo Bank, N.A. to Wachovia Bank, N.A. of Florida for checks "63465, 63438, 63464, 63468, 63440, 63466, 63467, 63461," beneficiary is R1A Palms, LLC; Dkt. 539, Ex. 286.)

On Thursday, January 26, 2012, Defendant Kaplan deposited 21 checks ("WFB Replacement Checks") drawn by SAA on the SAA WFB Account to accounts of R1A, TNE, MKI and BNK at Regions Bank. These checks totaled $10,550,000, and were replacement checks for checks drawn by SAA on the SAA BBG Account, which BBG had dishonored. The purpose of the WFB Replacement Checks was to repay Regions Bank for the overdrafts in the accounts of R1A, TNE, MKI and BNK. Regions Bank placed a hold on these funds.

Regions Bank contacted Wells Fargo to indicate that checks of more than $10 million drawn on the SAA WFB Account were deposited, and that Defendant Kaplan was depositing checks drawn on SAA's Account with BBG which had been returned "Refer to Maker." Regions Bank provided Wells Fargo with copies of the WFB Replacement Checks. Upon receiving copies of the WFB Replacement Checks, Wells Fargo investigated the activity in the SAA WFB Account, which showed a balance of $11,301.53. Wells Fargo placed a debit restriction on the SAA WFB Account.

Regions presented the WFB Replacement Checks for payment on Thursday, January 26, 2012. When the checks were presented for payment, WFB's return and processing system flagged them, and sent the checks for manual review and processing consistent with the debit restraint. The first WFB Replacement Check, in the amount of $700,000.00 was returned "NSF" and the remaining WFB Replacement Checks were returned "Refer to Maker." WFB dishonored the 20 WFB Replacement

Case No. 8:12-CV-1837-T-17MAP

Checks and notified Regions that the Checks were dishonored on Friday, January 27, 2012.

B. Tort Claims of Regions Bank against Kaplan, R1A, TNE, MKI, BNK

Defendant Plaintiff Marvin Kaplan is a sophisticated businessman who owned and managed R1A, TNE, MKI and BNK. Defendant Kaplan was the authorized representative for banking transactions for R1A, TNE, MKI and BNK. Defendant Kaplan entered into the Deposit Agreements and Wire Transfer Agreements for the accounts of R1A, TNE, MKI and BNK. Defendant Kaplan received a copy of the Deposit Agreement. The Deposit Agreement explains Regions "Funds Availability Policy."

In his deposition, Defendant Marvin Kaplan testified that he has conducted business with 20-25 banks and has operated hundreds of bank accounts. Defendant Kaplan further testified that he understood the meaning of "cleared funds," "available funds," "next day availability," and a "hold" on funds availability.

It is undisputed that Defendant Kaplan initiated all wire transfers for the accounts of R1A, TNE, MKI and BNK by a telephone call to Regions Money Transfer Department in Birmingham, Alabama. In his deposition, Defendant Kaplan testified that at the time Defendant Kaplan initiated wire transfers, he did not inquire whether funds were available, but made the wire transfer after viewing the account balances online, which indicated "available" funds. Defendant Kaplan admitted that he knew that the payment order to carry out the wire transfer would not be executed if funds were not available. Defendant Kaplan did not inquire as to funds availability at the time of his phone call placing the payment order. Defendant Kaplan carried out internal transfers between accounts via online access to the accounts.

6

Case No. 8:12-CV-1837-T-17MAP

Defendant Kaplan began the investment activities with the Smiths and SAA in 2008. Defendant Kaplan testified that, in general, Defendant Kaplan agreed to a deal, wired funds to SAA that day, and later received SAA checks returning principal and a profit via a FedEx package. The checks for profit were immediately deposited, and usually the principal repayment checks were deposited after 30 days. Defendant Kaplan testified that he did not request or examine the underlying deal documentation, such as purchase orders to SAA, SAA invoices to customers, SAA purchase orders to vendors, or vendor invoices offering prepayment discounts, with one exception in 2011. Defendant Kaplan continued to participate in the deals offered to him because of the extraordinary returns.

Defendant Kaplan opened the accounts at Regions because of the higher limit on wire transfers. Defendant Kaplan's investment activities changed in November, 2011. Larger amounts of money were involved in each deal. The deals typically involved the Kaplan's agreement to participate on Day 1, Kaplan's wiring out of funds to SAA and receipt of SAA notes and checks for principal, interest and incentives on Day 2, with the immediate deposit of the checks on Day 2. The amount of the checks received was always substantially greater than the amount of the outgoing wire earlier the same day. The circular movement of funds took place almost daily from December 1, 2011 to January 24, 2012. (Dkt. 541-3). Defendant Kaplan testified that the investments of R1A, TNE, MKI and BNK grew from $7 million in November, 2011 to $22 million in two months. (Dkt. 541-1, pp. 260-261).

The account statements reflect all wire transfers and internal transfers initiated by Defendant Kaplan on behalf of R1A, TNE, MKI and BNK. (Dkt. 541-3). The First Deal checks were deposited into Defendants' accounts at Regions on Friday, January 20, 2012. Defendant Kaplan agreed to the "Second Deal" on Friday, January 20, 2012, and wired out funds on Monday, January 23, 2012, for the "Second Deal." Defendant Kaplan's office received the "Second Deal" checks and notes on Monday, January 23,

7

Case No. 8:12-CV-1837-T-17MAP

2012. The "Second Deal" checks were deposited at 11:17 a.m. on January 23, 2012. Regions placed a hold and did not extend provisional credit on the "Second Deal" checks on Monday evening, January 23, 2012.   Defendant Kaplan testified that he learned that the funds were not credited very early on Tuesday morning by viewing the account balances online.  Defendant Kaplan learned of the hold on the "Second Deal" checks on Tuesday, January 24, 2012, after he telephoned Regions to inquire about the funds.

Todd Smith emailed Defendant Kaplan at 7:07 a.m. on Tuesday, January 24, 2012, to offer another deal ("Fourth Deal").  (Dkt. 539, Exhs. 266, 267).   R1A was to wire $2,000,000.00 to SAA, and receive repayment of $2,250,000.00 on January 25, 2012.  Defendant Kaplan wired out funds for the "Fourth Deal" between 8:16 a.m. and 9:16 a.m. on Tuesday, January 24, 2012; in his deposition, Defendant Kaplan testified that he was already aware that Regions had not credited the funds represented by the Second Deal Checks when he wired out those funds.  (Dkt. 540-1, pp. 372-373). Defendant Kaplan received the SAA notes in the amount of $2,250,000.00 for the Fourth Deal on Wednesday, January 25, 2012.  Defendant Kaplan did not receive SAA checks for the Fourth Deal, and testified that he did not know whether SAA paid R1A for the Fourth Deal.

Defendant Kaplan agreed to the "Third Deal" on Tuesday, January 24, 2012. Defendant Kaplan and Todd Smith agreed that SAA would stop payment on the Second Deal checks, and SAA would use the funds for the "Third Deal."  Defendant Kaplan received the SAA notes for the "Third Deal" in the amount of $10,945,000. Defendant Kaplan  did not deposit "Third Deal" checks.  (Dkt. 540-1, pp. 297-300).

The "First Deal" checks were dishonored and notice of return sent on Tuesday, January 24, 2012, and the "Second Deal" checks were dishonored and notice of return sent  on Wednesday, January 25, 2012.

8

Case No. 8:12-CV-1837-T-17MAP

On January 25, 2012, Regions' representatives met with Defendant Kaplan at his office in an attempt to understand the circumstances leading to the overdrafts in Defendants' accounts. Defendant Kaplan explained that R1A, TNE, MKI and BNK made short term loans to SAA through outgoing wires from Defendants' accounts at Regions to SAA's account at BBG. SAA would send SAA checks drawn on BBG in repayment, which Defendant Kaplan would deposit back to Defendants' accounts. Defendant Kaplan further explained that SAA would sometimes arrange for a private jet to transport the SAA checks drawn on BBG to Defendant Kaplan to expedite delivery of the checks. Defendant Kaplan "stated that SAA and Kaplan used SAA checks to 'leverage the float.'" (Dkts. 573-4, 573-5).

On January 25, 2012, Defendant Kaplan wired $2,775,000.00 to the Lighthouse Pointe, LLC account at WFB, an account which Defendant Kaplan controlled. These funds were later returned to Regions pursuant to stipulation and order in the state court action (Dkt. 1-6, 1-7). The funds were credited to the R1A account to reduce the overdraft.

When Defendant Kaplan received notice that the First Deal Checks were returned RTM, Defendant Kaplan contacted SAA. On January 28, 2012, Defendant Kaplan retained counsel to investigate and assist in collecting amounts owing by SAA.

Defendants recovered the following amounts from SAA:

1.    $500,000.00 incentive between the Second and Third Deals;

2.    $1,406,035.00 in incentives for the Second Deal; and

3.    $804,239.35 sent to Defendants' counsel between January 31, 2012 and February 15, 2012.

9

Case No. 8:12-CV-1837-T-17MAP

Defendants used these funds for their own benefit rather than reducing the overdrafts in Defendants' accounts at Regions.

II. Standard of Review

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

> The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The appropriate substantive law will guide the determination of which facts are material and which facts are...irrelevant.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson, 477 U.S. at 248. But, "[i]f the evidence is merely colorable...or is not significantly probative...summary judgment may be granted."  Id. at 249-50.

III. Discussion

Counterclaim/Crossclaim Plaintiffs Marvin I. Kaplan, RIA Palms, LLC ("R1A"), Triple Net Exchange, LLC ("TNE"), MK Investing, LLC ("MKI") and BNK Smith, LLC

Case No. 8:12-CV-1837-T-17MAP

("BNK") move for summary judgment on some counts of the Amended Counterclaim/Crossclaim (Dkt. 93). Counterclaim/Crossclaim Plaintiffs request the entry of summary judgment as a matter of law on their claims against BBG and WFB for the face value of the improperly returned checks, or the actual damages sustained, whichever is greater, pre- and post-judgment interest, costs, fees, and any other appropriate relief.

A.      Claims against Bridgeview Bank Group and Wells Fargo, N.A.

1.      Count XIII  Breach of U.C.C. Sec. 4-302(A)     BBG
        Count XIV  Breach of U.C.C. Sec. 4-302(A)     WFB

Counterclaim/Crossclaim Plaintiffs move for summary judgment on the above Counts, arguing that 12 C.F.R. 229.30(d) specifies that a proper return [of a check] must clearly indicate on the front of the check that it is a returned check and the reason for the return. Counterclaim/Crossclaim Plaintiffs argue that Sec. 674.302(1)(a), Florida Statutes, (Florida's U.C.C. Sec. 4-302(A)), provides that a bank that fails to properly return a check by the midnight deadline is liable for the face amount of the check, regardless of whether actual damage is sustained due to the improper return; the provisions of U.C.C. 4-302 impose strict liability on banking institutions for failing to properly return a check by the imposed deadlines.

Counterclaim/Crossclaim Plaintiffs argue that "Refer to Maker" is not a reason for return, pursuant to the interpretation of 12 C.F.R. 229 ("Reg. CC") of the Federal Reserve Board of Governors, nor is it a proper instruction. Crossclaim/Counterclaim Plaintiffs also argue that "Refer to Maker" was used inappropriately in this case, such that no reason for return was given, the checks were not validly returned, and Crossclaim/Counterclaim Plaintiffs are entitled to summary judgment as a matter of law.

Case No. 8:12-CV-1837-T-17MAP

BBG and WFB respond that Counterclaim/Crossclaim Plaintiffs' reliance on the March 25, 2011 Proposed Rule and Proposed Commentary of Federal Reserve Board is misplaced. The Proposed Rule and Commentary amendments were not adopted. Therefore, the prior and current Commentary to 12 C.F.R. Sec. 229.30(d), App. E, which provides that "[a] reason such as "Refer to Maker" is permissible in appropriate cases" remains the operative guidance.

A. First Deal and Second Deal Checks

BBG argues that it is uncontroverted that BBG timely returned the First Deal Checks. Regions presented the First Deal Checks to BBG on January 23, 2012. BBG dishonored and returned the First Deal Checks before its midnight deadline on January 24, 2012. BBG further argues that Regions presented the Second Deal Checks to BBG on January 24, 2012, and BBG dishonored and returned the Second Deal Checks before its midnight deadline on January 25, 2012.

BBG argues that Counterclaim/Crossclaim Plaintiffs' attempt to hold BBG strictly liable under the U.C.C. for failure to provide a return reason as required by 12 C.F.R. Sec. 229.30(d) is improper and fails as a matter of law. NBT Bank N.A. v. First National Community Bank, 393 F.3d 404, 413 (3d Cir. 2004)(affirming summary judgment in favor of bank pursuant to U.C.C. Sec. 4-301 where bank returned item by midnight deadline but, under Reg. CC, erroneously encoded the routing number on the check). The U.C.C. and the C.F.R. have differing enforcement provisions and liability. The C.F.R. supersedes the U.C.C., but only to the extent of inconsistency. See 12 C.F.R. Sec. 229.41. Since the U.C.C. does not require a return reason, there is no inconsistency. BBG requests that the Court conclude that BBG timely returned the First Deal Checks and Second Deal Checks and complied with the U.C.C., irrespective of the RTM issue.

12

Case No. 8:12-CV-1837-T-17MAP

BBG further argues RTM remains an available return designation when returning checks; among other reasons, the Federal Reserve's electronic system recognized RTM as an available option for return in its drop down menu for "return reason." The Federal Reserve Bank of Chicago acknowledged the RTM designation and return reason for the First Deal Checks and Second Deal Checks when BBG returned those checks.

BBG argues that the record evidence supports RTM as appropriate under the circumstances of this case. BBG used the RTM designation because BBG had placed a debit restriction on Account *8201 and had begun the process of closing the account; the account-closing process was not completed when the First Deal Checks were presented for payment. Since Account *8201 had not yet been closed, no other return designation was appropriate. BBG explains that BBG used the RTM return designation because it did not want the dishonored First Deal Checks and Second Deal Checks to be re-presented, pursuant to industry standards. BBG relied on Board rulings that RTM was an available return designation and used it as a catch-all return reason, also intending to alert Regions Bank, the presenting bank, to the activity. The record evidence includes the Garces April 14, 2015 Expert Report, the Carrubba Report, and the respective testimony and affidavits of BBG, all of which detail the circumstances and reasoning of BBG's use of RTM, as well as industry usage of RTM, and establish that RTM was appropriate under the circumstances of this case. BBG contends that BBG's use of RTM for the First Deal and Second Deal Checks was proper and in accordance with reasonable commercial standards.

BBG argues that there is no record evidence that RTM was inappropriate under the circumstances. The only authority on which Counterclaim/Crossclaim Plaintiffs rely is the March 25, 2011 Proposed Commentary. BBG argues that BBG relied on Board rulings when returning the First Deal Checks and Second Deal Checks. 12 U.S.C. Sec. 4010 (e) provides:

13

Case No. 8:12-CV-1837-T-17MAP

> (e) Reliance on Board rulings. No provision of this section imposing any
> liability shall apply to any act done or omitted in good faith in conformity
> with any rule, regulation, or interpretation thereof by the Board of
> Governors of the Federal Reserve System, notwithstanding the fact that
> after such act or omission has occurred, such rule, regulation, or
> interpretation is amended, rescinded, or determined by judicial or other
> authority to be invalid for any reason.

In addition to Counterclaim/Crossclaim Plaintiffs' inability to establish the element of damages, BBG and WFB argue that BBG and WFB have a defense based on the drawer's fraud, misconduct or own negligence. See U.C.C. Sec. 4-302(b), Reg. CC Sec. 229.38(a), (c). It is undisputed that the First Deal Checks and Second Deal Checks were fraudulently drawn and presented to BBG as part of the SAA Ponzi scheme, and the WFB Replacement Checks were presented to WFB as part of the SAA Ponzi Scheme. BBG and WFB further argue that Counterclaim/Crossclaim Plaintiffs were negligent for failing to examine the underlying documentation, accounts or transactions involved in the Ponzi scheme as a whole. WFB argues that Counterclaim/Crossclaim Plaintiffs were negligent for participating in the Third Deal with SAA when, just days before, BBG had already returned the Second Deal Checks with an RTM designation.

BBG and WFB further argue that Counterclaim/Crossclaim Plaintiffs knowingly and intentionally participated in a check kite, played the float, and attempted to defraud multiple financial institutions, including BBG and WFB, through the presentation of the First Deal Checks, Second Deal Checks and WFB Replacement Checks.

WFB further argues that Counterclaim/Crossclaim Plaintiffs' damages, if any, are limited to those available under Reg. CC; Reg. CC alone contains a "reason for return" requirement and specifies the liability that attaches for a violation thereof. See 12 C.F.R. Sec. 229.38(a). WFB argues that the U.C.C.'s strict liability standard for failure to timely return checks by the midnight deadline does not apply where, as here, the

14

Case No. 8:12-CV-1837-T-17MAP

ultimate question is the propriety of WFB's reason for return under Reg. CC.

B.  WFB Replacement Checks

WFB argues that WFB's reasons for the return of the WFB Replacement Checks was appropriate under the circumstances.  WFB returned the WFB Replacement Checks because WFB could not explain the account activity WFB encountered, and no other return reason was sufficient.  WFB argues that the debit restraint on the SAA WFB Account, the presentment of twenty checks totaling nearly 10 million dollars despite drastically insufficient funds in the account, and the looming midnight deadline all contributed to WFB's uncertainty as to the account activity and WFB's use of the RTM designation.  When WFB returned the WFB Replacement Checks, the Federal Reserve's electronic system recognized RTM as an available option for return in its drop down menu for "return reason."  When WFB returned the twenty WFB Replacement Checks, the Federal Reserve Bank of Los Angeles acknowledged the RTM return reason for the twenty WFB Replacement Checks.  The use of the RTM designation was a lawful and proper alternative, and one expressly contemplated by Reg. CC.  See Garces Report, Sec. V.A.; Carrubba Aff at pars. 13-14.

WFB asserts that, at the time WFB returned the WFB Replacement Checks, the law and established banking practices, accepted RTM as a reason for return.  WFB argues that the only record evidence before the Court on this issue is that set forth by WFB as to this Motion and WFB's Motion for Summary Judgment, and BBG's Motion for Summary Judgment.

WFB argues that WFB timely returned the WFB Replacement Checks, and WFB did so with the appropriate use of the RTM designation.  WFB further argues that Counterclaim/Crossclaim Plaintiffs have not provided record evidence to dispute the appropriateness of WFB's use of the RTM designation, or to demonstrate how WFB's

Case No. 8:12-CV-1837-T-17MAP

use of RTM was not appropriate.

Counterclaim/Crossclaim Plaintiffs seek entry of summary judgment as a matter of law in their favor against BBG and WFB for the face value of the improperly returned checks, or the actual damages sustained, whichever is greater, pre- and post-judgment interest, costs, fees, and any other appropriate relief.

The bank records show that all the Checks at issue were timely returned. The Court has already determined that RTM is a return designation. The Federal Reserve Bank accepts RTM as a reason for return. There is no material factual dispute as to whether the use of RTM was appropriate in this case. After consideration, the Court **denies** Counterclaim/Crossclaim Plaintiffs' Motion for Summary Judgment as to Count XIII and Count XIV.

2. Count XV        Breach of 12 C.F.R. Part 229    BBG
   Count XVI       Breach of 12 C.F.R. Part 229    WFB

Counterclaim/Crossclaim Plaintiffs moves for summary judgment against BBG for the improper return of the First Deal Checks,  and for summary judgment against WFB for the improper return of the WFB Replacement Checks.

Counterclaim/Crossclaim Plaintiffs argue that the First Deal Checks were not timely returned by the midnight deadline, and did not contain a reason for the return. As to Count XV, Counterclaim/Crossclaim Plaintiffs seek summary judgment against BBG for the amount of the items, $10,857,300.  In the alternative, Counterclaim/Crossclaim Plaintiffs seek the award of actual damages sustained, if greater than the face amount of the items, pre- and post-judgment interest, costs, fees and any other appropriate relief.

Case No. 8:12-CV-1837-T-17MAP

Counterclaim/Crossclaim Plaintiffs argue that the WFB Replacement Checks were not timely returned by the midnight deadline, and did not contain a reason for the return.   As to Count XVI, Counterclaim/Crossclaim Plaintiffs seek summary judgment against WFB for the amount of the items, $9,850,000.00.  In the alternative, Counterclaim/Crossclaim Plaintiffs seek the award of actual damages sustained, if greater than the face amount of the items, pre- and post-judgment interest, costs, fees and any other appropriate relief.

A. First Deal Checks and Second Deal Checks

Counterclaim/Crossclaim Plaintiffs deposited the First Deal checks in the amount of $10,857,300.00 on Friday, January 20, 2012.  These funds were available on Saturday, January 21, 2012.  Regions presented the First Deal Checks to BBG on Monday, January 23, 2012.  On Tuesday, January 24, 2012, at 4:04 p.m., BBG dishonored and returned the First Deal Checks to Regions via the Federal Reserve Bank of Chicago; BBG also provided electronic notice Regions that BBG was dishonoring and returning the First Deal Checks.  (Dkt. 541-16, Reytikh Aff., Pars. 24-28, Dkt. 539.)  On Wednesday, January 25, 2012, Regions orally notified Counterclaim/Crossclaim Plaintiffs that BBG had dishonored the First Deal Checks. (Dkt. 93, ACC, par. 123.)   On Thursday, January 26, 2012, Regions provided written notices of dishonor to Counterclaim/Crossclaim Plaintiffs following the return of the First Deal Checks. (Dkt. 93, ACC, par. 147).

Counterclaim/Crossclaim Plaintiff Kaplan was in Tampa, FL on Monday, January 23, 2012.  Someone acting on behalf of Kaplan deposited the Second Deal Checks in the amount of $11,956,053. to the accounts of Counterclaim/Crossclaim Plaintiffs R1A, TNE, MKI and BNK on Monday, January 23, 2012.  At 10:00 p.m. that evening, a Regions back-office employee in Tampa noticed that the Second Deal Checks consisted of multiple sequentially-numbered checks for large amounts, for which there

17

Case No. 8:12-CV-1837-T-17MAP

were no holds. He notified Brandy Burnett, the Regional Operations Manager, who placed the funds in an internal Regions account so Counterclaim/Crossclaim Plaintiffs could not access the funds. (Dkt. 541-2, Newberger Dec., p. 5).

Counterclaim/Crossclaim Plaintiff Kaplan testified that he learned that the Second Deal Checks were not credited to the accounts of R1A, TNE, MKI and BNK on Tuesday morning, January 24, 2012; he telephoned Linda Council to inquire about the reason. (Dkt. 540-1, p. 287). Linda Council later called Counterclaim/Crossclaim Plaintiff Kaplan and notified him that there was a hold on the funds. (Dkt. 540-1, pp. 288-289). Counterclaim/Crossclaim Plaintiff Kaplan next telephoned Todd Smith; according to Counterclaim/Crossclaim Plaintiff Kaplan, Todd Smith said he would put a stop payment on the Second Deal Checks and those funds would apply to a "Third Deal," with an incentive payment of $500,000. Counterclaim/Crossclaim Plaintiff Kaplan agreed to the Third Deal. (Dkt. 540-1, pp. 290-292). Counterclaim/Crossclaim Plaintiff Kaplan received the written notice of hold on the Second Deal Checks on January 24, 2012. (Exh. 126).

Regions presented the Second Deal Checks to BBG on Tuesday, January 24, 2012. (Dkt. 541-6, Reytikh Aff, par. 29, Dkt. 539). BBG had until midnight on Wednesday, January 25, 2012 to return the Second Deal Checks, pursuant to U.C.C. 4-302(a), and BBG had until January 30, 2012 for Regions to receive the checks, pursuant to 12 C.F.R. Sec. 229.30.

At 3:12 p.m. and 4:11 p.m. on January 25, 2012 , BBG dishonored the Second Deal Checks and returned the Second Deal Checks to Regions via the Federal Reserve Bank in Chicago. (Dkt. 541-16, Reytikh Aff., pars. 32, 33, Dkt. 539). BBG provided electronic notice of dishonor and return to Regions on January 25, 2012.

18

Case No. 8:12-CV-1837-T-17MAP

B. WFB Replacement Checks

Counterclaim/Crossclaim Plaintiff Kaplan delivered 21 checks drawn by SAA on the WFB SAA Account in the amount of $10,550,000 to Regions after business hours on Wednesday, January 25, 2012, and these checks were deposited to Counterclaim/Crossclaim Defendants' Accounts on Thursday morning, January 26, 2012. Regions placed a hold on these funds. Regions contacted WFB to indicate that $10 million in checks drawn on the WFB SAA Account were deposited, and provided copies of the WFB Replacement Checks to WFB.   Upon investigation of the account activity, WFB placed a debit restraint on the WFB SAA Account. (Dkt. 541-35, Emanuelson Aff., par. 9). Regions electronically presented the WFB Replacement Checks for payment on January 26, 2012.   (Dkt. 541-39, Onuchovsky Aff., par. 7). WFB dishonored and returned the WFB Replacement Checks to Regions via the Federal Reserve Bank of Los Angeles at 5:58 p.m.; 1 check was returned NSF and 20 checks were returned RTM. (Dkt. 541-39, Onuchovsky Aff., par, 13). On Friday, January 27, 2012, WFB provided electronic notice to Regions that WFB was dishonoring and returning the WFB Replacement Checks.   (Dkt. 541-2, Newberger Dec. II, par. 20; Dkt. 541-40, Ex. I).   Regions orally notified Counterclaim/Crossclaim Plaintiffs that WFB dishonored the WFB Replacement Checks on Monday, January 30, 2012, and provided written notices of dishonor on Monday, January 30, 3012, and Tuesday, January 31, 2012. (Dkt. 541-2, Ex. J.).

WFB argues that WFB timely returned the WFB Replacement Checks in accord with U.C.C. Secs. 4-301, 4-104 and 4-302 because the checks were returned prior to WFB's midnight deadline, (Dkt. 541-43, Carrubba Aff., par. 11; Dkt. 541-44, Carrubba Report, pp. 3-4), and timely returned the WFB Replacement Checks in compliance with Reg. CC, 12 C.F.R. Sec. 229.30. (Dkt. 541-43, Carrubba Aff., par. 12; Dkt. 541-44, Carrubba Report, p. 4).

Case No. 8:12-CV-1837-T-17MAP

There is no material factual dispute as to whether the First and Second Deal Checks, and the WFB Replacement checks, were returned in accordance with 12 C.F.R. Sec. 229.30(a)(1).   After consideration, the Court **denies** Counterclaim/Crossclaim Plaintiffs' Motion for Summary Judgment as to Count XV and Count XVI.

B.  Tort Claims of Regions Bank against Kaplan, R1A, TNE, MKI, BNK

Defendants Kaplan, R1A, TNE, MKI and BNK seek summary judgment against the claims of Regions Bank which arise from factual  allegations that Defendants were knowingly perpetrating a fraud scheme against Regions and, as a result of the transactions, Regions lost substantial funds.  Defendants contend that there is no substantial competent evidence that Defendants were aware of the Ponzi scheme carried out by the Smiths and SAA.  Defendants argue the evidence demonstrates that Defendants were victims of the scheme and lost millions of dollars.  Defendants assert that Regions' claims against Defendants are contrary to the weight of the evidence and testimony in this case, and request that the Court grant summary judgment in favor of Defendants Kaplan, R1A, TNE, MKI, and BNK on these claims.

1.  General Principles

A.  U.C.C. and Common Law Claims

The Court notes that Sec. 670.101, et seq., Florida Statutes, controls funds transfers.  Sec. 670.102, Florida Statutes, Official Comment, states:

> In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address particular issues raised by this method of

Case No. 8:12-CV-1837-T-17MAP

payment.  A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles.  In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures and to price funds transfer services appropriately.  This consideration is particularly important given the very large amounts of money that are involved in funds transfers.  Funds transfers involve competing interests–those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest.  These competing interests were represented in the drafting process and they were thoroughly considered.  The rules that emerged represent a careful and delicate balancing of those interest and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article.  Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

Sec. 670.105(4), Florida Statutes, provides:

(4) In addition, chapter 671 contains general definitions and principles of construction and interpretation applicable throughout this chapter.

Off. Cmt. 4 states:

4. Subsection (d) incorporates definitions stated in Article 1 as well as principles of construction and interpretation stated in that Article.  Included is Section 1-103.  The last paragraph of the Comment to Section 4A-102 is addressed to the issue of the extent to which general principles of law and equity should apply to situations covered by provisions of Article 4A.

Case No. 8:12-CV-1837-T-17MAP

The Court notes that Sec. 671.103, <u>Florida Statutes</u>, provides:

> Unless displaced by the particular provisions of this code,
> the principles of law and equity, including the law merchant
> and the law relative to capacity to contract, principal and
> agent, estoppel, fraud, misrepresentation, duress, coercion,
> mistake, bankruptcy, or other validating or invalidating cause
> shall supplement its provisions.

B. Check Kiting

A Federal Reserve Financial Services brochure defines check kiting as follows:

> "Check kiting requires multiple bank accounts and the movement of
> monies between accounts.  The check kiter takes advantage of the time
> required by a bank to clear a check.  A check drawn on one bank is
> deposited in a second bank without having proper funds to cover the
> check.  When the deposit is made, the bank grants the depositor a
> conditional credit, and will allow the customer to draw checks against
> uncollected funds.  The customer then writes a check on the second bank
> and deposits it in the first bank to cover the original check.  Unless
> detected, this process can continue indefinitely, covering one check
> written against insufficient funds with another check."

In <u>United States v. Lahood</u>, 201 Fed. Appx. 993 (5th Cir. 2006)(unpublished), the Court
defined a check kite as follows:

> "Check kiting is a systematic scheme to defraud, whereby nonsufficient
> checks are traded or cross deposited between two or more checking
> accounts in order to artificially inflate the bank account balances. This is
> accomplished by using the float time in the bank system. Once bank
> accounts are artificially inflated, checks that would normally be returned
> for nonsufficient funds are, in fact, paid or honored by the issuing banks."
> <u>United States v. Abboud</u>, 438 F.3d 554, 563 n.1 (6th Cir. 2006).

Banking Bulletin 85-17 (Aug. 16, 1985), Comptroller of the Currency, Administrator of
National Banks, states:

Case No. 8:12-CV-1837-T-17MAP

> "Check kiting can involve both drawing against uncollected funds and
> overdrafts and occurs when a depositor with accounts in two or more
> banking offices takes advantage of the time required for checks to clear in
> order to obtain an unauthorized loan of bank funds. Drawing against
> uncollected funds occurs when checks are written against deposits that
> have been provisionally credited to an account subject to final payment by
> the drawee bank. Overdrafts, however, are checks drawn against an
> insufficient balance. It is important to note that the usual drawing against
> uncollected funds may be accidental or intentional, whereas a check kite
> is done with the intent to defraud."

In this case, there was a circular movement of funds from the accounts of R1A, MKI,
TNE and BNK via wire transfers out of Defendants' accounts at Regions  and the same
day deposit of checks from SAA representing Defendants' return of the loan amount,
with interest and incentives.

The intent to defraud may be established with circumstantial evidence.  In this
case, Regions points to the fact that Defendant Kaplan is a sophisticated account
operator, that Defendant Kaplan knew the difference between cleared funds and
available funds, that R1A, TNE, MKI and BNK never received hold notices before
1/24/2012, and therefore Defendants knew that they were using Regions' advances on
SAA check deposits for wires, and that Regions advised R1A, TNE MKI and BNK, in
response to Defendant Kaplan's inquiry, that they were receiving next day availability of
SAA check deposits.

Regions further argues that the "bundled deals" required R1A, TNE, MKI and
BNK to wire funds, because SAA did not have sufficient funds in its account to pay
SAA's vendors.  In other words. insufficient funds were the predicate for the SAA
"bundled deals".  Regions further argues that Defendant Kaplan deposited checks in
substantially greater amounts than outgoing wires on the same day that he sent wires.
Regions further argues that R1A, TNE, MKI and BNK knew that SAA checks were
issued on insufficient funds because the checks were received the same day as their

23

Case No. 8:12-CV-1837-T-17MAP

outgoing wires to fund the supposed payment of vendor invoices, when R1A, TNE, MKI and BNK knew that SAA did not have sufficient funds to pay vendors. Regions further argues that Defendant Kaplan did not request SAA to verify that it had sufficient funds to pay SAA checks being deposited. Defendant Kaplan's Affidavit does not deny knowledge that the SAA checks deposited in the accounts of R1A, TNE, MKI and BNK were issued against insufficient funds.

Regions further argues that R1A, TNE, MKI and BNK knowingly "leveraged the float." Further, although Defendant Kaplan typically conducted due diligence before investing, Defendant Kaplan did not do so on the SAA deals. The unusual rates of return on the investments of R1A, TNE, MKI and BNK prompted Defendants to continue the alleged investments without looking at the facts of the underlying deals. Regions further argues that the deal documents did not match the money flow, and Defendant Kaplan could not explain the logic of the "bundled deals." Regions further argues that R1A, TNE, MKI and BNK participated in most bundled deals, but the money flow was not direct to SAA. R1A and MKI principally wired out funds, and funds were internally transferred from TNE and BNK to carry out the deals. Regions argues that, given the millions in anticipated daily profits and the lack of business justification for Defendant Kaplan's use of more than one entity to engage in the SAA transactions, the Court may reasonably reject Defendant Kaplan's proffered explanation, that internal transfers were done to avoid minimal wire transfer fees.

As of November, 2011, R1A, TNE, MKI and BNK had $7,000,000 invested with SAA. By the end of January, 2012, the amount invested was $22,000,000. In his deposition, Defendant Kaplan testified he could not identify the amount of principal that was invested. (Dkt. 540-1, pp. 258-263). Defendant Kaplan testified that he did take an unidentified amount of money out before the investment scheme came to an end. (Dkt. 540-1, p. 214).

24

Case No. 8:12-CV-1837-T-17MAP

1. Count V          R1A's Conversion
   Count XII        TNE's Conversion
   Count XIX        MKI's Conversion
   Count XXVI       BNK's Conversion
   Count XXXI       Kaplan's Conversion


These claims are directed to Regions' allegations that Defendants Kaplan, R1A, TNE, MKI and BNK knew that the funds in their accounts represented provisional credits from checks deposited by Defendants to their accounts belonged to Regions, that Defendants exercised dominion and control over Regions' funds with intent to deprive Regions of the funds by internal transfers between Defendants' accounts and by wiring funds to the SAA Account in exchange for checks delivered by SAA, and deposited by Defendants when Defendants knew the checks were not backed by sufficient funds.  Regions further alleges that Regions has sustained damages proximately caused by Defendants' actions, and Defendants acted willfully and with utter disregard of Regions' rights in the transactions.   Regions seeks the award of compensatory damages, costs, interest and punitive damages.


A.  R1A, TNE, MKI, BNK


Defendants argue that Regions Bank has asserted a U.C.C. claim for the value of the checks which were not paid, for which provisional credit was given.  Defendants argue that these claims are preempted because the above claims include the same cause of action as Regions' U.C.C. claim.


R1A, TNE, MKI and BNK were parties to contracts with Regions (Deposit Agreements, Wire Transfer Agreements).  Under Florida law, where there is some wrongful conduct which amounts to an independent tort in addition to the conduct resulting in a contractual breach, a tort claim can be appropriate.  See Kee v. National Reserve Life Insurance Company, 918 F.2d 1538 (11th Cir. 1990).  Regions responds

Case No. 8:12-CV-1837-T-17MAP

that the wrongful conduct of R1A, TNE, MKI and BNK goes well beyond mere breach of
contract.  Regions contends that Defendants engaged in a check-kiting scheme, a form
of bank fraud.  Regions argues that the U.C.C. is silent on check-kiting; since there is
no specific provision in the U.C.C., the conversion claim is not preempted.  Common
law claims which are not inconsistent with Article 4A (wire transfers) may be brought.

Defendants further argue that the undisputed facts show that the elements of
conversion cannot be met as a matter of law.  An action for conversion of money
consists of: 1)  specific and identifiable money; 2) possession or an immediate right to
possess that money; 3) an unauthorized act which deprives plaintiff of that money; and
4) a demand for return of the money and a refusal to do so.  United States v. Bailey,
288 F.Supp.2d 1261, 1264 (M.D. Fla. 2003).

In this case, Regions contends that Defendants knowingly deposited worthless
checks issued on insufficient funds.  Regions extended provisional credit on the checks
Defendants deposited.  In furtherance of the check-kiting scheme, Defendants internally
transferred funds between Defendants' accounts and wired out funds to SAA's account
at BBG.

Other courts have permitted a conversion claim based on specific checks written
to pay for the personal expenses of one party which diverted funds from the party
entitled to the funds.  See In re Challa, 186 B.R. 750 (Bk. M.D. Fla.  Sept. 11, 1995).  A
conversion claim for money requires proof that funds are specific and identifiable.
Money is capable of identification where it is delivered at one time, by one act and in
one mass, or where the deposit is special and the identical money is to be kept for the
party making the deposit, or where the wrongful possession of such property is
obtained.   Tambourine Comercio Internacional, S.A. v. Solowsky, 312 Fed. Appx. 263,
271-75 (11th Cir. 2009)(sufficient evidence for jury determination on conversion claim on
wrongful wire transfer depriving plaintiff of right to possession to funds held in

Case No. 8:12-CV-1837-T-17MAP

trust)(citing <u>Belford Trucking v. Zagar</u>, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)). <u>See</u>
<u>Allen v. Gordon</u>, 429 So.2d 369 (Fla. 1ˢᵗ DCA 1983)(conversion action where money
withdrawn in separate ascertainable amounts and accounts).

Defendants further argue that an action for conversion is inappropriate because
a "mere obligation to pay money may not be enforced by an action for conversion."
<u>See</u> <u>Capital Bank v. G & J Investments Corp.</u>, 468 So.2d 534, 535 (Fla. 3d DCA 1985).
A breach of contract is not transformed into a conversion by virtue of a demand for
payment and refusal to pay. Other courts have held that a refusal to pay for one
overdraft cannot be enforced by a conversion action. <u>See</u> <u>American International</u>
<u>Realty, Inc. v. Southeast First National Bank</u>, 468 So.2d 383 (Fla. 3d DCA 1985).

The Court understands this claim to be a common law claim for conversion of
money, not a claim for conversion of an instrument. The facts in this case, which
include an alleged check kiting scheme, multiple entities, multiple bank accounts, and
intentional manipulation of the check collection process, with intent to defraud Regions,
are beyond a breach of contract action for nonpayment of overdrafts. However, the
accounts at issue are demand deposit accounts, not special accounts. Although the
alleged conversion claim relates to specific checks, there is no specific and identifiable
money associated with the claim. As Defendants' authorized agent, Defendant Kaplan
was authorized to place the payment orders for Defendants. There was no
unauthorized act which deprived Regions of the funds.

The Court finds that the facts of this case do not support a conversion claim.

After consideration, the Court **grants** Defendants' Motion for Summary
Judgment as to the conversion claims.

27

Case No. 8:12-CV-1837-T-17MAP

B. Kaplan

Regions has asserted an individual claim against Defendant Kaplan. While R1A, TNE, MKI and BNK were Regions' customers, Defendant Kaplan acted in his capacity as their agent. Defendant Kaplan was not Regions' customer, as defined in Sec. 674.104(1), Florida Statutes. Regions argues that the U.C.C. does not provide a remedy as to Defendant Kaplan, as a non-customer, and the absence of a contractual relationship with Defendant Kaplan permits the tort claim against Defendant Kaplan.

Because there is no specific, identifiable money to be returned to Regions, and because Defendant Kaplan acted as Defendants' authorized agent in placing the wire transfers, the Court finds that the facts of this case do not meet the elements of a conversion claim.

After consideration, the Court **grants** Defendants' Motion for Summary Judgment as to this claim.

2. Count VI          R1A's Fraudulent Concealment
   Count XIII        TNE's Fraudulent Concealment
   Count XX          MKI's Fraudulent Concealment
   Count XXVII       BNK's Fraudulent Concealment

These claims are directed to Defendants' nondisclosure of material facts in connection with the account transactions, including Defendants' knowledge that Defendants were depositing checks into Defendants' accounts against insufficient funds in the SAA account, the failure to disclose Defendants' knowledge that SAA had stopped payment on checks deposited to Defendants' accounts, and Bridgeview Bank would be dishonoring and returning checks, on which checks Regions had relied in extending immediate credit to Defendants' accounts. Regions alleges that Defendants knew or should have known that the information Defendants concealed was material to

Case No. 8:12-CV-1837-T-17MAP

Regions' decision to provide immediate use of funds from SAA check deposits and that
the information should have been disclosed to Regions.  Regions further alleges that
Defendants knew their concealment of or failure to disclose the material facts would
induce Regions to provide immediate use of the funds from deposited SAA checks, and
under the circumstances, Defendants' had a duty to disclose the material facts.
Regions alleges Regions detrimentally relied on the lack of information in providing
immediate use of the funds credited from deposit of SAA checks, that the damage to
Regions was proximately caused by Defendants' fraudulent concealment, and
Defendants acted willfully and with utter disregard of Regions' rights in the transaction.
Regions seeks the award of compensatory damages, costs, interest and punitive
damages.

> The elements of fraudulent concealment include:

> 1) a misrepresentation of material fact or suppression of the truth; 2) (a)
> knowledge of the representor of the misrepresentation or (b)
> representations made by the representor without knowledge as to either
> the truth or falsity, or (c) representation made under circumstances in
> which the representor ought to have known, if he did not know, of the
> falsity thereof; 3) an intention that the representor induce another to act
> on it; and 4) resulting injury to the party in justifiable reliance on the
> representations.

See Greenberg v. Miami Children's Hosp. Research Inst., Inc., 264 F.Supp.2d 1064,
1073 (S.D. Fla. 2003).   The claims are based on two alleged misrepresentations: 1)
that Defendants did not disclose that SAA had insufficient funds; and 2) that
Defendants did not disclose that SAA was going to stop payment on the Second Deal
Checks.  Defendants argue that "[a]llegations of fraudulent concealment by silence
must be accompanied by allegations of a special relationship that gives rise to a duty to
speak." Greenberg, 264 F.Supp.2d at 1073.

Case No. 8:12-CV-1837-T-17MAP

Defendants argue that there is no special relationship between Defendants and Regions that would give rise to the duty to disclose.  Defendants further argue that Regions did not rely on Defendants' misrepresentations in providing provisional credit, but on Regions' internal "funds availability" policy.  Defendants contend they had no knowledge of SAA's possible account issues until late in the day on January 24, 2012, after the First Deal Checks and Second Deal Checks had been deposited.

Defendants argue that the First Deal wire was done on cleared funds from Regions' accounts, and then paid back with the First Deal checks on January 20, 2012. The Second Deal wire was executed on January 23, 2012, using provisional credit from the First Deal Checks, and then repaid by the Second Deal Checks, on which Regions placed a hold, prior to Defendants' knowledge that SAA would stop payment or that SAA had account problems.  Defendants further argue that SAA did not have a frozen account between January 20-24, 2012.

The relationship between a bank customer who maintains a demand deposit account and the bank is an arms length debtor/creditor relationship in which there is no duty to disclose.  Regions argues that, under the facts of this case, a check-kiting fraud scheme would support Defendants' duty to disclose material facts to Regions.  In other words, an implied fiduciary relationship has arisen based on Defendants' superior knowledge which Regions could not have discovered without disclosure by Defendants. Barnett Bank v. Hooper, 498 So.2d 923 (Fla. 1986).   Regions argues that the record supports fraudulent concealment.

There is no U.C.C. section which addresses check-kiting.  In deposition, Defendant Kaplan testified that when the accounts were opened, Defendant Kaplan advised Regions that there would be many check deposits and many wire transfers, but did not provide any facts as to the "deals" Defendants entered into with SAA/Smiths. Intent to defraud can be based on circumstantial evidence.   The Court finds that the

30

Case No. 8:12-CV-1837-T-17MAP

alleged fraudulent scheme, including knowingly presenting SAA checks issued on insufficient funds, and manipulation of the check collection process, is sufficient to support a duty to disclose under the facts of this case.

After consideration, the Court **denies** Defendants' Motion for Summary Judgment as to these claims.

3. Count VII          R1A's Aiding and Abetting
   Count XIV          TNE's Aiding and Abetting
   Count XXI          MKI's Aiding and Abetting
   Count XXVIII       BNK's Aiding and Abetting

This claim is directed to Defendants' transfers of funds between Defendants' accounts and transfers of funds from Defendants' accounts in exchange for SAA checks, by which Defendants had actual knowledge of Defendant Kaplan's and other Defendants' wrongdoing and conversion of Regions' funds, and rendered substantial assistance to the conversion.  Regions alleges that Regions has been damaged as a proximate result of Defendants' aiding and abetting, and Defendants acted willfully and with utter disregard of Regions' rights in the transactions.

Defendants argue that there is no substantial competent evidence that supports a finding that Defendants R1A, TNE, MKI, BNK or Kaplan were aware of any tortious or illegal activity at the time.  Defendants argue that undisputed facts state that Defendants had no knowledge or awareness during the "deals" that Defendants were aware of any illegal or wrongful activity.  Defendants did not know of the Ponzi scheme perpetuated by the Smiths.  Defendants further argue that at the time Defendants were unaware of the concept of provisional credit.  Defendants argue that the elements of a civil claim for aiding and abetting have not been met, and the evidence disproves any claim for aiding and abetting.  Defendants further argue that, to the extent that conversion is characterized as the underlying wrong, the facts cannot support a claim

31

Case No. 8:12-CV-1837-T-17MAP

for Conversion.

> To support a civil aiding and abetting claim, the evidence must show:
>
> 1) the party whom the defendant aids must perform a wrongful act that causes an injury; 2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; 3) the defendant must knowingly and substantially assist the principal violation.

Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386 (11th Cir. 1994).

Regions argues that Defendants aided/abetted each other and SAA, knowing of the kite and deposit of worthless SAA checks, and Defendants admitted leveraging the float. Regions argues that Defendants knew of the others' wrongful conduct because the deals involved inter-related and orchestrated fund movement among Defendants and outgoing wires. Regions argues that Defendants acted as a cohesive unit, at the same time to send and receive funds from SAA, received SAA documents and checks in the same package, deposited SAA checks at the same time, and internally moved money for wires back to SAA.

Regions argues that the above facts are sufficient to establish aiding/abetting. Coquina Investments v. Rothstein, 2010 WL 4479057 (S.D. Fla. 2012).

After consideration, the Court **denies** Defendants' Motion for Summary Judgment as to these claims.

4. Count XXIX        Fraudulent Concealment Against Kaplan

Regions argues that Defendant Kaplan orchestrated the transactions in the accounts of R1A, TNE, MKI and BNK to induce Regions to provide funds to Kaplan so

Case No. 8:12-CV-1837-T-17MAP

he could extract funds from Defendants' accounts through the kiting scheme conducted between Defendants' accounts and the SAA account. Regions alleges that Defendant Kaplan knew of the clearance time for collection of checks, and that Regions was providing its funds as provisional credits to Defendants' accounts, and Defendant Kaplan used the credits to Regions' detriment by wiring funds between and from Defendants' accounts.

Regions further alleges that Defendant Kaplan knew, but did not disclose to Regions, the material fact that Defendant Kaplan was depositing SAA checks into Defendants' accounts, and using the funds provisionally credited by Regions, even though the checks were drawn against insufficient funds in the SAA account. Defendant Kaplan further concealed the fact that he consented to stop payments on checks deposited into Defendants' accounts for which Regions had provided immediate use of funds, so that Defendant Kaplan could engage in further improper transactions, to Regions' detriment. Defendant Kaplan knew that the stop payments would cause Bridgeview Bank to dishonor and return checks that Defendant Kaplan had deposited to Defendants' accounts, but Defendant Kaplan did not disclose this fact, and wired out $4,775,000 of Regions' funds.

Regions alleges that Defendant Kaplan knew, or should have known, that the information that Defendant Kaplan was concealing was material to Regions' decision to provide immediate use of the funds from SAA check deposits, and that the information should have been disclosed to Regions.

Regions further alleges that Defendant Kaplan knew that his concealment or nondisclosure of the material facts would induce Regions to continue to provide immediate use of funds from SAA checks Defendant Kaplan deposited, and that under the circumstances, Defendant Kaplan had a duty to disclose the material facts. Regions alleges that Regions detrimentally relied on the lack of information in providing

33

Case No. 8:12-CV-1837-T-17MAP

immediate use of funds credited from deposit of SAA checks, and, as a proximate result of Defendant Kaplan's fraudulent concealment, Regions has been damaged. Regions alleges that Defendant Kaplan acted willfully and with utter disregard for Regions' rights in the transaction.

The Court has denied the Motion for Summary Judgment as to Defendants R1A, TNE, MKI and BNK. Defendant Kaplan acted as Defendants' authorized agent in personally carrying out transactions at issue. The Court therefore **denies** Defendants' Motion for Summary Judgment as to this claim.

5. Count XXX    Aiding and Abetting Conversion Against Kaplan

This claim is directed to Defendant Kaplan's conduct in orchestrating the outgoing wires from the accounts of Defendants R1A, TNE, MKI and BNK, and transferring funds between Defendants' accounts. Regions alleges that Defendant Kaplan had actual knowledge of the wrongdoing of Defendants R1A, TNE, MKI and BNK and conversion of Regions' funds, and rendered substantial assistance to the conversion. Regions further alleges that Defendant Kaplan acted willfully and with utter disregard of Regions' rights in the transactions, and Regions' damages were proximately caused by Defendant Kaplan's aiding and abetting.

The Court has granted Defendants' Motion for Summary Judgment as to the conversion claims. The Court therefore **grants** Defendants' Motion for Summary Judgment as to this claim. Accordingly, it is

**ORDERED** that Defendants' Motion for Summary Judgment is **denied in part and granted in part** as follows:

Case No. 8:12-CV-1837-T-17MAP

| | | | |
|---|---|---|---|
| Count XIII | Breach of U.C.C. Sec. 4-302(A) | BBG | **denied** |
| Count XIV | Breach of U.C.C. Sec. 4-302(A) | WFB | **denied** |
| | | | |
| Count XV | Breach of 12 C.F.R. Part 229 | BBG | **denied** |
| Count XVI | Breach of 12 C.F.R. Part 229 | WFB | **denied** |
| | | | |
| Count V | R1A's Conversion | | **granted** |
| Count XII | TNE's Conversion | | **granted** |
| Count XIX | MKI's Conversion | | **granted** |
| Count XXVI | BNK's Conversion | | **granted** |
| Count XXXI | Kaplan's Conversion | | **granted** |
| | | | |
| Count VI | R1A's Fraudulent Concealment | | **denied** |
| Count XIII | TNE's Fraudulent Concealment | | **denied** |
| Count XX | MKI's Fraudulent Concealment | | **denied** |
| Count XXVII | BNK's Fraudulent Concealment | | **denied** |
| | | | |
| Count VII | R1A's Aiding and Abetting | | **denied** |
| Count XIV | TNE's Aiding and Abetting | | **denied** |
| Count XXI | MKI's Aiding and Abetting | | **denied** |
| Count XXVIII | BNK's Aiding and Abetting | | **denied** |
| | | | |
| Count XXIX | Fraudulent Concealment Against Kaplan | | **denied** |
| | | | |
| Count XXX | Aiding and Abetting Conversion - Kaplan | | **granted** |

**DONE and ORDERED** in Chambers in Tampa, Florida on this $\underline{18}^{th}$ day of
April, 2016.

ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record