UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK,

        Plaintiff,

        v.                           CASE NO. 8:12-cv-1837-T-17MAP

MARVIN I. KAPLAN, et al

        Defendants.
_____/

## REPORT AND RECOMMENDATION

      This action centers around allegations by Regions Banks that Marvin Kaplan, R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC, and BNK Smith, LLC (the "Kaplan parties") participated in a check kiting scheme (doc. 190).  The Kaplan parties denied the allegations, claimed they were victims of a multi-million dollar fraud scheme conducted by, among others, G. Todd Smith, Gary T. Smith, Lucy B. Smith, and Smith Advertising & Associates, Inc. (the "Smith parties"), and brought a third-party complaint asserting a host of claims against the Smith parties: fraud (Count I), conspiracy to defraud (Count II), negligent misrepresentation (Count III), violation of 18 U.S.C § 1962(c) (Count IV), violation of 18 U.S.C § 1962(d) (Count V), violation of Fla. Stat. §§ 772.103(3), 772.104 (Count VI), violation of Fla. Stat. §§ 772.103(4), 772.104 (Count VII), violation of Fla. Stat. § 772.11 (Count VIII), conversion (Count IX), and violation of Fla. Stat. § 501.201 (Count X)  (doc. 93, as modified by docs. 244 and 351).  When the Smith parties failed to answer the third-party complaint, the district judge issued a default judgment (docs. 346, 349) and referred to me the issue of the

amount of damages (doc. 667).[1]  After briefing on the issues (docs. 758, 800, 804), as well as an evidentiary hearing on November 17, 2016, I recommend the Court award $47,598,983 to R1A Palms, LLC,  $11,246,494 to Triple Net Exchange, LLC,  $7,795,449.47 to MK Investing, LLC, $2,963,804.18 to BNK Smith, LLC, plus pre-judgment and post-judgment interest, as well as $40,609 in attorneys' fees.

    A.  *Damages*

        1.  *Default Standard*

A court may enter a default judgment against a party who has failed to plead in response to a complaint, and the decision to do so is committed to the court's discretion.  Fed. R. Civ. P. 55(b)(2);  *Mason v. Lister*, 562 F.2d 343, 345 (5th Cir. 1977).[2]  Although the factual allegations of a well-pleaded complaint are taken as true, conclusions of law are not.  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n. 41 (11th Cir. 1997); *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005). And a plaintiff's allegations relating to damages are also not admitted by virtue of default; rather, the court has "an obligation to assure that there is a legitimate basis for any award it enters, and then assure that damages are not awarded solely as the result of an unrepresented defendant's failure to respond." *Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003); *see also Adolph Coors Co. v. Movement Against Racism*

---

[1]  The default judgment applied to all Smith parties on all counts except counts I and III.  For those two counts, the default judgment held only against G. Todd Smith and Smith Advertising & Associates, Inc.

[2]  The Eleventh Circuit in an en banc decision, *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (on default judgment, "[d]amages may be awarded only if the record adequately reflects the basis for award").

      *2.   Facts*

      Kaplan, a businessman who resides in Sarasota, Florida, formed and managed R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC, and BNK Smith, LLC (the "Kaplan entities") (doc. 93 at ¶¶ 2, 17).  Around 2009, the Kaplan entities invested with Smith Advertising & Associates, Inc. ("SAA") (*id.* at ¶ 18).[3]  SAA offered advertising and marketing services to its customers, although SAA acted more like a broker for such services by contracting out the printing and profiting from the difference between what it charged the customer and what it paid its printer (*id.* at ¶¶ 26-27).  To increase profits, SAA paid the printer at a reduced rate up front instead of the full rate paid after SAA's customer satisfied the contract price (*id.* at ¶ 28).  Because SAA did not always have the necessary cash for pre-payment, it relied on investors like Kaplan to front the pre-payment (*id.* at ¶ 29).  SAA then split the pre-payment discount (the profit) with the investor (*id.*).  In effect, Kaplan, through his entities, made short term loans to SAA.  Kaplan would wire pre-payment money to SAA; SAA then sent Kaplan two checks: one for his share of the profit, which he could cash immediately, and the other reimbursing him for the initial investment, which he cashed after 30 days (when the customer paid SAA) (*id.* at ¶ 32).  The Kaplan entities invested in these deals for a few years, apparently without incident (*id.* at ¶¶ 68-71).  But that narrative changed, and what was past was not prologue.

      SAA offered Kaplan a new opportunity: if he fronted more money for multiple contract

---

[3]  Defaulted parties G. Todd Smith, Gary T. Smith, and Lucy B. Smith owned or managed SAA during the relevant time period (doc. 93 at  ¶¶ 14-16).

deals, he would receive a return on investment within 24 hours (i.e., cash both checks immediately) (*id*. at ¶¶ 76-80).  In January 2012, Kaplan invested millions in three deals within five days.  The Smith parties' checks bounced, and Kaplan his lost millions, not to mention his sizeable, anticipated profits.

*a.  the first deal*

On January 19, 2012, Kaplan wired these funds through his entities and expected these returns under the contracts with SAA (Wires, Evid. Exs. 38-41):

| Kaplan entity | Initial Investment | Total Expected Return |
|---|---|---|
| R1A Palms, LLC | $ 6,600,000 | $ 7,395,125 |
| Triple Net Exchange, LLC | $ 1,600,000 | $ 1,784,800 |
| MK Investing, LLC | $ 1,100,000 | $ 1,234,000 |
| BNK Smith, LLC | $ 400,000 | $ 443,375 |

(First Deal Contracts/Promissory Notes, Evid. Exs. 10-13; First Deal Checks, Evid. Ex. 23).[4]

SAA sent checks, which Kaplan deposited with Regions on January 20, 2012 (Evid. Ex. 23).

*b.  the second deal*

On January 23, 2012, Kaplan, through his entities, wired funds for a second deal  (Evid. Exs. 38-41):

| Kaplan entity | Initial Investment | Total Expected Return |
|---|---|---|
| R1A Palms, LLC | $ 7,000,000 | $ 7,994,660 |
| Triple Net Exchange, LLC | $ 1,800,000 | $ 2,009,700 |

---

[4]  To reduce the number of wires, Triple Net Exchange, LLC and BNK Smith, LLC transferred their initial investments to R1A Palms, LLC, which then wired SAA all three initial investments (Evid. Exs. 38, 39, 41)

4

| MK Investing, LLC | $ 1,250,000 | $ 1,395,000 |
| BNK Smith, LLC | $ 500,000 | $ 556,675 |

(Second Deal Contracts/Promissory Notes, Evid. Exs. 15-18; Second Deal Checks, Evid. Ex. 24). That same day, SAA issued Kaplan checks, which he promptly deposited (Evid. Ex. 24).

### c. the third deal

The next day, Kaplan, through R1A Palms, invested in one more deal. The contract called for an initial investment of $2,250,000 and a $2,475,000 expected return (Third Deal Contracts/Promissory Notes, Evid. Ex. 22; doc. 93 at ¶¶ 115-117). However, RIA Palms wired only $2,000,000, expecting a $2,225,000 return (Wire Transfer, Evid. Ex. 32)

### d. bounced checks

On January 25, 2012, Regions informed Kaplan that all of SAA's checks had bounced with the exception of one $600,000 check to R1A Palms, LLC associated with the first deal. The Kaplan entities suffered these losses:

| Kaplan entity | Total Loss (initial investment plus anticipated profits) | | |
|---|---|---|---|
| | first deal | second deal | third deal |
| R1A Palms, LLC | $ 6,795,125[5] | $ 7,494,660[6] | $ 2,225,000 |
| Triple Net Exchange, LLC | $ 1,784,800 | $ 2,009,700 | N/A |
| MK Investing, LLC | $ 1,234,000 | $ 1,395,000 | N/A |
| BNK Smith, LLC | $ 443,375 | $ 556,675 | N/A |

---

[5] R1A Palms, LLC's total expected return on the first deal less the $600,000 check that cleared.

[6] This accounts for a $500,000 wire from SAA that compensated R1A Palms, LLC for an error with the second deal contracts (R1A Palms Wire Record, Evid. Ex. 31).

*e.  Set-Off*

Kaplan, presuming some mistake as opposed to suspecting the perpetration of a fraud, demanded the Smith parties cure the bad checks.  On January 25, 2012, SAA wired $1,406,035 to R1A Palms, LLC (Wire Transfer, Evid. Ex. 47).  Later, SAA sent a cashier's check and a series of wires to Kaplan's counsel (Reimbursements, Evid. Ex. 48).[7]  These amounts reflected a small portion of what the Smith parties owed the Kaplans entities. The total set-offs are as follows:

| Kaplan entity | Amount Recovered |
|---|---|
| R1A Palms, LLC | $ 1,945,372.00 |
| Triple Net Exchange, LLC | $ 137,006.00 |
| MK Investing, LLC | $ 91,550.53 |
| BNK Smith, LLC | $ 36,345.82 |

*3.  Discussion*

Although the Court entered default judgment in favor of the Kaplan parties on all counts (each an alternative theory of liability for the lost investments), they may only recover once for the same actual damages.  *See, e.g., Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC,* 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009).  They recognize as much and appropriately analyze their damages under Court IV, which sets out a violation of 18 U.S.C. § 1962(c) (RICO).  This count incorporates the core operative facts that make up the other counts of the third-party complaint (doc. 93 at ¶ 201).  *See* 18 U.S.C. § 1961.

---

[7] These transactions occurred on the following dates: January 31, 2012 ($100,000), February 8, 2012 ($425,239.35), February 9, 2012 ($50,000), February 10, 2012 ($60,000), February 13, 2012 ($60,000), February 14, 2012 ($60,000), and February 15, 2012 ($49,000).

RICO provides "[a] person injured in his business or property by reason of a violation of section 1962 of this chapter . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964(c).  A plaintiff must prove the defendant's racketeering activity proximately caused his claimed damages.  *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (A plaintiff must prove "some direct relation between the injury asserted and the injurious conduct alleged."); *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010).  Courts determining proximate cause should consider (1) "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action;" (2) "the speculative nature of the proceedings that would follow if [the plaintiff] were permitted to maintain its claim;" (3) whether the alleged harm "could have resulted from factors other than [the plaintiff's] alleged acts of fraud;" (4) "any appreciable risk of duplicative recoveries;" and (5) whether "the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–60 (2006).  A plaintiff cannot recover "purely contingent" or "remote" damages.  *Id.* at 457.

Here, the Kaplan parties seek not only the return of their principal but also their expected profit.  Courts generally have avoided awarding civil RICO plaintiffs any "intangible, expectancy-type, benefit of the bargain damages."  *Roberts v. The Scott Fetzer Co.*, No. 4:07-CV-80 (CDL), 2010 WL 3937312, at *10 (M.D. Ga. Sept. 30, 2010) (reasoning that a party's lost expectation does not constitute an injury to business or property);  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008).  Yet the Eleventh Circuit has determined lost profits can be compensable damages under RICO if the amounts are easily ascertainable

(e.g., outlined in a contract).  *Corcel Corp. v. Ferguson Enterprises, Inc.*, 551 F. App'x 571, 578 (11th Cir. 2014) (finding proximate cause when Plaintiff would have been awarded supply and construction contracts but for racketeering activities); *see also Chesapeake Employers' Ins. Co. v. Eades*, 77 F. Supp. 3d 1241, 1252 (N.D. Ga. 2015) ("[C]oncrete financial loss in premiums [plaintiff] was entitled to under the insurance contract" are recoverable under RICO).   The *Corcel* panel examined the *Anza* factors, found the plaintiff's damages easily ascertainable from the contracts, concluded no appreciable risk of duplicative recoveries existed, and determined the plaintiff was the sole victim of the racketeering scheme.  *Corcel Corp.*, 551 F. App'x at 577-78.   In sum, the panel found "a direct relationship between the defendants' actions and plaintiff['s] harm."  *Id.* at 577.

Applying the *Anza* factors here, I find the Kaplan parties' losses (principal plus return) were not caused by some remote action, the losses are easily ascertainable based on the parties' agreements, the harm was a direct result of the Smith parties' Ponzi scheme, the losses are not duplicative, and there are no victims other than the Kaplan parties.  Accordingly, the Kaplan parties' damages should reflect both lost principal and lost profits, and their trebled amounts are as follows:

| Kaplan entity | Actual Loss | Trebled Amount |
|---|---|---|
| R1A Palms, LLC | $ 16,514,785 | $ 49,544,355 |
| Triple Net Exchange, LLC | $ 3,794,500 | $ 11,383,500 |
| MK Investing, LLC | $ 2,629,000 | $ 7,887,000 |
| BNK Smith, LLC | $ 1,000,050 | $ 3,000,150 |

The award must next be reduced by the set-off.  *Allstate Ins. Co. v. Palterovich*, 653 F.

8

Supp. 2d 1306, 1333 (S.D. Fla. 2009); *Bal Theatre Corp. v. Paramount Film Distrib. Corp.*, 206 F. Supp. 708, 716 (N.D. Cal. 1962) ("[W]here the law has a punitive purpose in multiplying the compensatory damages,. . . any set-offs, or deductions, from the judgment must be made after the compensatory damages are multiplied as required by law, so that the punitive purpose of the law will not be frustrated.").

| Kaplan entity | Trebled Amount Less Set-Off[8] |
|---|---|
| R1A Palms, LLC | $ 47,598,983.00 |
| Triple Net Exchange, LLC | $ 11,246,494.00 |
| MK Investing, LLC | $ 7,795,449.47 |
| BNK Smith, LLC | $ 2,963,804.18 |

These amounts should be entered jointly and severally against all defaulted parties. *See United States v. McKay*, 285 Fed. App'x. 637, 640 (11th Cir. 2008).

Finally, I conclude the Kaplan entities should be awarded pre-judgment and post-judgment interest.  In RICO cases, a court has broad discretion in determining whether to award pre-judgment interest.  *Maiz v. Virani*, 253 F.3d 641, 663 n. 15 (11th Cir. 2001)*; see also In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 495 (6th Cir. 2013).  Here, a pre-judgment interest award is appropriate given that the Kaplan parties' Florida law claims entitle them to pre-judgment interest.  *Palterovich*, 653 F. Supp. 2d at 1333; *see also Wiand v. Dancing $*, LLC, 578 F. App'x 938, 947 (11th Cir. 2014) ("Florida courts award prejudgment interest as a matter of course.") (internal quotations omitted).  However, pre-judgment interest shall only be awarded on the base amounts (not the trebled amounts). *See Palterovich*, 653 F. Supp. 2d at 1333 ("[A]

---

[8]  This reflects the set-off amounts in Section *A.2.e.*

trebled award of discretionary pre-judgment interest is inappropriate" because "[t]he award of trebled damages, without trebled pre-judgment interest is adequate to compensate the. . . plaintiffs for their damages." ); *Tremaine v. Downs*, No. 2:04-CV-151-FTM29SPC, 2007 WL 865557, at *1 (M.D. Fla. Mar. 21, 2007) (awarding prejudgment interest on "base amounts").

Given the Kaplan parties' state law claims, I find that applying Florida law in calculating pre-judgment interest is reasonable and fair. *See In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 710 (11th Cir. 2005) (giving courts discretion as to pre-judgment interest rates); *Palterovich*, 653 F. Supp. 2d at 1333 (finding state law appropriate on the issue of pre-judgment interest). And, under Florida law, pre-judgment interest should be calculated from the time investments were made until the time that any set-off payments were made, at which time it begins to run on the total of the investment less the set-off. *Greenberg v. Grossman*, 683 So. 2d 156, 157 (Fla. 3d DCA 1996) (citing Fla. Stat. § 772.11). Using this rule, pre-judgment interest should be awarded as follows:

**R1A Palms, LLC**

| Dates | Amount | Daily Interest Rate | Daily Interest Amount | Days | Award |
|---|---|---|---|---|---|
| 1/19/12 - 1/22/12 | $6,795,125.00 | .0129781% | $881.88 | 4 | $3,257.51 |
| 1/23/12 | $14,289,785.00 | .0129781% | $1,854.54 | 1 | $1854.54 |
| 1/24/12 | $16,514,785.00 | .0129781% | $2,143.31 | 1 | $2,143.31 |
| 1/25/12 - 1/30/12 | $15,108,750.00 | .0129781% | $1,960.83 | 6 | $11,764.98 |

| 1/31/12 - 2/7/12 | $15,008,750.00[9] | .0129781% | $1,947.85 | 8 | $15,582.80 |
| 2/8/12 | $14,583,510.65 | .0129781% | $1,892.66 | 1 | $1,892.66 |
| 2/9/12 - 12/31/2012 | $14,569,413.00 | .0129781% | $1,890.83 | 327 | $618,302.39 |
| 1/1/13 - 12/31/15 | $14,569,413.00 | .0130137% | $1,896.02 | 1095 | $2,076,141.57 |
| 1/1/16 - 3/31/16 | $14,569,413.00 | .0129781% | $1,890.83 | 91 | $172,065.80 |
| 4/1/16 - 6/30/16 | $14,569,413.00 | .01306011% | $1,902.78 | 91 | $173,153.10 |
| 7/1/16 - 9/30/16 | $14,569,413.00 | .01322404% | $1,926.67 | 92 | $177,253.18 |
| 10/1/16 - 12/31/16 | $14,569,413.00 | .01341530% | $1,954.53 | 92 | $179,816.80 |
| 1/1/17 - 2/16/17 | $14,569,413.00 | .01361644% | $1,983.84 | 47 | $93,240.26 |

I recommend the district judge award R1A Palms, LLC $ 3,526,738.91 in prejudgment interest through today's date. The daily pre-judgment interest amount at the present rate is $1,983.84.

**MK Investing, LLC**

| Dates | Amount | Daily Interest Rate | Daily Interest Amount | Days | Award |
|---|---|---|---|---|---|
| 1/19/12 - 1/22/12 | $1,234,000.00 | .0129781% | $160.15 | 4 | $640.60 |

---

[9]  Beginning on January 31, 2012, SAA's set-off payments were sent to the Kaplan entities' counsel, but not directed to any specific entity.  I applied the first-in, first-out method in allocating the payments to the entities for purposes of calculating pre-judgment interest.

| 1/23/12-2/8/12 | $2,629,000.00 | .0129781% | $341.19 | 17 | $5,800.30 |
|---|---|---|---|---|---|
| 2/9/12 | $ 2,593,097.65 | .0129781% | $336.53 | 1 | $336.53 |
| 2/10/12-2/12/12 | $ 2,533,097.65 | .0129781% | $328.75 | 3 | $986.24 |
| 2/13/12 - 12/31/2012 | $2,491,994.00 | .0129781% | $323.41 | 323 | $104,462.55 |
| 1/1/13-12/31/15 | $2,491,994.00 | .0130137% | $324.30 | 1095 | $355,109.18 |
| 1/1/16-3/31/16 | $2,491,994.00 | .0129781% | $323.41 | 91 | $29,430.63 |
| 4/1/16-6/30/16 | $2,491,994.00 | .01306011% | $325.46 | 91 | $29,616.60 |
| 7/1/16-9/30/16 | $2,491,994.00 | .01322404% | $329.54 | 92 | $30,317.89 |
| 10/1/16-12/31/16 | $2,491,994.00 | .01341530% | $334.31 | 92 | $30,756.38 |
| 1/1/17 - 2/16/17 | $2,491,994.00 | .01361644% | $339.32 | 47 | $15,948.08 |

I recommend the district judge award MK Investing, LLC $603,404.99 in prejudgment interest through today's date. The daily pre-judgment interest amount at the present rate is $339.32.

**Triple Net Exchange, LLC**

| Dates | Amount | Daily Interest Rate | Daily Interest Amount | Days | Award |
|---|---|---|---|---|---|
| 1/19/12 - 1/22/12 | $1,784,800.00 | .0129781% | $231.63 | 4 | $926.53 |
| 1/23/12-2/12/12 | $3,794,500.00 | .0129781% | $492.45 | 21 | $10,341.53 |

| 2/13/12 | $3,775,603.65 | .0129781% | $490.00 | 1 | $490.00 |
| 2/14/12 | $3,715,603.65 | .0129781% | $482.21 | 1 | $482.21 |
| 2/15/12 - 12/31/2012 | $3,702,949.47 | .0129781% | $480.57 | 321 | $154,263.77 |
| 1/1/13- 12/31/15 | $3,702,949.47 | .0130137% | $481.89 | 1095 | $527,670.36 |
| 1/1/16- 3/31/16 | $3,702,949.47 | .0129781% | $480.57 | 91 | $43,732.10 |
| 4/1/16- 6/30/16 | $3,702,949.47 | .01306011% | $483.61 | 91 | $44,008.44 |
| 7/1/16- 9/30/16 | $3,702,949.47 | .01322404% | $489.68 | 92 | $45,050.52 |
| 10/1/16- 12/31/16 | $3,702,949.47 | .01341530% | $496.76 | 92 | $45,702.08 |
| 1/1/17 - 2/16/17 | $3,702,949.47 | .01361644% | $504.21 | 47 | $23,697.86 |

I recommend the district judge award Triple Net Exchange, LLC $896,365.41 in prejudgment interest through today's date. The daily pre-judgment interest amount at the present rate is $504.21.

**BNK Smith, LLC**

| Dates | Amount | Daily Interest Rate | Daily Interest Amount | Days | Award |
|---|---|---|---|---|---|
| 1/19/12 - 1/22/12 | $443,375.00 | .0129781% | $57.54 | 4 | $230.17 |

| 1/23/12-2/14/12 | $1,000,050.00 | .0129781% | $129.79 | 23 | $2,985.11 |
|---|---|---|---|---|---|
| 2/15/12-12/31/2012 | $963,704.18 | .0129781% | $125.07 | 321 | $40,147.63 |
| 1/1/13-12/31/15 | $963,704.18 | .0130137% | $125.41 | 1095 | $137,327.86 |
| 1/1/16-3/31/16 | $963,704.18 | .0129781% | $125.07 | 91 | $11,381.41 |
| 4/1/16-6/30/16 | $963,704.18 | .01306011% | $125.86 | 91 | $11,453.34 |
| 7/1/16-9/30/16 | $963,704.18 | .01322404% | $127.44 | 92 | $11,724.54 |
| 10/1/16-12/31/16 | $963,704.18 | .01341530% | $129.28 | 92 | $11,894.11 |
| 1/1/17 -2/16/17 | $963,704.18 | .01361644% | $131.22 | 47 | $6,167.44 |

I recommend the district judge award BNK Smith, LLC $233,311.61 in prejudgment interest through today's date. The daily pre-judgment interest amount at the present rate is $131.22.

Finally, post-judgment interest shall accrue from the date final judgment is entered. 28 U.S.C. § 1961.

*B. Attorneys' Fees*

RICO provides that the Kaplan parties should be awarded reasonable attorneys' fees. 18 U.S.C. § 1964(c). The Kaplan parties petition for $67,253.20 in fees; I must determine if this amount is reasonable. A court should start any attorneys' fees calculation by determining the lodestar, which is the hours reasonably expended by an attorney multiplied by the attorney's reasonable hourly rate. *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). The party seeking fees bears the burden of establishing that its counsel's hours

14

and rate are reasonable.  *Webb v. Bd. of Educ. of Dyer County*, 471 U.S. 234, 242 (1985).  Thus,

the applicant must produce satisfactory evidence that the requested rate is within the prevailing

market rates and supports the number of hours worked and the rate sought.  *Hensley v.*

*Eckerhart*, 461 U.S. 424, 433 (1983).  Additionally, "[t]he court … is itself an expert on the

question and may consider its own knowledge and experience concerning reasonable and proper

fees and may form an independent judgment either with or without the aid of witnesses as to

value."  *Norman*, 836 F.2d at 1303.

"A reasonable hourly rate is the prevailing market rate in the relevant legal community

for similar services by lawyers of reasonably comparable skills, experience, and reputation."

*Norman*, 836 F.2d at 1299 (citing *Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11 (1984)).  The

Kaplan attorneys ask for the following rates:

| Biller | Rate |
|---|---|
| Jon Parrish (24 years' experience) | $395 - $425 |
| Floyd Yarnell (18 years' experience) | $300 - $350 |
| Donald Peterson (13 years' experience) | $350 |
| E.B. Newberry Yarnell (8 years' experience) | $250 |
| Anais Taboas (5 years' experience) | $225 - 250 |
| Jonathan Weirich (2 years' experience) | $230 |
| Natalia Staroschak (law clerk) | $150 |
| Paralegals | $100 - $150 |
| Legal Assistants | $85 - $125 |

However, they submit nothing to show these rates are within the prevailing market rates.  While

I recognize the complexity of this case, these rates are higher than Tampa's market rate.  I find

the following rates reasonable:

| Biller | Rate |
|---|---|
| Jon Parrish (24 years' experience) | $375 |
| Floyd Yarnell (18 years' experience) | $325 |
| Donald Peterson (13 years' experience) | $325 |
| E.B. Newberry Yarnell (8 years' experience) | $250 |
| Anais Taboas (5 years' experience) | $200 |
| Jonathan Weirich (2 years' experience) | $175 |
| Natalia Staroschak (law clerk) | $100 |
| Paralegals | $75 |
| Legal Assistants | $60 |

*Lietz v. Oxford Law, LLC*, No. 8:15-CV-2211-T-23TGW, 2016 WL 2897469, at *3 (M.D. Fla. Apr. 22, 2016), report and recommendation adopted, No. 8:15-CV-2211-T-23TGW, 2016 WL 2787099 (M.D. Fla. May 13, 2016) (awarding $350 to an attorney with over ten years' experience); *Sure Fill & Seal, Inc. v. GFF, Inc.*, No. 8:08-CV-882-T-17TGW, 2012 WL 5227676, at *12 (M.D. Fla. Apr. 2, 2012), report and recommendation adopted, No. 8:08-CV-882-T-17-TGW, 2012 WL 5199670 (M.D. Fla. Oct. 22, 2012) (finding $100 per hour to be a reasonable rate for a law clerk, and $60-$95 per hour reasonable for paralegals); *Rynd v. Nat'l Mut. Fire Ins. Co.*, No. 8:09-CV-1556-T-27TGW, 2012 WL 939387, at *14 (M.D. Fla. Jan. 25, 2012), report and recommendation adopted, No. 8:09-CV-1556-T-27TGW, 2012 WL 939247 (M.D. Fla. Mar. 20, 2012) (awarding $200 for an attorney with five years' experience)*; Johnson v. Potter*, No. 8:08-CV-1279-T-24TGW, 2011 WL 672347, at *4 (M.D. Fla. Feb. 17, 2011) (awarding $150/hour for an attorney with little experience); *Ottaviano v. Nautilus Ins. Co.*,

717 F. Supp. 2d 1259, 1270 (M.D. Fla. 2010) (hourly rates in the $300–$400 range are reserved for the most skilled attorneys litigating complex cases); *N.Y. Life Ins. Co. v. Waxenberg*, No. 807-CV-401-T-27TGW, 2009 WL 5214986, at *2 (M.D. Fla. Dec. 29, 2009) (approving $55 hourly rate for legal assistants).

As to the hours expended, the Supreme Court instructs fee applicants to use "billing judgment." *Norman*, 836 F.2d at 1301 (citing *Hensley*, 461 U.S. at 434). The Court should not compensate an attorney for excessive and unnecessary hours. *Id.* Due to the Smith parties' default, the Kaplan parties' action was limited to a few tasks: (1) investigating the facts and drafting a third-party complaint (and later amending it), (2) attempting to recover money, (3) filing motions for default after the Smith parties failed to answer, (4) filing a motion for final default judgment and memorandum of law, and (5) preparing for and attending an evidentiary hearing on damages and filing memoranda related to damages. Yet Kaplan employed six lawyers and a host of paralegals and legal assistants to work on the case (whether some of these attorneys expended some of these hours in Regions's action against the Kaplan parties is unclear). Many time entries (doc. 800-1) appear to be inaccurate.[10] Other entries are vague (e.g., "review file") or lack pertinent information to allow me to assess whether each is reasonable (e.g., relevance of telephone conferences with Bob or Donovan). Even where I can ascertain what the attorneys were doing, the hours billed are excessive. Kaplan's most experienced attorney spent over thirty hours drafting the complaint (in addition to the fifty hours he billed for

---

[10]  For example, there are time entries in November 2012 relating to "fees . . . as to default on Smith Defendants" but the Kaplan parties did not move for default until August 2013. There are no time entries between November 2013 and November 2016, yet the Kaplan parties filed their motion for final default judgment in June 2014.

investigating the facts).  And the time entries are replete with duplicative billing (e.g., three billers worked on a motion for an extension of time).  Parsing through the voluminous billing records is unworkable.  I instead find an across-the-board reduction of 30% appropriate for the hours charged.[11]  *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1351–52 (11th Cir. 2008) (permitting the court to apply an across-the-board reduction to reduce the number of hours to those deemed reasonable); *St. Fleur v. City of Fort Lauderdale*, 149 F. App'x 849, 853 (11th Cir. 2005) (per curiam) (affirming 30% reduction where there were duplicated efforts, excessive attorney meetings, and charges for administrative tasks).  Thus, I reduce the hours as follows:

| Biller | Hours Requested | Reasonable Hours |
|---|---|---|
| Jon Parrish | 124.1 | 86.9 |
| Floyd Yarnell | 1.1 | 0.8 |
| Donald Peterson | 0.2 | 0.1 |
| E.B. Newberry Yarnell | 0.2 | 0.1 |
| Anais Taboas | 12.9 | 9.0 |
| Jonathan Weirich | 20.6 | 14.4 |
| Natalia Staroschak | 2.6 | 1.8 |
| Paralegals | 58.8 | 41.2 |
| Legal Assistants | 2.7 | 1.9 |

The lodestar is $40,609.00, broken down as follows:

| Biller | Rate | Reasonable Hours | Award |
|---|---|---|---|
| Jon Parrish | $375 | 86.9 | $ 32,587.50 |

---

[11]  "Where documentation is inadequate, the district court is not relieved of its obligation to award a reasonable fee." *Norman*, 836 F.2d at 1303.

| | | | |
|---|---|---|---|
| Floyd Yarnell | $325 | 0.8 | $ 260.00 |
| Donald Peterson | $325 | 0.1 | $ 32.50 |
| E.B. Newberry Yarnell | $250 | 0.1 | $ 25.00 |
| Anais Taboas | $200 | 9.0 | $ 1,800.00 |
| Jonathan Weirich | $175 | 14.4 | $ 2,520.00 |
| Natalia Staroschak | $100 | 1.8 | $ 180.00 |
| Paralegals | $75 | 41.2 | $ 3,090.00 |
| Legal Assistants | $60 | 1.9 | $ 114.00 |

*C. Conclusion*

For the reasons stated, I recommend the district judge enter the following awards jointly and severally against G. Todd Smith, Gary T. Smith, Lucy B. Smith, and Smith Advertising & Associates, Inc:

1. damages in the following amounts:

   a. $47,598,983.00 to R1A Palms, LLC;

   b. $11,246,494.00 to Triple Net Exchange, LLC;

   c. $7,795,449.47 to MK Investing, LLC; and

   d. $2,963,804.18 to BNK Smith, LLC;

2. pre-judgment interest in the following amounts:

   a. $3,526,738.91, plus $1,983.84 per day through the date of final judgment, to R1A Palms, LLC;

   b. $896,365.41, plus $504.21 per day through the date of final judgment, to Triple Net Exchange, LLC;

   c. $603,404.99, plus $339.32 per day through the date of final judgment,

19

to MK Investing, LLC; and

d.   $233,311.61, plus $131.22 per day through the date of final judgment,

to BNK Smith, LLC;

3.   post-judgment interest; and

4.   attorneys' fees in the amount of $40,609.00.

IT IS SO RECOMMENDED in Tampa, Florida on February 16, 2017.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.