UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK, an Alabama
banking corporation,

        Plaintiff,

v.                            CASE NO.  8:12-CV-1837-T-17MAP

MARVIN I. KAPLAN, an
individual, et al.,

        Defendants.

_____/

MEMORANDUM OPINION

      The Court presided over a bench trial from May 2, 2016 through May 25, 2016
on the remaining claims asserted by Plaintiff Regions Bank against Defendants Marvin
I. Kaplan, R1A Palms, LLC ("R1A"), Triple Net Exchange ("TNE"), LLC, MK Investing,
LLC ("MKI"), and BNK Smith, LLC ("BNK") ("Kaplan Parties") in the Corrected Second
Amended Complaint (Dkt. 671):

| Count VI | R1A | Fraudulent Concealment |
|---|---|---|
| Count VII | R1A | Aiding and Abetting |
| Count XIII | TNE | Fraudulent Concealment |
| Count XIV | TNE | Aiding and Abetting |
| Count XX | MKI | Fraudulent Concealment |
| Count XXI | MKI | Aiding and Abetting |
| Count XXVII | BNK | Fraudulent Concealment |
| Count XXVIII | BNK | Aiding and Abetting |
| Count XXIX | Kaplan | Fraudulent Concealment |
| Count XXXIII | Kaplan | |
| | Kaplan Cos. | Civil Conspiracy |

In the Joint Pretrial Statement, the issues which remain to be litigated are:

(Dkt. 649, Exh. N):

Issues of Fact

1.    Whether Kaplan Parties used the Kaplan Accounts to kite with SAA;

2.    Whether Kaplan Parties deposited the First Deal Checks knowing they were issued on insufficient funds in SAA's account with BBG;

3.    Whether Kaplan Parties failed to disclose material facts to Regions including that they would be or were involved in wires-for-checks transactions, kiting, illegal use of the Kaplan Accounts, depositing checks knowing they were issued on insufficient funds;

4.    Whether Kaplan Parties knowingly diverted or attempted to divert funds from the Kaplan Accounts after Kaplan Parties became aware of issues involving the SAA account at BBG;

5.    Whether Kaplan Parties knowingly diverted recoveries from SAA instead of reducing the overdrafts.

(Dkt. 649, Exh. R.):

Issues of Law

1.    Whether Kaplan Parties knowingly conducted a kite between/among the Kaplan Accounts and SAA's Account with BBG;

2.    Whether the Kaplan Parties are liable for conversion with respect to the overdrafts in the Kaplan Accounts resulting from the dishonor and return of the First Deal Checks;

3.    Whether the Kaplan Parties are liable for fraudulent concealment with respect to the overdrafts in the Kaplan Accounts resulting from the dishonor and return of the First-Deal Checks;

4.    Whether the Kaplan Parties are liable for aiding/abetting with respect to the overdrafts in the Kaplan Accounts resulting from the dishonor and return of the First-Deal Checks;

5.      Whether the Kaplan Parties are liable for conspiracy with respect to the overdrafts in the Kaplan Accounts resulting from the dishonor and return of the First-Deal Checks;

6.      Whether the Kaplan Parties are liable for punitive damages on the tort claims.


I.      Preliminary Issues


A.      Regions and the Kaplan Parties stipulated that Articles 3, 4, and 4A of Florida's Uniform Commercial Code apply to the dispute between Regions and the Kaplan Parties.  The Parties do not stipulate as to whether the Code displaces or does not displace all common law principles with respect to this dispute.   (Dkt. 649, Exh. J, p. 122)


B.      Judicial Notice as to Formation of Kaplan Entities

The Court takes judicial notice of the records of the State of Florida Division of Corporations as follows:

MK Investing, LLC was formed on March 26, 2010;
 BNK Smith, LLC was formed on October 3, 2011.


C.      Judicial Notice of Related Criminal Cases

In Case No. 8:16-CR-36-T-33TGW, Marcia Caulder was charged in an Information (Dkt. 1) with Conspiracy to Commit Wire and Mail Fraud in violation of  18 U.S.C. Sec. 371.  Defendant Caulder entered into a plea agreement (Dkt. 3).  The Court accepted Defendant Caulder's plea and adjudicated Defendant Caulder guilty (Dkt. 16).  Defendant Caulder was sentenced on September 21,

2016 to 60 months imprisonment, a 3 year term of supervised release, a special assessment of $100.00, restitution of $57,797,575.90, to be paid jointly and severally with Tanisha Melvin (Case No. 8:16-CR-34-T-17JSS), Amber Mathias (Case No. 8:16-CR-35-T-35MAP) and Gary Todd Smith (Case No. 8:16-CR-120-T-17TGW), and forfeiture of $120,000.00 (Dkt. 33). A Corrected Judgment was entered on October 18, 2016 (Dkt. 37). The Corrected Judgment lists each victim and the restitution amounts due to each victim.

In Case No. 8:16-CR-34-T-17TGW, Defendant Tanisha Melvin was charged in an Information (Dkt. 1) with Conspiracy to Commit Wire and Mail Fraud in violation of 18 U.S.C. Sec. 371. Defendant Melvin entered into a plea agreement (Dkt. 4). The Court accepted Defendant Melvin's plea and adjudicated Defendant Melvin guilty (Dkt. 18). Defendant Melvin is set for sentencing on June 30, 2017 (Dkt. 45).

In Case No. 8:16-CR-35-T-17MAP, Defendant Amber Mathias was charged in an Information (Dkt. 1) with Conspiracy to Commit Wire and Mail Fraud in violation of 18 U.S.C. Sec. 371. Defendant Mathias entered into a plea agreement (Dkt. 5). The Court accepted Defendant Mathias' plea and adjudicated Defendant Mathias guilty. Defendant Mathias will be sentenced on a date to be determined.

In Case No. 8:16-CR-120-T-17TGW, Gary Todd Smith was charged in an Indictment with Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. Sec. 1349 (Count One), and Wire Fraud Affecting a Financial Institution in violation of 18 U.S.C. Sec. 1343 (Count Two) (Dkt. 18). Case No. 8:16-CR-120-T-17TGW was commenced on May 5, 2014 with the filing of a Criminal Complaint against Defendants Gary Todd Smith and Gary Truman Smith. Joint motions to extend the time to file an indictment were granted. The Indictment was filed on March 16, 2016.

The Government filed a Notice of Maximum Penalties, Elements of Offense, Personalization of Elements, and Factual Basis (Dkt. 51). On June 7, 2017, Defendant Gary Todd Smith entered an open plea of guilty to Counts One and Two of the Indictment. Defendant Gary Todd Smith will be sentenced on a date to be determined.

To the extent that any findings of fact may constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law may constitute findings of fact, they are adopted as such.

II.    Findings of Fact

1.    The operative complaint is the Corrected Second Amended Complaint (Dkt. 671).

The Parties

2.    Regions Bank is a banking corporation organized and existing under the laws of Alabama, with its principal place of business in Birmingham, Alabama. Regions Bank is a citizen of Alabama. (Dkt. 649, Exh. F, Stipulated Facts ("SF"), p. 115). Regions Bank operates branches in Sarasota, Florida.

3.    At all material times, Marvin I. Kaplan resided in Sarasota, Florida. (Dkt. 649, SF, p. 115).

4.    R1A Palms, LLC ("R1A"), Triple Net Exchange, LLC ("TNE"), MK Investing, LLC ("MKI"), and BNK Smith, LLC ("BNK") (the "Kaplan Entities") are limited liability companies. (Dkt. 649, SF, p. 115).

5. R1A Palms, LLC, MK Investing, LLC and BNK Smith, LLC were organized under Florida law, with their principal place of business in Sarasota County, Florida. (Dkt. 649, SF, p. 115).

6. Triple Net Exchange, LLC is a limited liability company organized under Delaware law, with its principal place of business in Sarasota County, Florida. (Dkt. 649, SF, p. 115). TNE maintained a deposit account with Regions Bank in Florida out of which this action arises; TNE breached its agreement with Regions Bank requiring acts to be performed in Florida. Regions Bank alleges that TNE committed torts in Florida. (Dkt. 671).

7. Marvin I. Kaplan owned, managed and controlled the Kaplan Entities (R1A, TNE, MKI, BNK). (Dkt. 649, SF, p. 115).

8. In his capacity as owner and managing agent, Marvin I. Kaplan directed all deposit and withdrawal activities on the deposit accounts maintained by the Kaplan Entities with Regions Bank.

Jurisdiction

9. The Complaint was filed in Sarasota County Circuit Court on February 23, 2012, and was removed on August 13, 2012. Cross-Defendant Bridgeview Bancorp, Inc. removed this case on the basis of federal question jurisdiction. The Counterclaim/Crossclaim included claims for violation of 18 U.S.C. Sec. 1962(c), (d) and for breach of 12 C.F.R. Part 229 (Dkt. 3, Count IV; Counts XII, XIII).

10. Counterclaim/Crossclaim Plaintiffs Marvin I. Kaplan and the Kaplan Entities filed an Amended Counterclaim/Crossclaim (Dkt. 93), which included claims for violation of 18 U.S.C. Sec. 1962(c), (d) and for breach of 12 C.F.R. Part 229

(Dkt. 93, Counts IV, V; Counts XV, XVI).

11. The Court denied Motions to Dismiss the RICO and RICO conspiracy claims, and the claims for breach of 12 C.F.R. Part 229 (Dkt. 244).

12. On reconsideration, the Court granted Motions to Dismiss the RICO and RICO conspiracy claims (Dkts. 351, 378).

13. The Court granted Motions for Summary Judgment in favor of Bridgeview Bank Group and Wells Fargo Bank, N.A. on the claims for breach of 12 C.F.R. Part 229 (Dkts. 655, 656).

14. In the Corrected Second Amended Complaint, Regions Bank alleges jurisdiction pursuant to 28 U.S.C. Sec. 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the action is between citizens of different states.

Chronology of Kaplan and Kaplan Entities with SAA/Smiths

15. SAA was run and operated by Gary and Todd Smith. (Dkt. 649, SF, p. 115).

16. At all relevant times, Smith Advertising and Associates, Inc. ("SAA") maintained a deposit account with Bridgeview Bank Group in Illinois. (Pl. Exhs. 349D, 349E).

17. During the relevant time, Gary T. Smith ("G. Smith") and G. Todd Smith ("T. Smith") operated the SAA Account. Both signed the checks issued by SAA. (e.g. Pl. Exh. 70). G. Todd Smith signed the promissory notes in his capacity as COO and owner of SAA. Both signed the promissory notes as guarantors. (e.g.

Pl. Ex. 32).

18. During the relevant time, Marvin I. Kaplan owned and operated many businesses; each business had a bank account. Marvin I. Kaplan was very familiar with bank accounts, and how they operate. Marvin I. Kaplan testified that he has owned and operated many bank accounts. (Dkt. 774, p. 115, l. 15).

19. During the relevant time, Marvin I. Kaplan's office was in the same building as the branch of Regions Bank. After opening the accounts at Regions Bank, Marvin I. Kaplan utilized online banking, made internal transfers between accounts, and made wire transfers out of the accounts. (Pl. Exh. 62).

Marvin I. Kaplan understood the check collection process. Marvin I. Kaplan understood that checks drawn on Bridgeview Bank Group in Illinois did not clear the same day the checks were deposited in Regions Bank in Sarasota, Florida. Marvin I. Kaplan understood that Regions Bank extended provisional credit for checks drawn on Bridgeview Bank Group in Illinois and deposited in Regions Bank in Sarasota, Florida, and that Regions Bank would not know that checks from SAA would be dishonored until Bridgeview Bank Group determined to pay or return the checks and then notified Regions of the returned item. Marvin I. Kaplan understood the float time created by the check collection process after the deposit of checks drawn on Bridgeview Bank Group to the accounts of the Kaplan Parties at Regions Bank in Sarasota, Florida. (Dkt. 774, pp. 116-126, 159-162).

20. Marvin I. Kaplan denied any knowledge of provisional credit and any knowledge that Regions wired out funds provisionally extended to the Kaplan Entities. Although at trial, Marvin I. Kaplan testified he could not recall instructing Regions to wire only cleared funds, in deposition Marvin I. Kaplan testified that at all

relevant times Regions Bank was instructed to wire only cleared funds. (Dkt. 774, pp. 142-152).

21. Marvin I. Kaplan began making short term loans to SAA in 2008, in exchange for payment of interest and incentives. Although Defendant Kaplan asserted in his Amended Crossclaim/Counterclaim that Defendant Kaplan began making short term loans to SAA in August, 2009, in deposition, Defendant Kaplan admitted that his bank statement showed a wire transfer of $52,000.00 to SAA on July 14, 2008. (Dkt. 540-1, p. 219).

22. The loans were pitched to Marvin I. Kaplan as an investment opportunity. (Dkt. 649, SF, p. 115).

23. Marvin I. Kaplan understood as follows: SAA would request the loans in order to take advantage of vendor discounts, which were offered if SAA could pay the vendor invoices before the due date. SAA would request money to be wired to its bank account to pay the printing costs up front at a discount, and then pay back the loan to Marvin I. Kaplan, splitting the discount amount as interest on the loan. (Dkt. 649, SF, p. 115).

24. After an initial short term loan to SAA was successful, Marvin I. Kaplan used the Kaplan Entities to continue to make more short term loans to SAA. SAA continued to offer more "deals" to the Kaplan Entities; the Kaplan Entities accepted the new deals offered and reinvested both principal and the returns on the deals. Between 2008 and 2011, Marvin I. Kaplan, on behalf of the Kaplan Entities, completed hundreds of short term loan transactions with SAA without any problems such as checks returned NSF, or for any other reason. (Pl. Exh. 62).

25. On February 24, 2011, T. Smith, for SAA, emailed Larry Starr about "bundled" deals. Larry Starr questioned T. Smith: "Are these going to be 1 or 2 days only and not stretch to 3 or 4 and how do you gain from having money for one or two days." T. Smith responded, explaining "last minute prepay opportunit[ies]" where "SAA knows that payment has been made by the client but it has not posted to SAA's account yet." T. Smith stated: "Many times it is a matter of a day to grab a discount. The vendor says he will do it if we can send money that a.m. or by 2:00. The issue is timing and being able to strike quickly." (Pl. Exh. 15).

26. The above email shows it was forwarded to Marvin I. Kaplan on February 24, 2011, but no action was taken by Marvin I. Kaplan on behalf of the Kaplan Entities regarding the "bundled" deals at that time.

Kaplan Entities' Accounts with Regions

27. The Kaplan Entities maintained four deposit accounts at Regions' Sarasota Branch. (Dkt. 649, SF, p. 116).

28. On July 13, 2011, Marvin I. Kaplan opened a deposit account at Regions Bank in the name of TNE, with Marvin I. Kaplan as one of the authorized signatories. (Pl. Exh. 23).

29. On November 8, 2011 and December 22, 2011, Marvin I. Kaplan signed the Wire Transfer Agreement, authorizing Defendant Kaplan to initiate wire transfers for TNE. (Pl. Exhs. 29, 30).

30. The Wire Transfer Agreement of 12/22/2011 specifies four accounts from which the Signatory Representative was authorized to transfer funds, TNE Account

xxxxxx4180, MKI Account xxxxxx4105, BNK Account xxxxxx9817, and R1A Account xxxxxx0211. (Pl. Exh. 30).

31. On January 11, 2012, Marvin I. Kaplan, Manager, signed Exhibit 6 to the Wire Transfer of Funds Agreement, as to Repetitive/Semi-Repetitive Transfer Instructions for the TNE Account. The maximum dollar amount per transfer is "unlimited." (Pl. Exh. 31, pp. 2, 6).

32. On September 12, 2011, Marvin I. Kaplan opened a deposit account at Regions Bank in the name of MKI, with Marvin I. Kaplan as one of the authorized signatories (Pl. Exh. 26).

33. On January 11, 2012, Marvin I. Kaplan, Manager, signed Exhibit 6 to the Wire Transfer of Funds Agreement, as to Repetitive/Semi-Repetitive Transfer Instructions for the MKI Account. The maximum dollar amount per transfer is "unlimited." (Pl. Exh. 31, pp. 3, 7).

34. On October 28, 2011, Defendant Kaplan executed a Business Name Change Maintenance Request to correct the business name on the BNK account, changing the business name from BNK Smith Inc. to BNK Smith LLC, applied to account xxxxx9817. (Pl. Exh. 28).

35. On January 11, 2012, Marvin I. Kaplan, Manager, signed Exhibit 6 to the Wire Transfer of Funds Agreement, as to Repetitive/Semi-Repetitive Transfer Instructions for the BNK Account. The maximum dollar amount per transfer is "unlimited." (Pl. Exh. 31, pp. 4, 8).

36.　On December 21, 2011, Marvin I. Kaplan opened a deposit account at Regions Bank in the name of R1A, with Marvin I. Kaplan as one of the authorized signatories.　(Pl. Exhs. 26, 27).

37.　On January 11, 2012, Marvin I. Kaplan, Manager, signed Exhibit 6 to the Wire Transfer of Funds Agreement, as to Repetitive/Semi-Repetitive Transfer Instructions for the R1A Account.　(Pl. Exh. 31, pp. 1, 5).

38.　From May, 2011 to January, 2012, R1A also maintained a deposit account at Wells Fargo, N.A.　(S-582).

39.　From March, 2011 through August, 2011, R1A maintained a deposit account at Landmark Bank.　(S-582).

40.　In his deposition, Marvin I. Kaplan testified:

Q.　How—why did you use two banks?　Why did you use both Wells Fargo and Regions?

A.　I don't think I–I think I only used Regions for any of the–no.　I might have used Wells Fargo some, but Wells Fargo would only wire up to $250,000. Wachovia.

(Dkt. 540-1, p. 34, l. 2 - l. 7).

41.　Marvin I. Kaplan further testified:

Q.　Why did R1A Palms open an account so late in December, so much longer after the other entities opened accounts?

A.    I believe because Wells Fargo wouldn't–Wachovia wouldn't wire more than 250,000, so we moved it over.

(Dkt. 540-1, p. 40, l. 12 - l. 17)

42.    In November, 2011, Todd Smith approached Marvin I. Kaplan and offered a new investment loan arrangement. Todd Smith told Marvin I. Kaplan he found a way to bundle multiple print deals together and time the payments in such a way that he could obtain the discounts and principal in a much shorter time frame, sometimes in as little as twenty-four (24) hours. (Dkt. 649, SF, p. 116).

43.    In his deposition, Marvin I. Kaplan testified that sometime in November, 2011, Todd Smith spoke about "bundled" deals with him in a phone call. (Dkt. 540-1, pp. 34-35).

Time Period That is the Focus of the Pending Claims

44.    From January 19, 2012 through January 24, 2012, Kaplan Parties agreed to four "bundled" deals.

45.    First Deal

On Thursday, January 19, 2012, Marvin Kaplan, on behalf of the Kaplan Parties, agreed to the "First Deal" short term loan transactions. SAA sent the checks and promissory notes by Fedex, to arrive on January 20, 2012. (Dkt. 645, SF, p. 116).

Early in the morning on Friday, January 20, 2012,Marvin I. Kaplan, using online access, internally transferred $400,000. and $1,600,000. from the BNK and TNE accounts to the R1A account to fund these entities' participation in the First Deal. (Dkt. 645, SF, p. 116).

Later in the morning on Friday, January 20, 2012, Marvin Kaplan wired out $9,700,000.00 to SAA's account at BBG (R1A: $8,600,000.00; MKI: $1,100,000.00) (Dkt. 649, SF, pp. 116-117)(Pl. Exh. 77)(Dkt. 774-2, pp. 185-186).

Later that morning, Marvin I. Kaplan received the Fedexed checks. (Dkt. 649, SF, pp. 116-117). On Friday, January 20, 2012, Marvin Kaplan deposited checks totaling $10,061,375.00 to the accounts of R1A, TNE, MKI and BNK at Regions Bank:

| | |
|---|---|
| R1A | $6,600,000. |
| TNE | 1,784,000. |
| MKI | 1,234,000. |
| BNK | 443,375. |

(Pl. Exh. 70).

The promissory notes SAA sent to Marvin Kaplan with a repayment date of January 20, 2012 include the following:

| | |
|---|---|
| R1A | $6,400,000. |
| TNE | 1,600,000. |
| MKI | 1,100,000. |
| BNK | 400,000. |

The one-time fees due in advance for the above short term loans include:

| | |
|---|---|
| R1A | 640,000. |
| TNE | 160,000. |
| MKI | 110,000. |
| BNK | 40,000. |

(Pl. Exhs. 71, 72, 73, 74).

According to the promissory notes, the total amount SAA was due to repay to the Kaplan Parties on January 20, 2012 was $10,450,000:

| | | |
|------|------------|------------|
| R1A | $6,400,000. | |
| | 640,000. | |
| | | 7,040,000. |
| TNE | 1,600,000. | |
| | 160,000. | |
| | | 1,760,000. |
| MKI | 1,100,000. | |
| | 110,000. | |
| | | 1,210,000. |
| BNK | 400,000. | |
| | 40,000. | |
| | | 440,000. |

46. Second Deal

After Marvin I. Kaplan deposited the First Deal Checks, Smith and SAA requested that the Kaplan Entities enter into a "Second Deal" to take place on Monday, January 23, 2012. The Kaplan Entities agreed to invest in the Second Deal. SAA Fedexed the "Second Deal" Checks and promissory notes to arrive on January 23, 2012. (Dkt. 649, SF, p. 117).

Marvin I. Kaplan, using online access, internally transferred $500,000. and $1,800,000. from BNK and TNE accounts to the R1A account for these Entities' contribution to the Second Deal. (Dkt. 649, SF, p. 117).

On Monday, January 23, 2012, at 8:00 a.m. (CST; 9:00 EST) Marvin Kaplan wired out $10,450,000. (R1A: $9,200,000.; MKI: $1,250,000.) to SAA's account at BBG. (Pl. Exh. 90).

Later that morning on January 23, 2012, Marvin I. Kaplan received the Second Deal Checks and promissory notes for the Second Deal, and deposited the Second Deal Checks into the Kaplan Entities' accounts at Regions. (Dkt. 649, SF, p. 117).

On January 23, 2012 at 11:15 a.m., Marvin Kaplan, by an agent, deposited checks into the accounts of R1A, TNE, MKI and BNK at Regions Bank in the amount of $11,956,035:

| | |
|---|---|
| R1A | 7,000,000. |
| R1A | 994,660. |
| TNE | 2,009,700. |
| MKI | 1,395,000. |
| BNK | 556,675. |

(Pl. Exh. 70).

The promissory notes that SAA sent to Marvin Kaplan with a repayment date of January 23, 2012 include the following:

| | |
|---|---|
| R1A | $7,000,000. |
| TNE | 1,800,000. |
| MKI | 1,250,000. |
| BNK | 500,000. |
| | $10,550,000. |

The one-time fees due in advance for the above short term loans include:

| | |
|---|---|
| R1A | 718,000. |
| TNE | 180,000. |
| MKI | 125,000. |
| BNK | 50,000. |
| | $ 1,073,000. |

(Pl. Exhs. 84, 86, 87, 89).

According to the promissory notes, the total amount that SAA was due to repay to the Kaplan Parties on January 23, 2012 was $11,623,000.

47. On January 23, 2012 at 11:21 a.m., the First Deal Checks hit SAA's account at BBG.

48. On January 23, 2012, SAA wired $500,000 from SAA's WFB account to R1A's account , xxxxxx0211, at Regions. (Pl. Exh. 100). This was for a missing contract/check 012312M ($500,000.).

16

49. Third Deal

   After the above $500,000. wire on January 23, 2012, Todd Smith proposed the "Third Deal" to Marvin I. Kaplan.

   Marvin I. Kaplan agreed to the "Third Deal" short term loans to SAA.

50. On January 23, 2012, Marvin I. Kaplan opened a business money market account for R1A, xxxxx4168, at Regions, and deposited $3,000,000., a transfer from R1A xxxxx0211.   (Pl. Exhs. 97, 99).

51. On January 24, 2012, Todd Smith, SAA, requested that the Kaplan Entities invest in a smaller "Fourth Deal" to be repaid on January 25, 2012.  Marvin I. Kaplan agreed to the Fourth Deal.  Marvin I. Kaplan, on behalf of R1A, wired $2,000,000. to SAA's account at BBG later in the morning of January 24, 2012. (Dkt. 649, SF, p. 117)(Pl. Exhs. 276, 277).

52. On January 24, 2012, at 8:16 a.m. (CST; 9:16 EST), Marvin I. Kaplan wired $2,000,000. to SAA.  (Pl. Exh. 105).

53. On Tuesday morning, January 24, 2012, Marvin I. Kaplan discovered that Regions had not credited the Second Deal Checks to the Kaplan Accounts. (Dkt. 649, SF, p. 117).  Marvin I. Kaplan contacted Linda  Council to inquire as to the absence of these deposits.   (Dkt. 774-4, pp. 51-52).

54. Linda Council investigated, and then advised Marvin I. Kaplan that there was a hold on the  Second Deal Checks.   (Pl. Exhs. 126, 138)(Dkt. 774-4, pp. 52-59).

55. Marvin I. Kaplan called Todd Smith and told him the Third Deal could not happen due to the hold on the Second Deal Checks. (Dkt. 774-6, p. 85, l. 11-12).

56. Todd Smith then sent Linda Council a screenshot that purported to show a positive balance in SAA's account at BBG. (Pl. Exh. 274). However, the screenshot was falsified; there was actually a negative balance in SAA's account at BBG.

57. Linda Council advised Marvin I. Kaplan that the screenshot was not sufficient to release the hold on the Second Deal Checks. (Dkt. 774-4, pp. 64-65).

58. On Tuesday, January 24, 2012, at 11:00 a.m. Marvin I. Kaplan received the Third Deal notes and checks from SAA:

| | |
|---|---|
| R1A | 6,500,000. |
| TNE | 2,000,000. |
| MKI | 1,450,000. |
| | $9,950,000. |

The one time fees for the above short term loans include:

| | |
|---|---|
| R1A | 650,000. |
| TNE | 200,000. |
| MKI | 145,000. |
| | $995,000. |

(Pl. Exhs. 101, 102, 103).

According to the promissory notes, the total amount that SAA was due to repay to the Kaplan Parties was $10,945,000.

59.   On January 24, 2012, Todd Smith suggested to Marvin I. Kaplan in a phone call that Todd Smith put a stop payment on the Second Deal checks in place of a wire transfer, and that Marvin I. Kaplan deposit the Third Deal checks on the way.  (Dkt. 774-6, pp. 49-51).

60.   Todd Smith then called Marvin I. Kaplan and told him not to deposit the "Third Deal" checks because there were issues with the SAA account at BBG. (Dkt. 774-5, pp.  150-156).

61.   Late in the day on January 24, 2012, Todd Smith called Marvin I. Kaplan.  Todd Smith advised that BBG had frozen all of SAA's accounts after Todd Smith had issued the stop payment on the Second Deal Checks.  Todd Smith told Marvin I. Kaplan that he could not move any money in or out of SAA's accounts at BBG. (Dkt. 649, SF, p. 117-118).

62.   Marvin I. Kaplan testified that a stop payment was not in fact put on the Second Deal Checks.  (Dkt. 774-6, p. 51, l. 22-23).

63.   The SAA Checks drawn on BBG in the amount of $11,284,300. dated 1/24/2012, the Third Deal Checks, were not deposited.  (Pl. Exh. 123).

64.   On Wednesday, January 25, 2012 at 7:48 a.m., Marvin I. Kaplan wired $2,775,000. from the R1A account at Regions to the Lighthouse Pointe, LLC account at WFB.   (Pl. Exhs. 307, 397).

65. On Wednesday, January 25, 2012, Regions, by Linda Council, advised Marvin I. Kaplan that the First Deal Checks were being returned unpaid. (Dkt. 649, SF, p. 118)(Dkt. 774-4, p. 63).

66. Marvin I. Kaplan contacted Todd Smith and SAA, the maker, and was advised that BBG had frozen all of the SAA accounts. Todd Smith sent a new set of checks to replace the returned checks totaling $10,550,000 by an air courier. The new checks were drawn on SAA's account at Wells Fargo Bank. Marvin I. Kaplan received the checks and deposited them. (Dkt. 649, SF, p. 118).

67. SAA maintained a checking account at Wells Fargo Bank, N.A. (Account xxxx-xxx-3952). On Wednesday, January 25, 2012, SAA wired $1,406,035.00 from its SAA WFB 3952 account to R1A's account at WFB. (Dkt. 583-3, p. 6 shows a wire transfer from Wells Fargo Bank, N.A. to Wachovia Bank, N.A. of Florida for checks "63465, 63438, 63464, 63468, 63440, 63466, 63467, 63461," beneficiary is R1A Palms, LLC. (Dkt. 539, Ex. 286).

The wire transfer to R1A's account at WFB (then Wachovia) paid Marvin I. Kaplan for the following checks which had been deposited at Regions Bank:

| R1A | | |
|---|---|---|
| 63438 | 244,660. | |
| 63464 | 110,000. | |
| 63465 | 640,000. | |
| | | 994,660. |
| TNE | | |
| 63466 | 180,000. | |
| 63439 | 29,700. | |
| | | 209,700. |

| MKI | | |
|---|---|---|
| 63468 | 125,000. | |
| 63440 | 20,000. | |
| | | 145,000. |
| BNK | | |
| 63467 | 50,000. | |
| 53441 | 6,675. | |
| | | 56,675. |
| | | _____ |
| | | $1,406,035. |

Marvin I. Kaplan received the one-time fees and interest/incentive payments for the Second Deal loans. (Dkt. 774-6, pp. 156-157).

68. On January 25, 2012, Marvin I. Kaplan received 5 promissory notes for the "Fourth Deal" short term loans from R1A to SAA in the amount of $2,250,000., with a one time fee due to R1A of $225,000., but no checks. (Pl. Exh. 104). Marvin I. Kaplan then called Todd Smith. According to Marvin I. Kaplan, Todd Smith advised that he would replace all checks from the WFB account.

69. On Wednesday, January 25, 2012, Regions stayed open late to permit Marvin I. Kaplan to deposit the WFB Replacement Checks delivered by air courier. (Dkt. 774-4, pp. 68-69). Marvin I. Kaplan testified that at that time he was "still a believer" and did not think there was any fraud involved. (Dkt. 774-6, p. 160).

70. On Thursday, January 26, 2012, following BBG's return of the First Deal Checks, Regions provided the Kaplan Entities with written notice of dishonor of the First Deal Checks. (Dkt. 649. SF, p. 118).

71.  On Friday, January 27, 2012, Regions provided the Kaplan Entities with written notice of dishonor of the Second Deal Checks. The First Deal Checks and the Second Deal Checks were marked "Refer to Maker." (Dkt. 649, SF, p. 118).

72.  On Monday, January 30, 2012, Regions orally notified the Kaplan Entities that WFB had dishonored the WFB Replacement Checks. (Dkt. 649, SF, p. 118).

73.  On Monday, January 30, 2012 and Tuesday, January 31, 2012, Regions provided written notices of dishonor to the Kaplan Entities as to the WFB Replacement Checks following their return. The checks were marked "Refer to Maker," except check #1409, which was label "NSF." (Dkt. 649, SF, p. 118).

74.  The account records of the SAA Account at BBG appear in the record. (Pl. Exhs. 349D (Dec. 2011), 349E (Jan. 2012).

75.  The short term loans offered by SAA to Kaplan Parties from 2008 through 2012 were all completely fraudulent. There were no printing contracts, no vendor invoices and no discounts for advance payment. The scheme was a Ponzi scheme designed to provide money to financially ailing SAA, its principals and others associated with SAA. See Factual Basis in Plea Agreement in Case No. 8:16-CR-36-T-33TGW, U.S. v. Marcia Caulder. In Case No. 8:16-CR-36-T-33TGW, a Final Judgment was entered on September 21, 2016 (Dkt. 33), and a Corrected Final Judgment was entered on October 18, 2016 (Dkt. 37).

Expert Opinion as to Presence of Check Kiting

76.  Regions Bank requested Richard Fechter, J.D., CAMS review bank account balances and transaction activity for the Kaplan Accounts and the SAA Account from the inception of the Kaplan Accounts through January 31, 2012, and

determine whether check kiting existed within those accounts. Richard Fechter rendered his expert opinion that there was a pattern of activity between the SAA Account and the Kaplan Accounts consistent with a check-kiting scheme.

The opinion of Richard Fechter is based on the following factors:

    a.  Frequent daily deposits using numerous
        checks all coming from the same payor at the
        same bank;
    b.  Escalating balances;
    c.  Significant "real" money being withdrawn;
    d.  Utilization of check float;
    e.  Extraordinary rates of return;
    f.  Checks written in "round" dollar amounts.

77.   At trial, Mr. Fechter testified that, with respect to checks deposited into Defendant Kaplan's account, it would not be possible to tell by looking at Regions' account statements whether or not those checks were supported by sufficient funds in the BBG account; knowledge of SAA's account balances would be necessary. (Dkt. 774-3, p. 145, l. 11-17; p. 146).

The Claims

Fraudulent Concealment Claims

78.   As to the Kaplan Entities, the alleged factual basis for the fraudulent concealment claims is Kaplan's knowledge that Regions provided immediate credit for SAA check deposits, and Kaplan's knowledge that Regions Bank advanced funds because of its expectation that the SAA checks deposited by Kaplan Parties would be paid after presentation to BBG.

As to the transactions on January 20, 2012, Regions contends that no legitimate investment or loan had the unusually high rate of return that the short term loans to SAA offered, and Kaplan knew that the transactions were not legitimate.

As to the transactions on January 23, 2012, Regions contends that Kaplan Parties knew that BBG's payment of the checks received by Kaplan and deposited in Regions on January 23, 2012 was necessary to cover the funds Kaplan wired to SAA on January 23, 2012.

Regions contends that the Kaplan Parties knew that when BBG dishonored and returned those checks, Regions would charge back the amount of the dishonored checks to the accounts, resulting in substantial overdrafts, but did not disclose this material fact to Regions.

Regions contends that Kaplan knew or turned a blind eye to the fact that SAA checks were not supported by funds in the SAA Account, and the purpose of the wire transfers was to induce BBG to pay the SAA checks even if an overdraft was created in the SAA account. Despite this knowledge, Kaplan and Kaplan Parties continued to use the funds advanced by Regions for their own use, which damaged Regions when BBG dishonored the returned SAA checks.

Regions contends that on January 23, 2012, Kaplan learned that SAA checks in the amount of $11,956,035. would be dishonored, but on January 24, 2012, Kaplan wired $2,000,000. from R1A to SAA, wrongfully using Regions' funds.

Regions contends that late on January 24, 2012, Kaplan learned from Todd Smith that BBG had frozen SAA's accounts, but did not advise Regions that SAA checks on which Regions had given or would give provisional credit would be dishonored.

Regions contends that, despite Kaplan's knowledge that BBG had frozen SAA's accounts on January 24, 2012, Kaplan wired $2,775,000. to the Lighthouse Pointe, LLC account at WFB on January 25, 2012, knowing that the funds Kaplan was wiring were Regions' funds provided to the R1A account through immediate provisional credit for SAA checks deposited which were going to be dishonored.

79. As to the fraudulent concealment claim against Marvin I. Kaplan individually, against the backdrop of the entire short term loan transactions to SAA, and in particular the transactions from January 20, 2012 through January 25, 2012, Regions contends that Marvin I. Kaplan orchestrated transactions in the Kaplan accounts designed to induce Regions to provide funds to Kaplan so he could extract Regions' funds from the Kaplan accounts through the alleged kiting scheme conducted between the Kaplan accounts and the SAA account.

Regions contends that Marvin I. Kaplan knew of the clearance time regarding collection of checks and that Regions was providing its funds as provisional credits to the Kaplan accounts, with immediate use, and Marvin I. Kaplan used such provisional credit to the detriment of Regions by wiring funds between and from the Kaplan accounts.

Regions contends that Marvin I. Kaplan knew, but did not disclose to Regions, the material fact that he was depositing SAA checks to the Kaplan accounts and using the funds immediately credited by Regions even though the checks were drawn against insufficient funds in the SAA account at BBG.

Regions contends that Marvin I. Kaplan also concealed the fact that he had consented to stop payments on numerous checks deposited to the Kaplan accounts for which Regions had provided immediate use of funds, so that

Kaplan could engage in further improper transactions, to the detriment of Regions. Knowing that the stop payments would cause BBG to dishonor and return checks Marvin I. Kaplan had deposited to the Kaplan accounts, Kaplan did not disclose the stop payments to Regions and also wired out $2,775,000. of Regions' funds.

Regions contends that Marvin I. Kaplan knew or should have known that the information he was concealing was material to Regions' decision to provide immediate use of the funds form SAA check deposits and that the information should have been disclosed to Regions. Regions contends that Marvin I. Kaplan knew his nondisclosure of material facts would induce Regions to continue to provide immediate use of the funds from deposited SAA checks, and that, under the circumstances, Marvin I. Kaplan had a duty to disclose the material facts to Regions.

Aiding and Abetting Claims

80. As to the Kaplan Entities, against the backdrop of the entire short term loan transactions to SAA, and in particular the transactions from January 20, 2012 through January 25, 2012, in internally transferring funds between the accounts of the Kaplan Entities, and in orchestrating outgoing wires from accounts of the Kaplan Entities to SAA, Regions contends that each Kaplan Entity had actual knowledge of the wrongdoing of the other Kaplan Entities, and Kaplan's wrongdoing, and rendered substantial assistance to it, proximately causing damage to Regions. Regions further contends that each Kaplan Entity and Kaplan acted willfully and with utter disregard of Regions' rights in the transactions.

Civil Conspiracy Claim

81.  Against the backdrop of the entire short term loan transactions to SAA, and in particular the transactions from January 20, 2012 through January 25, 2012, Regions contends that by conducting the kiting scheme, including wiring funds between Kaplan accounts to continue the scheme, the Kaplan Parties entered into an agreement to do unlawful acts or to do lawful acts by unlawful means Regions contends that each Kaplan Entity and Marvin I. Kaplan committed overt acts in pursuance of the conspiracy, which proximately caused damage to Regions.  Regions further contends that each Kaplan Entity and Marvin I. Kaplan acted willfully and with utter disregard of Regions' rights in the transactions.

II.   Conclusions of Law

Fraudulent Concealment Claims

| | |
|---|---|
| Count VI | R1A's Fraudulent Concealment |
| Count XIII | TNE's Fraudulent Concealment |
| Count XX | MKI's Fraudulent Concealment |
| Count XXVII | BNK's Fraudulent Concealment |
| Count XXIX | Fraudulent Concealment Against Kaplan |

82.  Under Florida law, the elements of a cause of action for fraudulent concealment are:

1.  The defendant concealed or failed to disclose a material fact;

2.  The defendant knew or should have known that the material fact should be disclosed or not concealed;

3.  The defendant acted in bad faith;

    4. The defendant knew that by concealing or failing to disclose the material fact, the plaintiff would be induced to act;

    5. The plaintiff suffered damages as a result of the concealment or failure to disclose.

    6. The defendant had a duty to speak.

See In re Palm Beach Finance Partners, L.P., 517 B.R. 310, 335, (Bk. S.D. Fla. 2013)(citing R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060, 1068-69 (Fla. 1st DCA 2010 )(citing Friedman v. Am. Guardian Warranty Servs., Inc., 837 So.2d 1165, 1166 (Fla. 4th DCA 2003)).

83.    The special circumstances which may give rise to a duty to speak include:

    a. One party to a transaction who speaks has a duty to say enough to prevent his words from misleading the other party;

    b. One party to a transaction who has special knowledge of material facts to which the other party does not have access may have a duty to disclose those facts to the other party;

    c. One party to a transaction who stands in a confidential or fiduciary relation to the other party has a duty disclose material facts.

See In re Palm Beach Finance Partners, L.P., 517 B.R. 310, 335, (Bk. S.D. Fla. 2013)(citing Klein v. First Edina Nat. Bank, 196 N.W.2d 619, 622 (Minn. 1972); Friedman, 837 So.2d at 1166.))

84.    A special circumstance may be found where a bank, having actual knowledge of fraud being perpetrated upon a customer, enters into a transaction with that customer in furtherance of the fraud. See Barnett Bank of West Florida v. Hooper, 498 So.2d 923 (Fla. 1986)(citing Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648 (1976)).

85. Knowledge of insolvency is not necessarily equivalent to knowledge of fraud. An insolvent purchaser, buying on credit, is not bound to disclose his financial condition to the seller if he has a reasonable expectation of being able to pay for the goods. If a party is so insolvent that he has no reasonable expectation of fulfilling his contract obligations, then it is fraud for that party to fail to disclose his insolvency before entering the contract. See Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 651 (1976).

86. Under Florida law, a bank does not have a fiduciary relationship to its standard deposit account customers, but instead owes only a duty of ordinary care in arms-length transactions. See Arbitrajes Financieros, S.A. v. Bank of America, N.A., 605 Fed. Appx. 820 (11th Cir. 2015) (unpublished opinion)(citing First Nat'l Bank and Trust Co. of the Treasure Coast v. Pack, 789 So.2d 411, 414 (Fla. 4th DCA 2001) and Maxwell v. First United Bank, 78 So.2d 931, 934 (Fla. 4th DCA 2001) ). The ordinary duty does not require [a bank] to act for the benefit or protection of its customers or to disclose facts that [the customer] could have discovered through its own diligence. Id.

87. Fiduciary relationships are either expressly or impliedly created. Those expressly created are either by contract, such as principal/agent or attorney/client, or through legal proceedings, such as trustee/beneficiary and guardian/ward. See Capital Bank v. MVB, Inc., 644 So.2d 515, 518 (Fla. 3d DCA 1994).

88. Fiduciary relationships implied in law are premised upon the specific factual situation surrounding the transaction and the relationship of the parties. Courts have found a fiduciary relationship implied in law when "confidence is reposed by one party and a trust accepted by the other." Id. at 518 (citations omitted).

29

89. In <u>Capital Bank v. MVB, Inc.</u>, <u>supra</u>, the Third District Court of Appeals notes that in <u>Barnett Bank of West Florida v. Hooper</u>, 498 So.2d at 923, the Florida Supreme Court found that a fiduciary relationship arose between a lender and a customer from the parties' established relationship of trust and confidence. <u>Hooper</u> cites to two cases which elaborate criteria for determining the existence of a fiduciary relationship: <u>Klein v. First Edina Nat'l Bank</u>, 196 N.W.2d 619 (1972) and <u>Tokarz v. Frontier Fed. Sav. & Loan Ass'n</u>, 656 P.2d 1089 (1982). <u>Capital Bank</u> at 519.

90. <u>Klein</u> declared that a fiduciary relationship arises where "the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him." 196 N.W. 2d at 623. <u>Tokarz</u> held that "special circumstances" may impose a fiduciary duty on a bank where the lender 1) takes on extra services for a customer, 2) receives any greater economic benefit than from a typical transaction, or 3) exercises exclusive control. 656 P.2 at 1094. <u>Capital Bank</u> at 519.

91. Regions Bank does not contend that there was a an express fiduciary relationship between Regions and the Kaplan Parties. The deposit account agreements provide:

> "**4.** **Collection of Items**. In receiving items for deposit or collection, we act as your collection agent and assume no responsibility beyond the exercise of ordinary care. Special instructions for handling an item are effective only if made in a separate writing and given to us along with the item."

(Pl. Trial Ex. 293, p. 8).

92. The Court previously granted summary judgment to Regions on the breach of contract claims and other statutory claims. (Dkt. 652).

93. The Court notes that the Kaplan Entities were business entities formed for various purposes, e.g. real estate transactions. (Dkt. 774, pp. 66-73). Over time, the Kaplan Entities were used primarily as vehicles to make short term loans to SAA, and to reinvest the returns on the SAA transactions. The Kaplan Entities were in an ongoing customer relationship with Regions; each Kaplan Entity maintained a deposit account with Regions.

94. Regions alleged that Kaplan Parties knew that no legitimate investment or loan offered the unusually high rate of return that the short term loans to SAA offered. By this allegation, the Court understands Regions to assert the theory that the Kaplan Parties had a duty to speak which arose from Kaplan Parties' special knowledge that the transactions were not legitimate.

95. The account records show that many transactions with SAA were executed without any check collection problems. (Pl. Exh. 62).

96. Marvin I. Kaplan testified in deposition that "I just knew I was making money, and I was going with it." (Dkt. 540-1, p. 124 ). Marvin I. Kaplan further testified in deposition that after he began the bundled deals, he did not increase due diligence since "Everything was going well, was going smooth. Was making money. I was fat, dumb and happy so to speak." (Dkt. 774, p. 208).

97. The Court has reviewed the trial testimony and the evidence. The Court concludes that there is no evidence that Marvin I. Kaplan had actual knowledge that "the transactions were not legitimate," in the sense that Marvin I. Kaplan had actual knowledge of the Ponzi scheme, or the transactions were carried out in furtherance of the Ponzi scheme executed by Todd Smith, SAA, and others.

98. Regions Bank contends that an implied fiduciary relationship arose between the Kaplan Parties and Regions Bank from the Kaplan Parties' knowledge that Regions Bank would provide immediate credit for SAA checks the Kaplan Parties deposited, Kaplan Parties' knowledge that the SAA Account at BBG did not have sufficient funds to support the SAA checks deposited in their accounts at Regions, and Kaplan Parties' knowledge that the funds they wired to the SAA Account were intended to cover, in whole or in part, the same checks that Kaplan Parties deposited. In other words, Kaplan Parties knew that Kaplan Parties were using Regions' funds to induce BBG to honor the SAA checks once Regions presented the checks to BBG. Regions contends that Kaplan Parties had a duty to speak, based on the implied fiduciary relationship between Kaplan Parties and Regions Bank.

99. Marvin I. Kaplan testified that he had no direct contact with BBG, and never knew the balance in SAA's account at BBG at any particular time. (Dkt. 774, p. 88; p. 89; Dkt. 774-6, p. 149, l. 11-12).

100. Marvin I. Kaplan completed many individual deals and bundled deals prior to the transactions included in the First, Second, Third and Fourth Deals, and there were no problems with the check collection process. (Pl. Ex. 12).

101. There were deposits into the SAA account at BBG from other individuals and other entities during the time that Marvin I. Kaplan agreed to bundled deals and individual deals, wired funds to the SAA account at BBG and deposited checks drawn on the SAA account at BBG in the Kaplan Entities' accounts at Regions. (Pl. Exhs. 349D, 349E).

102. To the extent that Regions' allegation that Marvin I. Kaplan "had actual knowledge that the transactions were not legitimate" refers to the Kaplan Parties' actual knowledge that the wire transfers were not supported by sufficient funds in the SAA account at BBG to pay the checks deposited in the Regions accounts, and were intended to induce BBG to honor the SAA checks once Regions presented them to BBG, the Court credits the testimony of Marvin I. Kaplan that he had no direct contact with BBG, and did not know of the balance in the SAA account at BBG at any particular time. In agreeing to additional "deals" with SAA, Marvin I. Kaplan was guided by the history of deals with SAA which were successfully executed.

103. Regions knew of the account activity in the accounts of the Kaplan Entities at Regions from beginning to end. There is no evidence that Marvin I. Kaplan prevented Regions from investigating the account activity by some artifice or trick intended to mislead Regions.

104. Regions contended that, after learning that the Second Deal checks would be dishonored, Marvin I. Kaplan wired $2,000,000 from R1A's account to SAA's account at BBG on January 24, 2012.

The Court has reviewed the trial testimony and the evidence. The Court concludes that Marvin I. Kaplan wired out the funds for the Fourth Deal early in the morning on January 24, 2012, before Marvin I. Kaplan learned that the Second Deal checks were not credited, prior to the agreement with Todd Smith in which Todd Smith was to put a stop payment on the Second Deal Checks in place of a wire transfer for the Third Deal, and before Todd Smith told Marvin I. Kaplan that BBG froze SAA's accounts at BBG late in the day on January 24, 2012. Marvin I. Kaplan testified that at that time Todd Smith told him all the

33

problems would be cleared up and he (Todd Smith) had plenty of money in the bank. (Dkt. 774-6, p. 104, l. 19-22; p. 107). Marvin I. Kaplan testified that, at that time, he thought the problems were just a glitch, not fraud. (Dkt. 774-6, p. 110, l. 10-12).

105. After Linda Council, Regions, advised Marvin I. Kaplan on Wednesday, January 25, 2012, that the First Deal Checks were being returned, Marvin I. Kaplan called Todd Smith, who agreed to send a set of replacement checks drawn on SAA's account at Wells Fargo Bank. (Dkt. 774-6, p. 140).

106. Regions has alleged that wire transfers from the Kaplan Entities' accounts after Marvin I. Kaplan knew that stop payments were to be put on the Second Deal Checks, which would result in overdrafts to the Kaplan Entities' accounts, was actionable fraudulent concealment.

The Court has reviewed the trial testimony and the evidence. The Court notes that the wire transfer for the Second Deal was sent on January 23, 2012. No wire transfer was sent for the Third Deal, and the Third Deal checks were not deposited. The wire transfer for the Fourth Deal was sent early on January 24, 2012, before Marvin I. Kaplan knew that the Second Deal checks were not credited, and the agreement for the alleged stop payments on the Second Deal checks was made.

107. Regions contends that Marvin I. Kaplan wired funds from R1A's Regions account to the Lighthouse Pointe, LLC account on January 25, 2012, despite knowledge that BBG had frozen SAA's Account on January 24, 2012.

108. Marvin I. Kaplan testified that the funds were transferred for a scheduled closing. The closing did not take place, and the funds were later returned to Regions,

pursuant to a stipulation.

109.    The Court notes that the wire transfer process required compliance with the authentication process put in place by Regions.  Other than the authentication process, initiating a wire transfer does not include any representations made by transferor.  Special instructions can be given in writing, but in this case, there were none.   After the authentication process, if funds are available, the wire transfer is executed.  (Dkt. 774-4, pp. 72-73).  In this case, the wire transfer was executed.  Since the funds were later returned, Regions sustained no loss caused by the wire transfer to Lighthouse Pointe, LLC.

110.    As of January 25, 2012, Marvin I. Kaplan testified that he believed that the problems with SAA were temporary.

111.    The Court concludes that Regions has not established that Marvin I. Kaplan and the Kaplan Entities had a duty to disclose under the circumstances of this case. Regions has not established that Marvin I. Kaplan and the Kaplan Entities were in a fiduciary relationship with Regions.  Marvin I. Kaplan and the Kaplan Entities did not have actual knowledge of the Ponzi scheme.  Marvin I. Kaplan and the Kaplan Entities did not have actual knowledge that the wire transfers out of the Regions accounts were not supported by sufficient funds in the SAA account at BBG to pay the checks deposited in the Regions accounts.  Regions has not established the knowing and intentional participation of Marvin I. Kaplan and the Kaplan Entities in check kiting between the Kaplan Entities' accounts at Regions and the SAA account at BBG.

Therefore, the fraudulent concealment claims asserted in Counts VI, XIII, XX, XXVI, and XXIX fail.  A final judgment will be entered in favor of Defendants on those claims.

Aiding and Abetting Claims

| | |
|---|---|
| Count VII | R1A's Aiding and Abetting |
| Count XIV | TNE's Aiding and Abetting |
| Count XXI | MKI's Aiding and Abetting |
| Count XXVIII | BNK's Aiding and Abetting |

112. These claims are claims for aiding and abetting tortious activity.
The tortious activity of the Kaplan Parties is the alleged fraudulent concealment of material facts as to their deposit accounts at Regions. Regions alleged that the Kaplan Parties engaged in check kiting, a form a bank fraud. Regions alleged that, in orchestrating the outgoing wires from the Kaplan Entities' accounts at Regions, including internal transfers between accounts, in exchange for SAA checks, the Kaplan Entities had actual knowledge of the "other Kaplan Entities' and Kaplan's wrongdoing and conversion of Regions' funds and rendered substantial assistance to the conversion."

The Court previously dismissed the conversion claims. For the aiding and abetting claims to survive, the Court reads the above allegations to include Defendants' actual knowledge of the check kiting scheme between the Kaplan Entities' accounts at Regions and the SAA account at BBG, aided and abetted by wire transfers and internal transfers using Regions' funds made available by Regions' extension of provisional credit after deposit of the SAA checks into the accounts of the Kaplan Entities, and rendering substantial assistance to the scheme.

113.    A cause of action for aiding and abetting requires:

> "(1) an underlying violation on the part of the primary wrongdoer;
> (2) knowledge of the underlying violation by the alleged aider and abetter
> (sic); and (3) the rendering of substantial assistance in committing the
> wrongdoing by the alleged aider and abettor."

See Wiand v. Wells Fargo Bank, N.A., 938 F.Supp.2d 1238, 1244 (M.D. Fla.
2013) (citing Lawrence v. Bank of America, 455 Fed. Appx. 904 (11th Cir.
2012)(unpublished opinion)(citing Amerifirst Bank v. Bomar, 757 F. Supp. 1365,
1380 (S.D. Fla. 1991); ZP No. 54 Ltd. Partnership v. Fid. & Deposit Co. of
Maryland, 917 So.2d 368, 372 (Fla. 5th DCA 2005)).

In Wiand, supra, the Court further states:

> "In actions involving the liability of a bank for aiding and abetting its
> customer's Ponzi scheme, the second element, knowledge, will only be
> satisfied if the bank "had actual knowledge of [the] fraudulent activities.
> ...Actual knowledge may be shown by circumstantial evidence....In
> addressing aiding-and-abetting liability, courts are "[m]indful of the
> potentially devastating impact aiding-and-abetting liability might have on
> commercial relationships." Wiand at 1244 (internal citations omitted).

In Wiand, the Court further emphasizes:

> "While actual knowledge may be shown by circumstantial evidence, courts
> 'stress that the requirement is *actual* knowledge' and the circumstantial
> evidence must demonstrate that the aider-and-abettor *actually knew* of
> the underlying wrongs committed.   Wiand at 1244 (internal citation
> omitted).

114.    The Court has granted judgment to the Kaplan Entities and Kaplan on the

fraudulent concealment claims.  The Court found that Regions did not establish

that Marvin I. Kaplan and the Kaplan Entities had actual knowledge of the Ponzi scheme. The Court further found that Marvin I. Kaplan and the Kaplan Entities did not have actual knowledge that the wire transfers out were not supported by sufficient funds in the SAA account at BBG to pay the checks deposited in the Regions accounts. Since Marvin I. Kaplan and the Kaplan Entities did not have a duty to disclose material facts based on their actual knowledge of fraudulent activities or based on a fiduciary relationship with Regions Bank, the claims for fraudulent concealment failed. To the extent that the aiding and abetting claims are premised on the underlying wrong of fraudulent concealment of material facts by Marvin I. Kaplan, the primary wrongdoer, aided and abetted by the Kaplan Entities, the aiding and abetting claims fail.

115. Because Marvin I. Kaplan and the Kaplan Entities did not have actual knowledge that the wire transfers out were not supported by sufficient funds in the SAA account at BBG to pay the checks deposited in the Regions accounts, the Court concludes that aiding and abetting claims premised on actual knowledge of the underlying wrong, check kiting, must fail. The Court therefore grants judgment to Defendants on the aiding and abetting claims, Counts VII, XIV, XXI, and XXVIII. A final judgment will be entered in favor of Defendants on those claims.

Civil Conspiracy Against Kaplan Parties
Count XXXII

116. Under Florida law, a claim for civil conspiracy requires: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy and (d) damage to plaintiff as a result of the acts done under the conspiracy. See Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997).

117. Under Florida law, a conspiracy claim requires that "the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person." See Am. Diversified Ins. Services, Inc. v. Union Fid. Life Ins. Co., 439 So.2d 904, 906 (Fla. 2d DCA 1983).

118. The underlying wrongs in this case are the alleged fraudulent concealment of material facts, and check kiting, a form of bank fraud. Regions alleged that by conducting the check kiting scheme, including wiring funds between Kaplan Accounts to continue the scheme, the Kaplan Parties entered into an agreement to do unlawful acts, or to do lawful acts by unlawful means, that the Kaplan Parties committed overt acts in pursuance of the conspiracy, and Regions was damaged as a result of the Kaplan Parties' wrongful acts.

119. The SAA account at BBG was a necessary element of alleged fraudulent concealment of material facts and the alleged check kiting scheme. The Court understands that SAA and Todd Smith, who operated the SAA account, among others, were necessarily members of the alleged conspiracy to defraud Regions. The intracorporate conspiracy doctrine alone does not condemn the civil conspiracy claim to failure.

120. The Court has found that Marvin I. Kaplan did not have actual knowledge of the Ponzi scheme carried out by Todd Smith, SAA and others. The Court has also found that Marvin I. Kaplan and the Kaplan Entities did not have actual knowledge that the wire transfers out of the Regions accounts were not supported by sufficient funds in the SAA account at BBG to pay the checks deposited in the Regions accounts. The Court credited the testimony of Marvin I. Kaplan that he did not have any direct contact with BBG, and did not know the balance in SAA's account at any particular time. Marvin I. Kaplan and the Kaplan Entities were guided by the history of "deals" with SAA which were

executed successfully.

121.    In this case, there is no direct evidence of agreement to do unlawful acts.

122.    The Court notes that "in a civil case, a fact may be established by circumstantial evidence alone only when the inference sought to be created by such circumstantial evidence outweighs all reasonable inferences to the contrary." See Diamond v. Rosenfeld, 511 So.2d 1031, 1034 (Fla. 4th DCA 1987).

Claims for civil conspiracy are routinely based on circumstantial evidence. In this case, the circumstantial evidence shows that Marvin I. Kaplan and the Kaplan Entities were in an ongoing business relationship with SAA and Todd Smith. Marvin I. Kaplan and the Kaplan Entities agreed to fund many individual short term loans and "bundled" deals offered by SAA and Todd Smith. The Court has concluded that there is no evidence that Marvin I. Kaplan and the Kaplan Entities had actual knowledge of the Ponzi scheme. The Court has further found that Marvin I. Kaplan and the Kaplan Entities did not have actual knowledge that the wire transfers out of the Regions accounts were not supported by sufficient funds in the SAA account at BBG for the checks deposited in the Regions accounts.

123.    The Court has reviewed the trial testimony and the evidence. The Court concludes that the circumstantial evidence does not establish the agreement of Marvin I. Kaplan and the Kaplan Entities to do unlawful acts or to do a lawful act by unlawful means. Therefore, the conspiracy claim against Marvin I. Kaplan and the Kaplan Entities fails. A final judgment in favor of Defendants will be entered on Count XXXII. Accordingly, it is

**ORDERED** that the Clerk of Court **shall enter** a final judgment in favor on the named Defendant and against Regions Bank on the following Counts of the Corrected Second Amended Complaint (Dkt. 671):

| | | |
|---|---|---|
| Count VI | R1A | Fraudulent Concealment |
| Count VII | R1A | Aiding and Abetting |
| Count XIII | TNE | Fraudulent Concealment |
| Count XIV | TNE | Aiding and Abetting |
| Count XX | MKI | Fraudulent Concealment |
| Count XXI | MKI | Aiding and Abetting |
| Count XXVII | BNK | Fraudulent Concealment |
| Count XXVIII | BNK | Aiding and Abetting |
| Count XXIX | Kaplan | Fraudulent Concealment |
| Count XXXIII | Kaplan | |
| | Kaplan Cos. | Civil Conspiracy |

**DONE and ORDERED** in Chambers in Tampa, Florida on this 23rd day of June, 2017.

ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record