UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK,

Plaintiff,

v.                                                    CASE NO.  8:12-CV-1837-T-17MAP

MARVIN I. KAPLAN, et al.,

Defendants.

_____/

ORDER

This cause is before the Court on:

Dkt. 804        Supplemental Memorandum
Dkt. 805        Report and Recommendation
Dkt. 806        Memorandum (Bank Parties)
Dkt. 807        Response (Kaplan Parties)

On March 24, 2015, the Court granted the Motion for Final Default Judgment of
Crossclaimants Marvin I. Kaplan, R1A Palms, LLC, Triple Net Exchange, LLC, MK
Investing, LLC and BNK Smith, LLC ("Kaplan Parties") against G. Todd Smith, Gary T.
Smith, Lucy B. Smith and Smith Advertising & Associates, Inc. ("SAA") on the claims in
the Amended Counterclaim and Crossclaim (Dkt. 93). (Dkts. 346, 349).  The Court
reserved jurisdiction for the determination of damages.  On April 22, 2016, the Court
referred the determination of damages to the assigned Magistrate Judge for an
evidentiary hearing, and a Report and Recommendation.  (Dkt. 667).

The assigned Magistrate Judge conducted an evidentiary hearing on November
17, 2016, and has issued a Report and Recommendation recommending that the Court
award damages as follows:

| | |
|---|---|
| R1A Palms, LLC | $47,598,983.00 |
| Triple Net Exchange, LLC | $11,246,494.00 |
| MK Investing, LLC | $ 7,795,449.47 |
| BNK Smith, LLC | $ 2,963,804.18 |

The assigned Magistrate Judge further recommends pre-judgment interest on the base amounts, post-judgment interest, and the award of $40,609.00 in attorney's fees. (Dkt. 805).

I. Background

The Amended Counterclaim/Crossclaims (Dkt. 93) includes the following claims:

| Count I | Fraud | Gary Todd Smith, Charles L. Starr, III, SAA |
|---|---|---|
| Count II | Conspiracy to Defraud | Charles L. Starr, III, Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, Bridgeview Bank Group, SAA |
| Count III | Negligent Misrepresentation | Charles L. Starr, III, Gary Todd Smith, SAA |
| Count IV | Violation of 18 U.S.C. Sec. 1962(c) and Sec. 1964 | Charles L. Starr, III, Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, Bridgeview Bank Group, SAA |
| Count V | Violation of 18 U.S.C. Sec. 1962(d) and Sec. 1964 | Charles L. Starr, III, Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, Bridgeview Bank Group, SAA |
| Count VI | Violation of F.S. Sec. 772.103(3) and 772.104 | Charles L. Starr, III, Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, Bridgeview Bank Group, SAA |

| | | |
|---|---|---|
| Count VII | Violation of F.S. Sec. 772.103(4) and 772.104 | Charles L. Starr, III, Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, Bridgeview Bank Group, SAA |
| Count VIII | Violation of F.S. Sec. 772.11 | Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, SAA |
| Count IX | Conversion | Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, SAA |
| Count X | Violation of Florida's Deceptive and Unfair Trade Practices Act | Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, Bridgeview Bank Group, SAA |
| Count XI | Violation of F. S. Sec. 68.065 | SAA |
| Count XII | Breach of Contract | SAA, Gary Todd Smith, Gary Truman Smith |
| Count XIII | Breach of U.C.C. 4-302(A) | Bridgeview Bank Group |
| Count XIV | Breach of U.C.C. 4-302(A) | Wells Fargo, N.A. |
| Count XV | Breach of 12 C.F.R. Part 229 | Bridgeview Bank Group |
| Count XVI | Breach of 12 C.F.R. Part 229 | Wells Fargo, N.A. |
| Count XVII | Negligence | Bridgeview Bank Group |
| Count XVIII | Negligence | Wells Fargo, N.A. |
| Count XIX | Fraud | Bridgeview Bank Group |
| Count XX | Negligent Misrepresentation | Bridgeview Bank Group |
| Count XXI | Defamation Per Se | Regions Bank, Florida Bankers Association, Inc., Robert Nicholas Shaw |

| Count XXII | Invasion of Privacy | Regions Bank, Florida Bankers Association, Inc., Robert Nicholas Shaw |
|---|---|---|
| Count XXIII | Negligence/Negligent Misrepresentation | Regions Bank |

The Court notes that Kaplan Parties attached documents to the Amended Counterclaim and Crossclaims. (Exhs. 1-72). Exhibits 1-67 are copies of promissory notes from SAA to Kaplan Entities with due dates from 1/20/12 to 1/25/12. Exhibits 68-72 are copies of Notices of Intent to Claim Damages for Civil Theft, all dated in April, 2012. A list of unpaid checks is attached to Exhibit 72.

Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, and Smith Advertising & Associates, Inc. are named Defendants in Counts II, IV, V, VI, VII, VIII, IX, and X. Gary Todd Smith and Smith Advertising & Associates, Inc. are named Defendants in Counts I and III. Count XI names only Smith Advertising & Associates, Inc. as a Defendant. Count XII is directed to Gary Todd Smith, Gary Truman Smith and Smith Advertising & Associates, Inc.

In the Supplemental Memorandum, Kaplan Parties request that all Defendants be held jointly and severally liable for the damages incurred by the Kaplan Entities as a result of the fraudulent acts described in the Crossclaim. (Dkt. 804, p. 23).

II. Standard of Review

A. Report and Recommendation

The District Court determines de novo any part of the Report and Recommendation that has been properly objected to. The District Court may accept,

reject, modify in whole or in part the recommended disposition, may receive further evidence, or may recommit the matter to the Magistrate Judge with instructions. See 28 U.S.C. Sec. 636(b)(1); Fed. R. Civ. P. 72(b)(3). [I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record to accept the recommendation. To the extent that the magistrate judge has made findings of fact based upon the testimony of witnesses heard before the magistrate judge, the district court is obligated to review the transcript or listen to the tape-recording of those proceedings. LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988).

B. Default Judgment

The entry of a default against a defendant, unless set aside pursuant to Fed. R. Civ. P. 55 ( c), severely limits the defendant's ability to defend the action. While "a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover," a defaulted defendant is deemed to "admit[] the plaintiff's well-pleaded allegations of fact." Nishimatsu Const. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. Id.

Before entering a default judgment for damages, the district court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought. At that point, the defendant, even though in default, is still entitled to contest the sufficiency of the complaint and its allegations to support the judgment being sought. See Cotton v. Mass. Mutual Life Ins. Co.., 402 F.3d 1267, 1278 (11th Cir. 2005)(citing Nishimatsu, 515 F.2d at 1206.)

III. Discussion

A. Objection

Regions Bank, Bridgeview Bank Group, Wells Fargo Bank, N.A. and Charles Larry Starr, III filed a Memorandum (Dkt. 806) requesting that the Court defer ruling on the Report and Recommendation pending ruling on Regions' tort claims against Marvin I. Kaplan, R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC, and BNK Smith, LLC, to avoid the possibility of inconsistent rulings.

In support of the objection, Regions Bank cites <u>Frow v. De La Vega</u>, 82 U.S. 552 (1872), in which Supreme Court states:

> "The true mode of proceeding where a bill makes a joint charge against several defendants, and one of them makes default is simply to enter a default and a formal decree <u>pro confesso</u> against him, and proceed with the cause upon the answers of the other defendants. The defaulting defendant has merely lost his standing in court...But if the suit be decided against the complainant on their merits, the bill will be dismissed as to all the defendants alike–the defaulter as well as the others. If it be decided in the complainant's favor, he will then be entitled to a final decree against all. But a final decree on the merits against the defaulting defendant alone, pending the continuance of the cause, would be incongruous and illegal.")

R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC have filed a response (Dkt. 807) to the Memorandum, arguing that no inconsistencies can arise that would preclude the Court from approving the Report and Recommendation, and entering a final judgment against the Smiths.

The Court has ruled on the pending claims asserted by Regions Bank against Marvin I. Kaplan, R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC, and BNK Smith, LLC in the Memorandum Opinion after the bench trial, and the summary judgment Order. (Dkts. 652, 826). The Court has ruled on the pending claims asserted by Marvin I. Kaplan, R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC against Regions Bank, Bridgeview Bank Group, Wells Fargo Bank, N.A. and Charles Larry Starr, III in the summary judgment Orders. (Dkts. 654, 655, 656, 657).

After consideration, the Court finds that the request to defer ruling is moot, and therefore overrules the objection to the Report and Recommendation (Dkt. 806).

B.    Subsequent Dismissal of Counts IV, V, VI, VII

The Report and Recommendation recognized that, although the Court entered default judgment in favor of the Kaplan Parties on all counts (each an alternative theory of liability for the lost investments), the Kaplan Parties may only recover once for the same actual damages. The Report and Recommendation also recognized that Count IV incorporates the core operative facts that make up the other counts of the Third Party Complaint (Dkt. 93 at par. 201). (Dkt. 805, p. 6).

The Court notes that the RICO counts were dismissed on reconsideration against Counterclaim/Crossclaim Defendants Charles L. Starr, III and Bridgeview Bank Group. (Dkts. 351, 378). The Court dismissed the RICO counts based on insufficient allegations of the use of mail or wires as to the first phase of the fraudulent scheme, and a lack of closed-end continuity as to the second phase of the scheme.

The Eleventh Circuit has extended the _Frow_ rule to apply to defendants who are similarly situated, even if not jointly and severally liable. See Gulf Coast Fans, Inc. v. Midwest Elecs. Importers, Inc., 740 F.2d 1499, 1512 (11th Cir. 1984).

Counterclaim/Crossclaim Plaintiffs have requested a joint and several damage award against the defaulting Defendants. Because the Court dismissed the RICO counts as to other Defendants named in those Counts, the Court is concerned that _Frow_, supra, compels the Court to dismiss the RICO counts as to the Smith parties. If the RICO counts are dismissed as to the Smith parties pursuant to _Frow_, the Court would look to the remaining pending Counts to award damages.

The Court has considered whether the RICO counts state a cause of action if Charles L. Starr, III and Bridgeview Bank Group are dismissed from those Counts. The Eleventh Circuit has instructed that a plaintiff bringing a RICO claim under Sec. 1962(c) "must satisfy four elements of proof: 1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity. Williams v. Mohawk Industries, Inc., 568 F.3d 1350, 1355 (11th Cir. 2009)(citations omitted); see also Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).

In Count IV, Counterclaim/Crossclaim Plaintiffs allege that the Ponzi scheme is the RICO enterprise. (Dkt. 93, p. 32). Counterclaim/Crossclaim Plaintiffs further allege that the enterprise is an association-in-fact comprised of "Starr, T. Smith, G. Smith, L. Smith, Bridgeview and SAA." Section 1961 defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." See 18 U.S.C. Sec. 1961(4).

8

During the relevant time, G. Todd Smith, Gary T. Smith and Lucy B. Smith owned or managed Smith Advertising & Associates, Inc. (Dkt. 93, p. 3, pars. 14-16). Without Defendants Charles L. Starr, III, and Bridgeview Bank Group, the enterprise consists of the corporation, SAA, and its owners and/or officers.    In Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1357 (11th Cir. 2016), the Eleventh Circuit Court of Appeals held:

> "We , too, hold that plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees. For our purposes, there is no distinction between the corporate person and the alleged enterprise."

The Eleventh Circuit Court of Appeals explained that, while RICO is intended to interpreted broadly, permitting plaintiffs to plead an enterprise consisting of a defendant corporation, its officers, agents and employees acting within the scope of their employment would broaden RICO beyond any reasonable constraints. Id., at 1357.    In the absence of an association-in-fact, the RICO claims would fail, because there is no RICO person which is distinct from the RICO enterprise.

1.  Related Criminal Cases

The Court notes that there are criminal cases related to this case:

A.    Case No. 8:16-CR-36-T-33TGW

In Case 8:16-CR-36-T-33TGW, United States v. Marcia Caulder, Defendant

Marcia Caulder entered a plea of guilty to Count One, conspiracy to commit wire and mail fraud, each affecting a financial institution, 18 U.S.C. Sec. 371, and was sentenced to 60 months imprisonment, a 3 year term of supervised release, a special assessment fee of $100.00, a forfeiture money judgment in the amount of $120,000.00, and restitution of $57,797,575.50, jointly and severally with Tanisha Melvin (Case No. 8:16-CR-34-T-17JSS); Amber Mathias (Case No. 8:16-CR-35-T-15MAP) and Gary Todd Smith (Case No. 8:16-CR-120-T-17TGW).

The Corrected Judgment (Dkt. 37) includes a list of the victims, and the restitution amount owed to each victim. The victims include Marvin Kaplan, $24,228,535.00, Regions Bank, $6,343,000.00, and Charles L. Starr, III, $1,266,616.26.

B.     Case No. 8:16-CR-34-T-17JSS

In Case No. 8:16-CR-34-T-17JSS, United States v. Tanisha Melvin, Defendant Tanisha Melvin entered a guilty plea to Count One of the Information, conspiracy to commit mail fraud and wire fraud, each affecting a financial institution, in violation of 18 U.S.C. Sec. 371 (Dkt. 10). On June 30, 2017, Defendant Melvin was sentenced to 9 months imprisonment, a 3-year term of supervised release, a special assessment of $100.00, a forfeiture money judgment in the amount of $70,000.00, and restitution in the amount of $57,797,575.90, jointly and severally with Amber Mathias in Docket No. 8:16-CR-35-T-35MAP, Marcia Caulder in Docket No. 8:16-CR-36-T-33TGW and Gary Todd Smith in Docket No. 8:16-CR-120-T-17TGW. A list of victims and the amount of restitution due to each victim is attached to the Final Judgment (Dkt. 57).

The Court notes that the Plea Agreements of Defendants Caulder and Melvin provide:

6.    Restitution to Victims of Offense of Conviction

> Pursuant to 18 U.S.C. Sec. 3663(a)and (b), and 3663A(a)
> and (b), the defendant agrees to make full restitution to any
> person or entity that lent money to Smith Advertising through
> bridge loans or factoring. With respect to restitution flowing
> from factoring through RMF, the defendant agrees that the
> restitution shall be made directly to the individual members
> of RMF.

The Court further notes that 18 U.S.C. Sec. 3664(l) provides:

A conviction of a defendant for an offense involving the act giving rise to
an order of restitution shall estop the defendant from denying the
essential allegations of that offense in any subsequent Federal civil
proceeding or State civil proceeding, to the extent consistent with State
law, brought by the victim.

The statement of facts in Defendant Caulder's Plea Agreement (Dkt. 3, pp. 16-29) includes the following, *inter alia*:

1.    Sometime in or about 2007, Smith Advertising's Florida office was
      established at 1626 Ringling Boulevard, Suite 510, Sarasota,
      Florida 34236. (Dkt. 3, p. 16).

2.    On May 5, 2009, G.T.S. and G.T.S. met with a group of principals
      organized by L.S., which was then known as the "Investment
      Group" to discuss replacing CapitalPlus as Smith's factor. These
      principals later formed Receivable Management Funding ("RMF")
      and they included M.S., W.S., and L.S. RMF was based in
      Sarasota and ultimately co-located with Smith Advertising's Florida
      presence. (Dkt. 3, p. 18).

3.    Individuals joined RMF to raise the capital that was then lent to
      Smith Advertising. The conspirators created and had created false
      invoices from Smith Advertising to support the factoring
      arrangement with RMF. Because RMF allowed the clients to pay
      on the invoices directly to Smith Advertising, RMF did not detect
      the fraud. Instead, money was lent by RMF to Smith Advertising

and money sent back to RMF directly from Smith Advertising, a
pattern that continued until the scheme collapsed. (Dkt. 3, p. 20).

4. Individuals also lent money directly to Smith Advertising in the form
of bridge loans. Bridge loans were supposed to fund Smith
Advertising's advance purchase of advertising space. Because the
purchase of advertising space was done in bulk and in advance,
Smith Advertising was supposed to be able to purchase it at a
discount. Smith Advertising could then sell the advertising space to
its clients at a lesser discount and thereby benefit its clients while
still profiting from pre-purchasing the advertising space. However,
to purchase in advance advertising space Smith Advertising
needed to have capital available to make the purchases. Bridge
loans were meant to provide the upfront capital needed to buy the
advertising space, bridging the gap in time between when the
advance purchase of the advertising space was completed and the
time when Smith Advertising's client paid Smith Advertising for the
space. As with the invoice factoring, the bridge loans were
supported by fake invoices from Smith Advertising usually created
and supplied to the lenders or sometimes implied, depending on
the amount of documentation sought by the individual lenders for
each loan. The fake invoices falsely and fraudulently showed
Smith Advertising owed money for having made an advance
purchase of advertising space at a discount. The invoices were (1)
all fake, (2) not true regarding what was purchased and for the
amount it was purchased, and (3) unlawfully used the identities of
people and entities to "bill" Smith Advertising without their
permission.

In addition, all of the loans–invoice factoring and bridge
loans–were premised on a fundamental lie, that is, the true
purpose of the loans materially varied from that which was
represented to the lenders. In truth and fact as the
conspirators then and there well knew, the true purpose of
the loans was actually to cover Smith Advertising's losses, to
attempt to stay current on the ever-growing debt, and to
benefit the conspirators (e.g. keeping themselves employed
and paid).

With respect to the creation of the fraudulent documents,
Smith Advertising had an instruction manual, entitled
"Instructional Manual–Drksd.doc," which described how to
create the fake invoices and promissory notes. (Dkt. 3, p.

21).

5.    The false invoices were, after creation, often sent directly to the
      lenders.  First, conspirators manufactured the documents.  For
      example, on February 7, 2012, A.M. sent an email and attachment
      to G.T.S.  The attachment contained promissory notes totaling
      $1,350,000 to be loaned by victim-lender J.C. in return for
      $233,000 in fees, as well as vendor invoices.  (Dkt. 3, p. 22).

6.    The terms of the loans were generally set in the solicitations by
      conspirators to lenders.  (two examples of email solicitations
      included).  (Dkt. 3, p. 23).

7.    In addition, many of the loans were "renewed," that is, the principal
      of the loan was lent again to Smith Advertising for a subsequent
      loan after the preceding loan had concluded.  (example of email
      renewal included).  (Dkt. 3, pp. 23-24).

8.    In addition to wire communications crossing state lines (e.g. emails
      from Fayetteville, NC to Sarasota, FL), mailings were sent in
      execution of the mail fraud aspect of the scheme.  Recovered at
      Smith Advertising during the execution of the search warrant were
      FedEx and UPS shipment receipts that showed mailings from the
      Smith Advertising office in Fayetteville, NC, to victim-lender C.S.'
      residence in Sarasota, FL.

9.    Some checks were even sent by private courier.  On January 25,
      2012, checks were actually flown to M.K. on a private flight (tail
      number N744SR), from Fayetteville Regional airport to the
      Sarasota airport (airport code SRQ) by Smith Advertising.

10.   In addition to manufacturing false invoices and promissory notes,
      conspirators also fabricated other documents to perpetrate and
      mask the fraud.  For example, on February 6, 2012, MARCIA
      CAULDER sent an email to M.S., a principal of the RMF group.
      MARCIA CAULDER wrote that "[T.]" had asked her to send the
      message to him.  The email appeared to show messages sent
      between G.T.S. and D.G., Senior V.P. of Bridgeview Bank Group
      and a victim of identity theft, on January 26, 2012.  In the initial
      message from G.T.S. to D.G., Smith asked why several checks
      were returned when Smith Advertising had the funds available in

13

their account. D.G.'s fabricated reply stated in part, "It appears it was a clerical error...It was our fault. If you want to send them thru a second time they will be honored." This email conversation was also sent by G.T.S. to victim-lender C.S. on February 8, 2012.

The email communication between G.T.S. and D.G. actually took place on September 14, 2011, and was about a different topic. Emails found on the server showed that G.T.S. had sent the original, genuine conversation to MARCIA CAULDER on February 6, 2012; the text was edited by MARCIA CAULDER and returned to G.T.S. The contents of D.G.'s communication to G.T.S. were falsely, fraudulently and substantially altered. (Dkt. 3, p. 25).

11.    A large number of people and entities were defrauded by the scheme. At least one hundred and twenty-nine individuals lent funds to Smith Advertising as bridge lenders or as members of RMF. Seventy-four of them have claimed that, collectively, their losses exceed $55,000,000. Smith Advertising maintained two sets of financial books, a false set and an accurate set. According to the accurate set of books, on February 23, 2012, Smith Advertising's total assets were then valued at -$66,723,391.55 and the total equity was  -$103,140,084.68.

In March of 2012, the scheme collapsed under the weight of the ever increasing debt burden. The cash crunch was particularly acute in a series of transactions between M.K. and Smith Advertising. M.K., a bridge lender, required his principal and interest be returned to him before he would lend the money again to Smith Advertising. The problem was that Smith Advertising could not repay M.K. as he requested. Smith Advertising's Bridgeview Bank account was significantly in the red. Starting in December 2010, the average balance in the Smith Advertising Bridgeview account (ending with the numbers 8201) fell below zero. Monthly deposits and withdrawals for 2011 averaged $7.4 million and $7.6 million respectively. The monthly ending balances in 2011 on the account averaged -$316,000. As might be expected, Smith Advertising incurred significant overdraft fees for the negative balances, $79,551 in overdraft fees to Bridgeview Bank in 2011 alone. Finally, on or about January 25, 2012, Bridgeview Bank began returning Smith Advertising's checks as "dishonored" and marked "refer to maker." (Dkt. 3, pp. 26-27).

12.     As Bridgeview Bank began "dishonoring" the Smith Advertising checks, Regions Bank began to question the Smith Advertising-related transactions. G.T.S. attempted to intervene to keep the money flowing. Regions Bank's Sarasota branch manager Linda Council received a phone call from G.T.S., who told her that, while the checks had not cleared the Smith Advertising account, there really was enough money in the account to cover the checks to M.K. G.T.S. offered to send a screen shot of Smith Advertising's account balances. On January 24, 2012, at 10:51 a.m., G.T.S. in Fayetteville, North Carolina, emailed L.C. in Sarasota, Florida a screen shot of a webpage that read, "Welcome [T.S.]. Your last Bridgeview Business Internet Banking sign on was Tuesday, January 24, 2012 at 8:10 AM ET." The screen shot showed the balance for the account ending in 8201 to be $12,489,358.59. What Regions Bank did not know is that the account balance was actually -$12,489,358.59 and that the minus sign (showing that it was negative $12 million) had been fraudulently removed. The email was an electronic transmission of data that crossed state lines, terminating in Sarasota, Florida, which is in the Tampa Division of the Middle District of Florida. By January 26, 2012, Bridgeview Bank had "dishonored" over $14,800,000 of Smith Advertising's checks that victim M.K. had deposited into his Regions Bank account. In the interim, M.K. had wired large sums of money back to Smith Advertising's account at Bridgeview Bank. As a result of this email and other actions, FDIC-insured Regions Bank suffered a loss of approximately $9,000,000. (Dkt. 3, pp. 28-29).

The Plea Agreement of Defendant Melvin contains similar allegations.

C.     Case No. 8:16-CR-35-T-35MAP

In Case No. 8:16-CR-35-T-35MAP, United States v. Amber Mathias, Defendant Mathias entered a plea of guilty to conspiracy to commit mail fraud and wire fraud, each affecting a financial institution, in violation of 18 U.S.C. Sec. 371. The Court has accepted Defendant Mathias' Plea Agreement and adjudicated Defendant Mathias guilty; Defendant's sentencing is to be scheduled at another time. (Dkt. 20). Defendant

Case No. 8:12-CV-1837-T-17MAP

Mathias' sentencing has not yet been scheduled.  (Dkt. 27).

D.    Case No. 8:16-CR-120-T-17TGW

In Case No. 8:16-CR-120-T-17TGW, United States v. Gary Todd Smith,
Defendant Gary Todd Smith entered a guilty plea to Counts One and Two of the
Indictment (Dkt. 59). Count One alleges a conspiracy to commit mail fraud affecting a
financial institution and wire fraud affecting a financial institution, in violation of 18
U.S.C. Sec. 1349.  Count Two alleges a substantive count of wire fraud affecting a
financial institution in violation of 18 U.S.C. Sec. 1343.  The Government filed a Notice
of Maximum Penalties, Elements of Offense, Personalization of Elements and Factual
Basis (Dkt. 51).

Defendant Gary Todd Smith did not enter into a plea agreement.  The Court
notes that Defendant Gary Todd Smith does not admit the factual accuracy of the facts
stated in the Government's Notice, but stipulates  the Government could prove the
elements of Counts One and Two if the case proceeded to trial.  (Dkt. 63, Transcript of
Change of Plea, p. 15).

At the hearing on June 7, 2017, the assigned Magistrate Judge questioned
Defendant Gary Todd Smith:

The Court:    Well, I'm going to ask him basic questions.  I'm not going ask him
about details, but, yeah, I didn't ask him if he agreed or he disputed
any of that stuff.  But, Mr. Smith, you were the chief operating
officer of Smith Advertising, is that true?

The Defendant:    Yes, Your Honor.

The Court:    And in essence what count–and what's alleged is that there was
wire fraud and mail fraud and that the essence of the two–there
were two schemes.  One was submitting false invoices to a

16

factoring–actually two different factoring companies that resulted in Smith Advertising getting funds based upon those invoices. Is that true? Were false invoices submitted to some couple factors?

The Defendant:     Yes, Your Honor.

The Court:     Did you know that those invoices were false?

The Defendant:     Yes, Your Honor.

The Court:     And in connection with those two things, were some of them sent by mail, some of them sent by electronic communication?

The Defendant:     Yes, Your Honor.

The Court:     Okay. And the second aspect of that is that there were–there were what was termed bridge loans in that it was represented that Smith Advertising had purchased space for future advertising at a discount when, in fact, there wasn't any such purchases. Were there false representations like that?

The Defendant:     Yes, Your Honor.

The Court:     Did you know that there were?

The Defendant:     Yes, Your Honor.

The Court:     And there were others involved in it, just not you doing this by yourself, right? There were others involved doing it?

The Defendant:     Correct.

The Court:     And they knew about the plan?

The Defendant:     Yes, Your Honor.

The Court:     Okay. Mr. Palermo, anything further you wish me to inquire about concerning that?

Mr. Palermo:     No. That was perfect.

17

The Court:      And then with respect to Count Two, there's a scheme to defraud
                and the essence of that is that there was an electronic
                communication sent to Regions Bank saying that Smith Advertising
                had a bank account balance of over $12 million and that that was
                false. Was that done?

The Defendant:    Yes, Your Honor.

The Court:    Okay. And did you know that that statement was false?

The Defendant:    Yes, Your Honor.

The Court:    And then further--anything further, Mr. Palermo, about that?

Mr. Palermo:      Just to be safe, just to add on that it was on January 24th,
                  2012, no.

The Court:    Well, I don't imagine a whole lot
              with $12 million emails but that was back on
              January 24th of 2012 as far as you recall.

The Defendant:    Yes, Your Honor.

(Dkt. 63, Transcript of Change of Plea, pp. 16-18).

Defendant Gary Todd Smith is scheduled for sentencing in January, 2018. The
Court has accepted Defendant Gary Todd Smith's plea and has adjudicated Defendant
Smith guilty. (Dkt. 62).


2.      Defendant Charles L. Starr, III

As to Charles L. Starr, III,'s participation in the RICO enterprise, the allegations
of the Amended Counterclaim/Crossclaim include the allegation that Starr "participated
directly in the predicate acts of mail fraud insofar as he monitored and tracked with a
log the mailings as they came and went from Kaplan's office, assisting T. Smith, G.
Smith and SAA to track the transactions to ensure payment of his commissions. He

18

also participated by drawing off commissions and compensation as the investments occurred." (Dkt. 93, p. 32, par. 203).

The Court notes that a Default Judgment in the amount of $17,632,735.14 was registered in Sarasota County Circuit Court on August 21, 2012 in favor of Receivable Management Funding, LLC against Smith Advertising & Associates, Ind., Gary T. Smith and Todd G. Smith. The Default Judgment is a final judgment on a breach of contract claim as to Smith Advertising & Associates, Inc., and a breach of contract and guaranty as to Gary T. Smith and Todd G. Smith. The Default Judgment was entered in Case No. 12-CVS-4437, General Court of Justice, Superior Court Division, Wake County, North Carolina, according to the Affidavit attached to the Default Judgment (p. 7, par. 2). (Dkt. 657, pp. 3-4). The Case Number that appears on the Default Judgment is 2012 CA 6733 NC. The Default Judgment provides that the Judgment is not preclusive as to pending fraud claims in other jurisdictions.

A civil case was filed in Sarasota County Circuit Court by Receivable Management Funding, LLC against Smith Advertising & Associates, Inc., Gary T. Smith and Todd G. Smith, Case Number 2012 CA 001966 NC. That case was dismissed for lack of prosecution on the Court's Motion on August 21, 2012.

Defendant Starr cannot be both a participant in the Ponzi scheme, and a victim of the Ponzi scheme. Defendant Starr was not an employee of Smith Advertising; Defendant Starr was an "outsider." The allegations of direct participation in the affairs of the enterprise are predicated on Defendant Starr being an "associate in fact" --an individual that is "associated together [with other individuals/entities] for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981). It is not plausible that Defendant Starr intentionally aided SAA to commit mail and wire fraud, with knowledge of the fraud scheme, when such participation would cause Defendant Starr to lose the money Defendant Starr lent to SAA. If the RICO

claims had proceeded beyond the pleading stage as to Defendant Starr, the RICO claims would have been dismissed as to Charles L. Starr, III.

3,    Defendant Bridgeview Bank Group

As to Bridgeview Bank Group, the only evidence of record is that Bridgeview Bank Group performed banking services for SAA.    The Count previously found that there was no evidence that Bridgeview Bank Group had actual knowledge of the Ponzi scheme or any other fraud scheme. (Dkt. 655, pp. 7-8).    Bridgeview Bank Group did not have a role within the vertical chain of command of SAA, but was in a horizontal relationship with SAA.  Bridgeview Bank Group did not participate in the RICO enterprise by virtue of the fact that SAA used its business checking account at Bridgeview Bank to carry out SAA's scheme.  Bridgeview Bank Group played no role in directing the affairs of SAA.  "It is not enough that [the] RICO enterprise might not have been able to function without the banking scheme in place...*[E]ven provision of services essential to the operation of the RICO enterprise itself is not the same as participating in the conduct of the affairs of the enterprise.* " In Re Sunpoint Securities, Inc., 350 B.R. 741, 750 (E.D. Tex. 2006)(citing DeWit v. Firstar Corp.., 879 F.Supp. 947, 966 (N.D. Iowa 1995)(emphasis added).

Bridgeview Bank Group dishonored the SAA checks in accordance with controlling rules and regulations.  Honoring or dishonoring checks is incidental to Bridgeview Bank Group's conduct of its own affairs when faced with an overextended account.  RICO "liability depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's* affairs,' not just their own affairs." Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).  If the RICO claims had proceeded beyond the pleading stage as to Bridgeview Bank, the RICO claims would have been dismissed.

20

Because the Court dismissed the RICO claims against Charles L. Starr, III and Bridgeview Bank, the Court concludes that the <u>Frow</u> rule requires that the RICO claims in Counts IV, V, VI VII be dismissed as to the Smith Defendants. The Court rejects the Report and Recommendation as to the award of damages premised on Count IV, Violation of 18 U.S.C. Sec. 1962(c) and Sec. 1964. The Court therefore looks to the remaining pending counts to support an award of damages as to SAA/ Smith parties.

C.  Remaining Counts as to Smith Defendants

As to Count I, Fraud, the Court notes that Count I was dismissed without leave to amend, and Counterclaim/Crossclaim Plaintiffs acknowledged they were not pursuing Count I. (Dkt. 244, pp. 10-12).

As to Count II, the Court granted summary judgment to Bridgeview Bank Group (Dkt. 655) and to Charles L. Starr, III (Dkt. 657).

As to Count III, the Court dismissed Count III without leave to amend, and Counterclaim/Crossclaim Plaintiffs acknowledged that they were not pursuing Count III. (Dkt. 244, pp. 15-16).

Although the Court entered default judgment in favor of the Kaplan Parties on all Counts, the Kaplan Parties may only recover once for the same actual damages. <u>See Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC</u>, 650 F.Supp.2d 1213, 1229 (S.D. Fla. 2009). Of the remaining pending Counts (VIII, IX, X, XI, XII), as discussed below, the Court finds that an award of damages under Count VIII is appropriate.

1.     Count VIII    Violation of F.S. Sec. 772.11

A.     Sufficient Basis

In Count VIII, Counterclaim/Crossclaim Plaintiffs allege:

223.    T. Smith, G. Smith, L. Smith and SAA knowingly retained
        and used the money of the Investment Companies with the
        intent to permanently deprive them of the right to the money
        and to appropriate it for their own use in violation of Florida
        Statutes Sec. 812.014.

224.    The Investment Companies have made demand in
        accordance with Fla. Stat. 772.11(1). Despite such
        demands, T. Smith, G. Smith, L. Smith and SAA have
        refused to deliver possession of the wrongfully stolen money
        to the Investment Companies. Copies of the demand letters
        are attached hereto as Exhibits 68-71.

In Count VIII, Counterclaim/Crossclaim Plaintiffs incorporate the operative facts
that make up the other Counts of the Third Party Complaint (Dkt. 93, par. 222).

Exhibit 68, dated April 13, 2012, directed to Gary T. Smith, G. Todd Smith, Lucy
B. Smith, Dawn Jackson, Tanisha Melvin and Amber Mathias, is a Notice of Intent to
Claim Damages for Civil Theft on behalf of BNK Smith, LLC. The Notice states:

> YOU ARE HEREBY NOTIFIED that you have taken and converted for
> your own use and benefit and deprived BNK Smith, LLC of its right to and
> use of corporate funds by stealing and appropriating said funds under
> false pretenses. On or about January 20, 2012, you converted and stole
> the sum of $443,375.00 and on or about January 23, 2012, you converted
> and stole the sum of $556,675.00 from BNK Smith, LLC. These acts
> were in violation of Florida Statutes Secs. 812.012-812.037 and/or s.
> 825.103.
>
> Pursuant to Sec. 772.11, Fla. Stat., BNK Smith, LLC hereby makes its claim
> against you for the sum of $3,000,150.00, which represents triple the amount of
> damages sustained by the undersigned due to said takings and deprivations.
> This is a demand that you pay the sum specified within thirty (30) days after
> receipt of this notice.

Exhibit 69, dated April 13, 2012, directed to Gary T. Smith, G. Todd Smith, Lucy B. Smith, Dawn Jackson, Tanisha Melvin and Amber Mathias, is a Notice of Intent to Claim Damages For Civil Theft on behalf of R1A Palms, LLC, alleging conversion and theft of $6,795,125.00 on January 20, 2012 and $8,044,660.00 on January 23, 2012. Crossclaim/Counterclaim Plaintiffs demand $44,519,355.00, for triple the amount of damages sustained, and demand payment within thirty days of receipt of the notice.

Exhibit 70, dated April 13, 2012, and directed to Gary T. Smith, G. Todd Smith, Lucy B. Smith, Dawn Jackson, Tanisha Melvin and Amber Mathias, is a Notice of Intent to Claim Damages for Civil Theft on behalf of MK Investing, LLC, alleging conversion and theft of $1,234,000.00 on January 20, 2012 and $1,395,000.00 on January 23, 2012. Crossclaim/Counterclaim Plaintiffs demand $7,887,000.00, for triple the amount of damages sustained, and demand payment within thirty days of receipt of the notice.

Exhibit 71, dated April 13, 2012, and directed to Gary T. Smith, G. Todd Smith, Lucy B. Smith, Dawn Jackson, Tanisha Melvin and Amber Mathias, is a Notice of Intent to Claim Damages for Civil Theft on behalf of Triple Net Exchange, LLC, alleging conversion and theft of $1,784,000.00 on January 20, 2012, and $2,009,700.00 on January 23, 2012. Crossclaim/Counterclaim Plaintiffs demand $11,383,500.00, for triple the amount of damages sustained, and demand payment within thirty days of receipt of the notice.

"[T]o establish a claim for civil theft, the claimant must prove the statutory elements of theft, as well as criminal intent." Gersh v. Cofman, 769 So.2d 407, 409 (Fla. 4th DCA 2000). Under section 812.014(1), "[a] person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently: a) Deprive the other person of a right to the property or a benefit from the property [or] b) Appropriate the property to his or her own

23

use or to the use of any person not entitled to the use of the property." "Obtains or uses" includes "[c]onduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception." Sec. 812.012(3)(d)(1), Fla. Stat. (2010).

Where the property at issue is also the subject of a contract between the parties, a civil theft claim requires additional proof of "an intricate sophisticated scheme of deceit and theft." Trend Setter Villas of Deer Creek v. Villas on the Green, 569 So.2d 766, 767 (Fla. 4th DCA 1990).

All the elements of civil theft must be proven by clear and convincing evidence. See Anthony Distributors, Inc. v. Miller Brewing Co., 941 F.Supp. 1567, 1575 (M.D. Fla. 1996).

Count VIII incorporates all prior factual allegations in the Amended Counterclaim/Crossclaims. The Court notes that demand letters attached to the Amended Counterclaim/Crossclaims are directed to the individual Defendants and not to SAA. A corporation is an artificial entity that cannot act other than through its officers, employees and agents.

In United Technologies Corp. v. Mazer, 556 F.3d 1260 (11th Cir. 2009), the Eleventh Circuit notes:

> "Under the doctrine of respondeat superior, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer." Iglesia Cristiana La Casa Del Senor, Inc. v. L.M., 783 So.2d 353, 356 (Fla. 3d DCA 2001). Under Florida law, an action falls within the scope of employment if the conduct: 1) is of the kind the employee was employed

Case No. 8:12-CV-1837-T-17MAP

to perform; 2) occurred within the time and space limits of the employee's employment; and 3) was activated at least in part by a purpose to serve the employment. Spencer v. Assurance Co. of Am, 39 F.3d 1146, 1150 (11th Cir. 1994); Iglesia Cristiana, 783 So.2d at 357."

Further, the corporate employer of the perpetrator of a theft or conversion is vicariously liable for punitive damages or treble damages when "(a) the theft or conversion was committed by a managerial employee of the corporation within the scope of the latter's employment; or (b) the theft or conversion was committed by a non-managerial employee of the corporation within the scope of the latter's employment, provided further that the management of the corporation was guilty of some fault which foreseeably contributed to the plaintiff's injury." McArthur Dairy, Inc. v. Original Kielbs, Inc., 481 So.2d 535, 540 (Fla.3d DCA 1986) (internal citations omitted).

As in United Technologies v. Mazer, Counterclaim/Crossclaim Plaintiffs do not expressly plead that the acts of Gary Todd Smith, Gary Truman Smith and Lucy B. Smith were within the scope of their employment. As to Gary Todd Smith and Gary Truman Smith, Counterclaim/Crossclaim Plaintiffs allege that those Defendants were owner/officers of SAA, committed the torts alleged in this action in Sarasota County, Florida, entered into the contracts alleged in Sarasota County, Florida, and the contracts were to be performed in Sarasota County, Florida. (Dkt. 93, pars. 14, 15). Gary Todd Smith and Gary Truman Smith both signed the promissory notes at issue, each giving their personal guarantee. Gary Todd Smith also signed each promissory note in his capacity as COO/Owner, Smith Advertising & Associates.

As to Lucy B. Smith, Counterclaim/Crossclaim Plaintiffs allege that Lucy B. Smith was an owner/officer of SAA at all material times, and the tortious acts alleged in this complaint were performed by L. Smith in Sarasota County, Florida. (Dkt. 93, par. 16). Counterclaim/Crossclaim Plaintiffs further allege that Gary Todd Smith, Gary Truman Smith, Lucy B. Smith, and SAA, with others, realized that they could use the platform of

25

SAA's prior legitimate business dealings to jointly create an illegitimate Ponzi scheme that would generate large returns for them. (Dkt. 93, par. 42).

Counterclaim/Crossclaim Plaintiffs have pled many additional facts in addition to the above facts. All of the facts, when read together, at least arguably allege that the conduct of the Counterclaim/Crossclaim Defendants Gary Todd Smith, Gary Truman Smith and Lucy B. Smith included acts which reasonably could have been the type of acts for which each Defendant was employed, that they acted within the time and space constraints of their employment, and that they could reasonably have been acting to serve and benefit SAA.

The Court notes that Defendant Gary Todd Smith was adjudicated guilty of one Count of conspiracy to commit wire fraud and mail fraud, and one substantive Count of wire fraud. A defendant who is convicted in a criminal proceeding involving the conduct that forms the basis of the civil claim is estopped from challenging all matters that are actually and necessarily adjudicated in the prior action. See Stafford v. Don Reid Ford, Inc., 920 So.2d 791 (Fla. 5th DCA 2006)(citing Starr Tyme, Inc. v. Cohen, 659 So.2d 1064, 1067 (Fla. 1995). The Notice of Maximum Penalties, Elements of Offense, Personalization of Elements and Factual Basis (Dkt.51) provides:

> "Gary Todd Smith (also known as Todd Smith) conspired with Gary Truman Smith, Amber Mathias, Marcia Caulder, Tanisha Melvin, D.J., S.A. and others known and unknown to commit wire fraud and mail fraud, as described below." (Dkt. 51, pp. 3-4)

Defendant Gary Todd Smith's plea and adjudication of guilt is clear and convincing evidence as to Defendant Gary Todd Smith's intent to commit civil theft. The plea agreements of Tanisha Melvin, Marcia Caulder and Amber Mathias also include factual statements that those Defendants "conspired with G.T.S., G.T.S." and others.

At the evidentiary hearing, Marvin I. Kaplan testified that he made two trips to Fayetteville, NC, to meet the principals of Smith Advertising. The trips were in 2010 and 2011. Marvin I. Kaplan further testified as to his understanding of the respective roles of Gary Truman Smith and Gary Todd Smith in Smith Advertising. Marvin I. Kaplan testified that he understood that Gary Truman Smith founded Smith Advertising, which continued in business for thirty-nine years, and that Gary Truman Smith was reaching retirement, turning the reins of Smith Advertising over to Gary Todd Smith. Marvin I. Kaplan testified that he had direct contact with Gary Truman Smith and Gary Todd Smith during the three years he was doing business with Smith Advertising..

Defendant Gary Truman Smith has not been prosecuted in this Court. The public records of the State of Florida show that Gary Truman Smith was CEO of Smith Advertising & Associates, Inc. and Gary Todd Smith was COO of Smith Advertising & Associates, Inc. during the relevant time. The Court notes that Gary Truman Smith signed the personal guarantees on the promissory notes. Given the scope of the conspiracy, including the number of victims, length of time and the losses sustained by the victims, Gary Truman Smith's position as owner/manager during the relevant time, and the direct contact with Marvin I. Kaplan, the Court concludes that there is clear and convincing evidence of Defendant Gary Truman Smith's knowing participation in the fraud scheme.

Defendant Lucy B. Smith has not been prosecuted in this Court. Defendant Lucy B. Smith is not expressly named in the plea agreements of Gary Todd Smith, Tanisha Melvin, Marcia Caulder and Amber Mathias. At the evidentiary hearing, Marvin I. Kaplan testified that Defendant Lucy B. Smith was a member/manager of Smith Advertising, and the spouse of Gary Todd Smith. Based on the prior pleadings in this case (Dkts. 105, 109, 168), the Court notes that Lucy B. Smith is the spouse of Gary Truman Smith.

The public records of the State of Florida show that Lucy B. Smith was the Corporate Secretary of Smith Advertising & Associates, Inc. during the relevant time. Marvin I. Kaplan testified that Defendant Lucy B. Smith worked in the office of Smith Advertising, helping with bookkeeping during the relevant time. Marvin I. Kaplan further testified that Defendant Lucy B. Smith was actively involved in Smith Advertising as long as he was doing business with Smith Advertising.

Counterclaim/Crossclaim Plaintiffs have alleged a sophisticated scheme of deceit and theft. After consideration, the Court finds that the allegations of Count VIII of the Amended Counterclaim/Crossclaim state a cause of action for civil theft, and there is a sufficient basis in the pleadings for the relief sought.

B.    Damages

The Court notes that the Counterclaim/Crossclaim Plaintiffs made a claim for "benefit of the bargain" damages in the letters to Defendants in which Counterclaim/Crossclaim Plaintiffs demanded treble damages within thirty days of receipt of the claim letters. Florida law recognizes that, in tort actions, the goal is to restore the injured party to the position it would have been in had the wrong not been committed. To that end, Florida law permits the Court to use either the "out-of-pocket" or "benefit-of-the-bargain" rule, depending upon which is more likely to fully compensate the injured party. See <u>Nordyne v. Florida Mobile Home Supply, Inc.</u>, 625 So.2d 1283, 1286 (Fla. 1st DCA 1993). In light of the fraud scheme carried out by Defendants, "benefit of the bargain" damages will more likely fully compensate Counterclaim/Crossclaim Plaintiffs.

"The amount to be trebled should consist solely of Plaintiffs' actual damages, prior to adding the value of prejudgment interest and prior to setting-off the value of Plaintiffs' settlements with various Defendants. The value of the settlements should

28

then be set-off subsequent to trebling." See Allstate Ins. Co. v. Palterovich, 653 F.Supp.2d 1306, 1333 (S.D. Fla. 2009).

Counterclaim/Crossclaim Plaintiffs provided a detailed supporting Memorandum as to the damages sought. (Dkt. 804).

The Court has attached a separate schedule as to the calculation of actual damages and treble damages. In the Report and Recommendation, the assigned Magistrate Judge recommended that the trebled amounts less set-off as to each entity should be entered jointly and severally against all defaulted parties. The Court adopts the Report and Recommendation as to this issue.

C. Prejudgment Interest

["W]hen a verdict liquidates damages or a plaintiff's out-of-pocket pecuniary losses, that plaintiff is entitled as a matter of law to prejudgment interest at the statutory rate from the date of that loss." See Air Prods. and Chems., Inc. v. Louisiana Land and Exploration Co., 867 F.2d 1376, 1380 (11th Cir. 1989); SEB S.A. v. Sunbeam Corp., 476 F.3d 1317, 1320 (11th Cir. 2007)(quoting Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 215 (Fla. 1985)). When the loss arises from a series of civil thefts, prejudgment interest is an element of compensatory damages that should be calculated from the date of each taking, based on any portion of the damages that are ascertainable as of a date certain from the record. Allstate Ins. Co. v. Palterovich, 653 F.Supp.2d 1306 (S.D. Fla. 2009).

As to a civil theft claim under Sec. 772.11, Florida Statutes, prejudgment interest should be awarded only on the amount stolen, not on the amount as trebled under the civil theft statute. Sebastiano v. Sclafani, 984 So.2d 673 (Fla. 4th DCA 2008).

29

In the Report and Recommendation, the assigned Magistrate Judge recommended the award of prejudgment interest on the base amounts (not the trebled amounts) under Florida law, given that Counterclaim/Crossclaim Plaintiffs' claims entitle them to prejudgment interest. The Court adopts the Report and Recommendation as to this issue.

In the Report and Recommendation, the assigned Magistrate Judge found that pre-judgment interest should be calculated from the time investments were made until the time that any set-off payments were made, at which time it begins to run on the total of the investment less the set-off. Greenberg v. Grossman, 683 So.2d 156, 157 (Fla. 3d DCA 1996)(citing Fla. Stat. Sec.772.11). The Court adopts and incorporates the recommended award of prejudgment interest to each entity, which includes prejudgment interest until the date of the Report and Recommendation, February 16, 2017:

| | |
|------|-----------------|
| R1A  | $3,526,738.91   |
| TNE  | $  896,365.41   |
| MKI  | $  603,404.99   |
| BNK  | $  233,311.61   |

The assigned Magistrate Judge further recommended that the award of prejudgment interest through the date of entry of the final judgment as to each entity at the following rates:

| | |
|------|----------------------|
| R1A  | $1,983.84 per day    |
| TNE  | $  504.21 per day    |
| MKI  | $  339.32 per day    |
| BNK  | $  131.22 per day    |

The Court adopts and incorporates the Report and Recommendation as to the daily rates for each entity. Based on 233 days from the date of the Report and Recommendation until November 7, 2017, the expected date of entry of a final judgment, additional prejudgment interest in the following amounts is due:

| | |
|------|------------|
| R1A  | $462,234.72 |
| TNE  | $117,480.93 |
| MKI  | $ 79,061.56 |
| BNK  | $ 30,574.26 |

Therefore, the total amount of prejudgment interest as to each entity is:

| | |
|------|---------------|
| R1A  | $3,988,973.63 |
| TNE  | $1,013,846.34 |
| MKI  | $ 682,466.55 |
| BNK  | $ 263,885.87 |

D. Post-judgment Interest

In the Report and Recommendation, the assigned Magistrate Judge recommended the award of post-judgment interest from the date the final judgment is entered, pursuant to 28 U.S.C. Sec. 1961.

The Court adopts and incorporates the Report and Recommendation as to the award of post-judgment interest.

E. Attorney's Fees

In the Report and Recommendation, the assigned Magistrate Judge recommended the award of attorney's fees in the amount of $40,609.00.

The Court adopts and incorporates the Report and Recommendation as to the award of attorney's fees.

F. Final Judgment

The Court has rejected the Report and Recommendation in part, and adopted and incorporated the Report and Recommendation in part. The Clerk of Court shall enter a Final Judgment jointly and severally against G. Todd Smith, Gary T. Smith, Lucy B. Smith and Smith Advertising & Associates, Inc. on Count VIII of the Amended Counterclaim/Crossclaims (Dkt. 93) and in favor of R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC as follows:

    1.    Damages in the following amounts:

    a.    $47,598,983.00 to R1A Palms, LLC;

    b.    $11,246,494.00 to Triple Net Exchange, LLC;

    c.    $7,795,449.47 to MK Investing, LLC;

    d.    $2,963,804.18 to BNK Smith, LLC

2.      Prejudgment Interest in the following amounts:

a.      $3,988,973.63 to R1A Palms, LLC;

b.      $1,013,846.34 to Triple Net Exchange, LLC

c.      $682,466.55 to MK Investing, LLC

d.      $263,885.87 to BNK Smith, LLC.

The Court further awards attorneys fees in the amount of $40,609.00 in favor of R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC.

The Final Judgment shall accrue post-judgment interest pursuant to 28 U.S.C. Sec. 1961, for which sum execution shall issue. Accordingly, it is

**ORDERED** that the Report and Recommendation is **adopted and incorporated in part and rejected** in part. To the extent that the Report and Recommendation awards damages based on Count IV, the Court **rejects** the Report and Recommendation; the Report and Recommendation is otherwise **adopted and incorporated**. The Court has awarded damages pursuant to Count VIII for the reasons stated above. Counts IV, V, VI, VII, IX, X, XI and XII are **dismissed with prejudice**.

The Clerk of Court **shall enter** a Final Judgment in favor of R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC and BNK Smith, LLC for damages, prejudgment interest, attorney's fees and post-judgment interest as stated above, and jointly and severally against G. Todd Smith, Gary T. Smith, Lucy B. Smith, and Smith Advertising & Associates, Inc., for which sum execution shall issue.

Case No. 8:12-CV-1837-T-17MAP

**DONE and ORDERED** in Chambers in Tampa, Florida on this ___7th___ day of
November, 2017.


ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record