UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK,

      Plaintiff,

      v.                          CASE NO. 8:12-cv-1837-T-17MAP

MARVIN I. KAPLAN, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

Regions Bank asks the Court to enter a supplemental final judgment awarding it $1,649,557.53 in attorneys' fees and $168,984.09 in costs against the Kaplan Entities.[1] The District Judge has tasked me with reporting and recommending to her the appropriate dispositions of both Regions's fees motion (doc. 895) and the Kaplan Entities' motion to bifurcate the fees litigation into two phases: entitlement first, then a determination of the reasonable amount of fees after the Eleventh Circuit resolves the parties' cross-appeals (doc. 914).[2] I held oral argument on the motions on June 18, 2018. After considering the parties' arguments and filings (docs. 895, 896, 913, 914, and 940), including their court-authorized supplemental filings (docs. 948, 953, 954), I recommend that Regions's fees motion be granted in part and denied in part and the Kaplan Entities' motion to bifurcate be denied.

---

[1] The "Kaplan Entities" are R1A Palms, LLC, Triple Net Exchange, LLC, MK Investing, LLC, and BNK Smith, LLC. Although Regions sued a larger group of "Kaplan Parties" (including Marvin Kaplan), its fees motion pertains to these four Kaplan Entities.

[2] *See* 28 U.S.C. § 636(b) and Local Rule 6.01(a).

I.      *Overview*

Summarizing the complaints and the counter-complaints is unnecessary, particularly given the detailed facts in the summary judgment orders and amended omnibus final judgment (docs. 652, 654, 655, 656, 657, 826, 942).  A broad overview provides enough context for understanding my reasoning.

Marvin Kaplan, through his limited liability companies, made short-term loans to Cross Defendant Smith Advertising & Associates, Inc. (SAA) for exceedingly handsome returns.[3]  The Smiths solicited these loans without hinting that they would fleece him like all Ponzi schemers do when their schemes collapse.  After a three-year financial honeymoon, the Smiths asked Mr. Kaplan to up his ante.  And he did – to the tune of over 20 million dollars in four days.  The Smiths quickly bounced their repayment checks before Mr. Kaplan knew to stop payment.  Mr. Kaplan lost his millions.

Although Mr. Kaplan was duped by the Smiths, Regions sued him to recover its losses, eventually accusing him of scheming with the Smiths to kite checks.  Mr. Kaplan and his entities countersued the banks and sued the Smiths.[4]  After years of litigation, Regions obtained summary

---

[3]  Defaulted Counter Defendants Gary Todd Smith (son), Gary Truman Smith (father), and Lucy B. Smith (mother) (the Smiths) owned or managed SAA during the relevant time period (doc. 93 at  ¶¶ 14-16).

[4]  Federal prosecutors eventually aimed indictments at the Smiths' conspiracy.  Gary Todd and Gary Truman Smith were charged via criminal complaint in May 2014, in this district (Case No. 8:14-mj-1309-T-MAP).  The government indicted Gary Todd Smith in March 2016 (Case No. 8:16-cr-120-T-17TBM), on charges of wire fraud and conspiracy to commit wire and mail fraud.  He pleaded guilty in June 2017, to both counts without the benefit of a plea agreement, and he awaits sentencing.  In February 2018, the government filed an information charging Gary Truman Smith with conspiracy to commit mail and wire fraud (Case No. 8:18-cr-0050-T-33MAP).  He pleaded guilty before me and also awaits sentencing in August.  The factual basis of his plea agreement details the Smiths' scheme and lists Mr. Kaplan and Regions as victims (adding that the Smiths

judgment on 16 of their 32 counts:  breach of deposit agreement, obligation of reimbursement, obligation of refund, and obligation of indorser against each of four Kaplan Entities (doc. 652). Specifically, Regions obtained a $6,698,970.35 judgment against the Kaplan Entities as follows: against R1A Palms, LLC for $3,666,077.52;  against Triple Net Exchange, LLC for $1,689,590.03; against MK Investing, LLC for $1,178,923.79; and against BNK Smith, LLC for $164,379.01 (doc. 942).[5]  The Kaplan Parties, on the other hand, obtained summary judgment on Regions's conversion claims (*Id.*).

The District Judge disposed of all the Kaplan Parties' claims pretrial: she awarded them about $70 million in their action against the Smiths, plus interest and attorneys' fees (*see* doc. 848: the Smith defendants defaulted, and the Kaplan Parties obtained a default judgment against them). And as for the Kaplan Parties' counterclaims against Regions, the District Judge dismissed the defamation and invasion or privacy claims (docs. 84, 244) and granted summary judgment in Regions's favor on the claims of negligence/negligent misrepresentation (doc. 652).

After an 11-day bench trial, the District Judge issued her findings of fact and conclusions of law in June 2017, ruling in favor of the Kaplan Parties on the only counts that survived through trial: Regions's fraudulent concealment, aiding and abetting, and civil conspiracy counts (doc. 826).  After six years of litigation, Regions now seeks to recover its fees and costs associated with successfully prosecuting its breach of contract and UCC claims through summary judgment, successfully

---

defrauded as many as 74 people with a collective fraud loss exceeding $55 million) (8:14-cr-0050-T-33MAP, doc. 3 at 27).

[5] Plus pre- and post-judgment interest. The judgment also reserves jurisdiction "to determine entitlement to attorney's fees and costs (dkt. 851), and to consider all pending, and any other appropriate, post-judgment motions." (doc. 942 at 2).

defending the Kaplan Entities' counterclaims against it, and litigating the issue of attorneys' fees (doc. 895).  The Kaplan Entities object that Regions is not entitled to fees under the deposit agreements (the linchpin to a fee award); but if so, then the fees Regions's counsel requests are unreasonably high.[6]

II.     Entitlement to Fees

In her summary judgment Order (doc. 652), the District Judge found the deposit agreements between the Kaplan Entities and Regions enforceable and that each agreement incorporated a separate wire transfer agreement.  In her words, these deposit agreements notified the Kaplan Entities "all items are credited subject to final payment, that dishonored items may be charged back to the account at any time, and that the customer will be liable for the overdraft created by the charged-back items." (doc. 652-1 at 1).[7]  And later: "The Deposit Agreements reflect Defendants' express agreement to pay for overdrafts and related fees.  It is undisputed that checks on which Regions extended provisional credit were dishonored and returned after Defendants wired out funds for additional deals, resulting in overdrafts." (Id. at 5).  In short, the Kaplan Entities breached the contracts.

Regarding attorneys' fees, the deposit agreements each have the following provisions:

12. Service Charges.  You agree to pay all service charges and fees that apply to your

---

[6]  Regions is represented by David Garbett of Garbett, Allen & Roza, P.A.  That firm's billing professionals included Mr. Garbett, two other attorneys, and three paralegals (doc. 896-1).  Regions was also represented in state court and in this Court (from the date of removal until late 2012) by Amy Drushal of Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.  That firm seeks reimbursement of fees by five attorneys and one paralegal (doc. 896-4).

[7]  The wire transfer agreements provided that if Regions executes a payment at a customer's request that creates an overdraft, any overdraft existing at the close of business is immediately due and payable without notice or demand (doc. 652-1 at 3).

account or transactions within or affecting your account. . . . You agree to pay all expenses, including reasonable attorney's fees, involved in the collection of fees, charges, overdrafts, or the enforcement of any other of our rights and remedies in relation to your account.

. . .

35.  Indemnification; Waiver of Consequential Damages. . . . If we take any action with respect to your account in accordance with your instructions or orders, or in accordance with this Agreement, or if you breach any warranty provided in this Agreement or by law, and we incur any loss, liability, damage, cost or expense (including reasonable attorney's fees) as a result of any claim, demand, actions, suit or proceeding brought or made by any party, you agree to indemnify and hold us harmless from and against such loss, liability, damage, cost or expense and to reimburse us for the amount thereof.

(Doc. 2-1 at 18, 28).  And the wire transfer agreements have this provision:

25.  Indemnity.  Except as may be limited by the Article 4A of the UCC or other applicable law, you agree to defend, indemnify, protect and hold us and our officers, directors, employees, attorneys, agents and representatives harmless from and against any and all liabilities, claims, damages, losses, demands, fines (including those imposed by any Federal Reserve Bank, clearinghouse or funds transfer system), judgments, disputes, costs, charges and expenses (including attorneys' fees and the costs of litigation, arbitration or other dispute resolution) which relate in any way to (a) your failure to comply with all the terms and conditions of the agreement, (b) the failure of the representations and warranties that you make to us to be true and correct in all material respects at anytime, (c) any instructions you give us or (d) the services or the agreement and (e) our enforcement of our rights and remedies under the agreement against you.

(Regions's Tr. Ex. 29 at 5-6).

Florida law conforms to the "American Rule," which requires each party to pay for its own attorneys' fees unless a contract or statute otherwise provides.  *Price v. Tyler*, 890 So.2d 246, 251 (Fla. 2004).  "Under Florida law, a contractual attorney's fee provision must be strictly construed." *Wiand v. Wells Fargo Bank, N.A.*, No. 8:12-cv-557-T-27EAJ, 2015 WL 12839237, at * 2 (M.D. Fla. June 10, 2015) (quoting *Succar Succar v. Safra Nat'l Bank of New York*, 237 F. App'x 526, 528

5

(11th Cir. 2007)).  "[T]he rule is that if an agreement for one party to pay another party's attorney's fees is to be enforced it must unambiguously state that intention and clearly identify the matter in which the attorney's fees are recoverable." *Sholkoff v. Boca Raton Comm. Hosp., Inc.*, 693 So. 2d 1114, 1118 (Fla. 4th DCA 1997).  It is more a rule for resolving ambiguities than one of strict construction. *Id.*

According to the Kaplan Entities, the indemnification provisions are not incontrovertible prevailing party provisions that permit the award of attorneys' fees in a suit between the parties to the agreement.  Stated differently, the issue is whether the indemnification provisions obligate the Kaplan Entities to pay Regions's attorneys' fees in this direct action between the parties to the agreement. *Compare, BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 654-55 (11th Cir. 2016) (finding "broadly worded" indemnification provision requiring investor to indemnify company for "any breach of any representations or warranties or any failure to fulfill any covenants or agreements set forth in [the relevant agreement]," did not require investor to indemnify company for company's expenses incurred defending against investor's suit), *and Succar Succar,* 237 F. App'x at 528-29 (finding indemnification clause only applies to claims by third parties because attorneys' fees provision is not limited to prevailing party in suits between the parties to the contract), *with Nature's Prod., Inc. v. Natrol, Inc.*, No. 11-62409-Civ-Dimitrouleas/Snow, 2014 WL 11889447, at * 5 (S.D. Fla. Jul. 30, 2014) (enforcing indemnity agreement and awarding attorneys' fees in action between indemnitor and indemnitee; *Succar* does "not stand for the proposition that a broadly worded and unambiguous contract – such as the indemnity agreement between [the parties] – is unenforceable as to attorneys' fees."), *and SRE Culinary Equipment & Supplies, LLC v. Sch. Dist. of Hillsborough Cty.*, No. 8:17-cv-2819-T-24JSS, 2018 WL 3068069, at *4 (M.D. Fla. Apr. 9, 2018) (enforcing

attorneys' fees provision of indemnification agreement in a direct claim between the parties to the contract and in absence of "prevailing party" language).

But I do not reach this issue, because under Paragraph 12 of the deposit agreements with Regions, each of the Kaplan Entities agreed to pay "all expenses, including reasonable attorney's fees" that Regions incurred in enforcing "any other of our rights and remedies in relation to your account." The Kaplan Entities argue that this paragraph is open-ended, illusory, and unenforceable. They cite *Coin-O-Matic, Inc. v. Cornerstone Residential Management, Inc.*, 879 So.2d 649, 650 (Fla. 3d DCA 2004), which interprets an attorneys' fees provision in a lease agreement as illusory and unenforceable because it "in essence provides for fees whenever the lessee . . . so much as telephones a lawyer." The case on which *Coin-O-Matic* relies involves a contract for the sale of goods that was unenforceable because it was not supported by consideration of a promised performance; in other words, the buyer's performance was optional, and the assurance of performance illusory. *See Office Pavilion S. Fla., Inc. v. ASAL Products, Inc.*, 849 So.2d 367, 370 (Fla. 4th DCA 2003).

Regions sued to enforce its "rights and remedies" in relation to the Kaplan Entities' accounts – it successfully sued the Kaplan Entities for breach of contract to recoup its losses. The deposit agreements allow for the recovery of reasonable attorneys' fees and expenses. *See Jaffe v. Bank of Am. Corp., N.A.*, 399 F. App'x 535 (11th Cir. 2010) (enforcing broadly worded provision in letter of credit agreement with bank, awarding bank "all costs and expenses . . . of all claim or legal proceedings arising out of the issuance by [the bank] of the Letter of Credit" for defending account holders claims against it); *Am. Infoage v. Regions Bank*, No. 8:13-cv-1533-T-23JSS, 2016 WL 7733983, at * 5-7 (M.D. Fla. Dec. 7, 2016) (recommending award of $338,880.08 in fees and costs under attorneys' fees provision in loan agreement for defending account holder's breach of contract

case; fee provision stated the account holder "shall pay all costs and expenses thereof including, but not limit to, reasonable attorneys' fees and expenses"), *adopted* 2017 WL 111601 (M.D. Fla. Jan. 11, 2017).

Additionally, the fee provision is broad enough to include fees associated with Regions's UCC counts, which – along with Regions's defense of the counterclaims asserted against it – are all based on a common core of facts.  "Florida law explicitly provides that 'claims arise out of a contract if they are inextricably intertwined with the contract.'"  *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017) (quoting *Dolphin LLC v. WCI Comm., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013)); *Daddono v. Miele*, 69 So.3d 320, 324 (Fla. 4th DCA 2011); *Current Builders of Fla., Inc. v. First Sealord Sur., Inc.*, 984 So.2d 526, 534 (Fla. 4th DCA 2008).  Although the UCC counts addressed the Kaplan Entities' failure to fulfill statutory obligations, these claims cannot be separated from the deposit agreements.[8]  Regions's damages are for the overdraft amounts it lost pursuant to the contract; in other words, Regions alleged no claim that could exist without the contract.

The Kaplan Entities conceded this at the hearing.  They also agreed that Regions's defense of the counterclaims was inextricably intertwined with the deposit agreements, in light of this language in the Order granting Regions summary judgment on the negligence/negligent misrepresentation claim:   "Regions did not make any representations on which Counterclaim/Crossclaim Plaintiffs could have reasonably relied.  As to the claim based on the alleged prior oral agreement as to Regions's future performance under the Deposit Agreements and

---

[8]  Regions does not argue and I do not address whether Regions could recover fees pursuant to statutory fees provisions in the UCC.

Wire Transfer Agreements, the claim does not rise to the level of an independent tort." (doc. 652 at 57).

Regions is entitled to recover its reasonable attorneys' fees and costs associated with its breach of deposit agreement counts, its UCC counts, and its defense of the counterclaims the Kaplan Parties asserted against it.  Regions is not entitled to its fees and costs incurred in prosecuting its tort claims, a point it concedes.[9]

*III.    Amount of Fees*

With entitlement settled, the next step is for me to determine a reasonable amount of fees. In diversity cases such as this one, the determination of a reasonable attorneys' fee is governed by state law.  *See All Underwriters v. Weisberg*, 222 F.3d 1309, 1311-12 (11th Cir. 2000).  Florida has adopted the federal lodestar approach as the foundation for setting reasonable fee awards.  *Fla. Patient's Compensation Fund v. Rowe*, 472 So.2d 1145, 1150 (Fla. 1985).  This method requires the court to determine a "lodestar figure" by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate for the services of the prevailing party's attorney.  *Id*. at 1151.

---

[9] In his declaration attached to Regions's motion for attorney's fees, Mr. Garbett states:

In reviewing the billing data, I endeavored to eliminate entries and time (a) solely dedicated to prosecuting the tort claims; and (b) occurring after the Court entered the summary judgment-related orders on April 18, 2016 because the remaining claims for trial were tort claims for which Regions is not seeking reimbursement of fees, costs and expenses through this motion (collectively "Excluded Services"), unless the post-April 18, 2016 entries relate to the UCC and contract claims, defending against the Counterclaim/Crossclaim, or preparation of this motion, in which case I included the entry in Included Services.

(doc. 896-1 at 4-5).

9

In computing the lodestar, a court considers the following factors, listed in Rule 4-1.5 of the Rules Regulating the Florida Bar: (1) the time and labor required, the novelty, complexity, and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee, or rate of fee, customarily charged in the locality for legal services of a comparable or similar nature; (4) the significance of, or amount involved in, the subject matter of the representation, the responsibility involved in the representation, and the results obtained; (5) the time limitations imposed by the client or by the circumstances and, as between attorney and client, any additional or special time demands or requests of the attorney by the client; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, diligence, and ability of the lawyer or lawyers performing the service and the skill, expertise, or efficiency of effort reflected in the actual providing of such services; and (8) whether the fee is fixed or contingent. *See Standard Guar. Ins. Co. v. Quanstrom*, 555 So.2d 828, 831 (Fla. 1990).

The fee applicant bears the burden of presenting satisfactory evidence to establish that the requested rate is in accord with the prevailing market rate and that the hours are reasonable. *Fla. Patient's Compensation Fund*, 472 So.2d at 1150-51. In addition, the court itself is an attorneys' fees expert and may consider its own knowledge and experience concerning reasonable and proper fees. *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988).

Regions was represented by two firms, Trenam Law (until late 2012) and Garbett, Allen & Roza (from July 2012 to present). Garbett, Allen & Roza requests $1,548,356.56 in attorneys' fees; Trenam requests $101,200.97. Regions seeks a total of $1,649,557.53 in attorneys' fees (docs. 896-1 and -4). Mr. Garbett and Ms. Drushal have submitted declarations and billing records. The invoices

from Mr. Garbett's firm span 494 pages (doc. 896-2); Trenam Law's invoices are 83-pages long (doc. 896-5). Mr. Garbett has redacted his firm's invoices so extensively (to omit charges related to trying Regions's unsuccessful tort claims) that it is impossible to verify his total fee request except by adding up each individual entry. Although he filed a spreadsheet after the hearing that contains just the time entries for which Regions seeks reimbursement, it is 295-pages long (doc. 948-1). Without a massive expenditure of time, I cannot figure out how Mr. Garbett arrived at his final lodestar figure, whether he accurately excluded entries (or portions of entries) related to Regions's tort claims, or whether multiple attorneys billed for the same task (either within Garbett, Allen & Roza or between that firm and Trenam Law).

Neither the invoices, the declarations, nor the spreadsheet summarizes the hours expended by the nature of the activity or stage of the case or the amount of time each attorney spent during that particular stage. The court in *Norman*, 836 F.2d 1292, suggests such a format, noting that courts are often faced with inadequate fee applications. But aside from promoting this workable format, *Norman* teaches two other points. *See Regions Bank v. Hyman*, No. 8:09-cv-1841-T-17MAP, 2013 WL 12166237, at *2 n. 1 (M.D. Fla. Aug. 26, 2013). Even if the fee petition lacks support, "the court is not relieved of its obligation to award a reasonable fee," assuming an award is appropriate. *Id*. (quoting *Norman*, 836 F.2d at 1303). And, the district court should be mindful of its neutrality and not depart from that position by coaching either party on the proper preparation of their pleadings. *Id*.

With this in mind, courts within the Eleventh Circuit generally apply *Norman*'s hour-by-hour rule, which requires that when a court disallows hours it should identify the hours and explain why they are disallowed. To a large degree, however, this case evades the application of *Norman*. The

11

Kaplan Entities' supplemental filings (docs. 953, 954) do break down the hours billed by broad categories and provide an outline helpful for my analysis of what constitutes a reasonable number of hours. But the burden is on Regions at this stage, and at bottom the format of Regions's fee petition makes my task much more difficult. "Where fee documentation is voluminous, such as in the instant case, an hour-by-hour review is simply impractical and a waste of judicial resources." *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994). "[I]t is sufficient for the court to provide a concise but clear explanation of its reasons for the redaction." *Id*. A court is permitted to make an across-the-board percentage cut either in the number of hours claimed or in the final lodestar figure, so long as the court "concisely but clearly articulates their reasons for selecting specific percentage reductions." *Id*.

    A.    *Reasonableness of Hours Expended*

The first step in computing the lodestar is determining the reasonable number of hours expended. Regions's counsel Mr. Garbett declares he and his colleagues spent a total of 4,377.10 hours on Regions's behalf litigating the breach of contract and the UCC claims and defending against the counterclaims from the filing of the complaint through the April 2016 summary judgment order (docs. 896-1, 948). Ms. Drushal of Trenam Law, the firm that represented Regions until late 2012, attests to her firm spending 368.1 hours litigating this case, including "filing the complaint and motion for temporary injunction, attending the hearing on the motion for temporary injunction, and successfully having the temporary injunction entered, as well as preparing an amended complaint." (doc. 896-4 at 4).[10] Between the two firms, the hours Regions's counsel spent litigating this case

---

[10] Ms. Drushal totals her firm's hours at 368.4, but the hours listed in her chart actually total 368.1 (doc. 896-4 at 3-4).

total 4,745.2.

An in-depth analysis of the voluminous pages of time records would clearly be a waste of judicial resources in this case.  *See Loranger*, 10 F.3d at 783.  The Eleventh Circuit precedent counsels against a rote "cash register approach" to setting a fee.  *Yellow Pages*, 846 F.3d at 1164. Mindful of this, and using the Kaplan Entities' supplemental filing as a guide (the parties offer me no other), the following hours reduction by category and firm is appropriate under the circumstances.

1.      *Garbett, Allen & Roza – Tort Claims*

The number of Garbett, Allen & Roza's hours is excessively high, even considering Mr. Garbett's reductions of time spent litigating after the summary judgment order.  This case was filed in 2012.  Although Regions emphasizes the complexity of the issues, the claims on which Regions prevailed are relatively straightforward breach of contract claims involving a series of transactions over a four-day span.  Nonetheless, Regions alleged 32 counts, including one for civil conspiracy. This unsuccessful claim that Mr. Kaplan, a victim of the Smiths' Ponzi scheme, was engaged in a check kiting scheme ratcheted up what was already a contentious litigation.  It is impossible to discern how Regions's conspiratorial strategy impacted the progress of the case as a whole, although the only reasonable conclusion is that it clearly did, especially during the discovery phase.  There also appears to be some duplication of effort – after taking over the case, Mr. Garbett tread some of the same ground as Trenam Law.

Mr. Garbett declares that he excised all hours his firm spent prosecuting the tort claims from the invoices he submitted to the Court – a task that is easier said than done across 500 pages of billing records.  In its supplemental filing, the Kaplan Entities highlight in yellow the time entries associated with Regions's tort claims that slipped through the cracks and into Regions's fee petition

13

(*see* doc. 953 at 2-3).  These entries total 268 hours among three attorneys and two paralegals.  I am persuaded, as the Kaplan Entities assert, that these hours relate to time spent on Regions's unsuccessful tort claims, including researching check kiting schemes, preparing summary judgment on the conspiracy claim, investigating the criminal cases filed against the Smiths, and conferring with Richard Fechter, Regions's kiting expert.[11]  Consequently, I find that Regions's total requested (4,377.10) should be reduced by 268 hours to 4,109.1 hours as follows: Mr. Garbett's hours reduced to 1,342 (a reduction of 53.9 hours); Joseph Perkins's hours reduced to 2,043.6 (a reduction of 124.2 hours); Jonathan Kaskel's hours reduced to 44.4 (a reduction of 21.8 hours); Ivonne Herrera's hours reduced to 92 (a reduction of 62.8 hours); and Gemma Guzman's hours reduced to 578.4 (a reduction of 5.3 hours).[12]

---

[11]  For example, Mr. Perkins spent .4 hours on February 6, 2014, "review[ing] memorandum re: the extent to which an expert witness may testify regarding his opinion of whether kiting has occurred."  (doc. 896-2 at 122).  On February 28, 2014, Mr. Kaskel billed .4 hours to "review/analyze kiting training materials." (*Id*. at 130).  On May 8, 2014, Mr. Perkins made this entry: "review criminal complaint against Gary and Todd Smith (1.5); review news articles re: Smith arrest (.2)." (*Id*. at 147).  An entry of Mr. Perkins's from March 4, 2015, reads: "review file re: employee training re: Ponzi schemes and kiting schemes and confer with D. Garbett re: same (.5)." (*Id*. at 197).  And on March 26, 2015, he billed 4.5 hours to "continue working on deposition outline, analyzing Kaplan's ledgers and statements for other banks re: reconciling divergent numbers and proving that Kaplan knew he was involved in fraudulent scheme. (4.5)." (*Id*. at 205).  Mr. Garbett billed .8 hours on April 1, 2015, for "review[ing] expert report and underlying exhibits and draft email to Richard Fechter re revisions/corrections to report." (*Id*. at 209).

[12]  I reduced each timekeeper's hours by the amount of time he or she spent on the tort claims, as suggested by the Kaplan Entities in their supplemental filing (doc. 954).  Additionally, Ms. Herrera and Ms. Guzman are paralegals at Mr. Garbett's firm.  Generally, "[w]ork by paralegals is recoverable only to the extent that the paralegal performs work traditionally done by an attorney." *Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir. 1988).  Costs associated with clerical tasks are overhead expenses that are not compensable in the attorneys' fees award.  Although included in these 268 hours is time Ms. Herrara and Ms. Guzman billed time for clerical tasks, these hours are deducted anyway because they were related to Regions's tort claims.

14

2.      *Garbett, Allen & Roza – Summary Judgment-Related Entries*

According to the Kaplan Entities' supplemental filing (which I find to be a reasonable and cogent synopsis), Mr. Garbett, Mr. Perkins, and Ms. Guzman spent a total of 332.7 hours preparing Regions's summary judgment motion and related filings and responding to the Kaplan Parties' summary judgment motion.  Regions moved for summary judgment on all of its 32 counts and prevailed on 16 of them.  This is somewhat misleading, however.  Regions asserted the same four counts against each of the four Kaplan Entities, and facts supporting each of these 16 successful claims were substantially similar.  My review of the summary judgment filings as well as the District Judge's detailed Orders (Orders at docs. 652, 654, 655, 656, 657) convinces me the parties spent at least half of their summary judgment-related papers debating how the Kaplan Parties fit into the Smiths' Ponzi scheme and whether the Kaplan Parties were orchestrating their own check kiting scheme within it.  All of this relates to Regions's debunked civil conspiracy claim.  On the other hand, the only counterclaim against Regions that survived to the summary judgment briefing stage was the negligent/negligent misrepresentation claim.

I have reviewed the time entries the Kaplan Entities highlighted in purple and find that they indeed relate to summary judgment.  Under these circumstances, I adopt the Kaplan Entities' suggested 50% reduction to Garbett, Allen & Roza's summary judgment-related hours as more than reasonable considering the relative success Regions achieved at the summary judgment stage.  *See, e.g., Yellow Pages Photos, Inc. v. Ziplocal, LP*, 8:12-cv-755-T-26EAJ, 2017 WL 3393569 at *4 (M.D. Fla. Aug. 8, 2017) ("[w]here the billing records are voluminous, the court may employ an across-the-board adjustment rather than an hour-by-hour review") (citing *Alhassid v. Bank of Am., N.A.*, 688 F. App'x 753 (11th Cir. 2017)); *Hepsen v. J.C. Christensen & Assoc., Inc.*, 394 F. App'x

597, 600 (11th Cir. 2010); *Bivens v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008); *Loranger*, 10 F.3d at 781; *Baby Buddies, Inc. v. Toys R Us, Inc.*, 8:03-cv-1377-T-17MAP, 2011 WL 4382450, at *10 (M.D. Fla. Aug. 9, 2011).

Regions's total hours should be reduced by an additional 166.35 (50% of the summary judgment hours) from 4,109.1 (reduced for tort hours) to 3,942.75 as follows: Mr. Garbett's hours reduced to 1,268.85 (a reduction of 73.15 hours); Mr. Perkins's hours reduced to 1,974.9 (a reduction of 68.7 hours); and Ms. Guzman's hours reduced to 553.9 (a reduction of 24.5 hours).[13]

### 3.    *Garbett, Allen & Roza – Trial Preparation*

As the Kaplan Entities concede, "Regions has redacted nearly all billing entries regarding the trial itself and the ensuing work . . . ." (doc. 953 at 5). But they point out that Regions "failed to redact any portions of the trial preparations from January through April [the date of the summary judgment order], despite much of that time necessarily was spent preparing for trial on the tort claims." (*Id*.). The Kaplan Entities have highlighted all trial preparation hours – which total 999 – in green (*see* doc. 954-1). I have reviewed these entries and note first, they are indeed trial-related and second, the attorneys' and paralegals' block descriptions of their time do not permit me to separate hours spent preparing for the trial of Regions's contract and UCC claims (which were live claims until the April 2016 summary judgment Order) from hours spent preparing for the trial of its tort claims. Applying the same reasoning as the above section on summary judgment time, I reduce these pre-April 2016 trial preparation hours by 50% from 999 to 499.5. The total hours of 3,942.75 (reduced by tort hours and summary judgment hours) should be reduced by 499.5 to 3,443.25 as

---

[13]    Said differently, Regions has not satisfied its burden that these excised hours are compensable under its legal theories or reasonable, even assuming they applied to the relevant counts.

16

follows:  Mr. Garbett's hours reduced to 1,131.35 (a reduction of 137.5 hours); Mr. Perkins's hours

reduced to 1,781.4 (a reduction of 193.5 hours); and Ms. Guzman's hours reduced to 385.4 (a

reduction of 168.5 hours).

4.   *Garbett, Allen & Roza – Discovery Practice and Undefined Categories*[14]

This category is the most amorphous of the lot, with entries spanning from December 2012

(when discovery started) through the end of discovery in October 2015.  According to the Kaplan

Entities, all hours spent within that time period (a total of 2,440.5 hours[15]) should be reduced by

60%.  It points out that "while Regions claims to have redacted entries throughout which pertained

to litigation of the tort claims, of the approximately 1600 billing entries made between December

2012 and September 2015, only a hundred or so are redacted." (doc. 953 at 6).  They continue: "The

reality is that at least half of the time billed for discovery and motion practice was primarily for the

tort claims or other non-compensable time . . . ." (*Id.*).

Although impossible to parse from the invoices, a reasonable conclusion is that a significant

portion of Regions's effort during the discovery phase was spent chasing its fraud and conspiracy

theories.  My review of the invoices also convinces me that Regions billed for time spent reviewing

other parties' filings and formulating a joint strategy with them.  Some amount of this is expected

---

[14]  The Kaplan Entities' supplemental filing (doc. 953) totals the hours spent in each of four categories for a grand total of 4,040.2 hours (this does not include time spent on litigating the attorneys' fees issue, 21.6 hours).  This is approximately 336.9 hours less than what Mr. Garbett contends are his firm's total compensable hours (doc. 896-1 at 6).  Regions's attorneys' fee petition and the billing invoices are poorly organized and presented, and I cannot account for these missing 336.9 hours.  This buttresses my decision to apply an across-the-board reduction to total hours in three of the four case management categories (summary judgment, trial preparation, and discovery/miscellaneous).

[15]  This total reflects all entries during the discovery period, minus the hours already deducted as related to Regions's tort claims during this period (which total 123.6 during the discovery phase).

17

in a case involving as many parties and claims, counterclaims, and cross-claims as this one, but some of these hours are unnecessary and redundant.  Much of Regions's effort during discovery (other than those clearly related to Regions's tort claims), however, also corresponds to the Kaplan Parties' counterclaims, which broadened the scope of discoverable information and demanded Regions's attention.  I reduce the number of hours during the discovery phase from 2,440.5 to 1,220.25, which is a 50% reduction.  In other words, the total hours are reduced from 3,443.25 (reduced by tort, summary judgment, and trial preparation hours) to 2,223.  The hours are reduced by timekeeper as follows:  Mr. Garbett's total hours reduced to 750.5 (a reduction of 380.85 hours); Mr. Perkins's total hours reduced to 1,087.8 (a reduction of 693.6 hours); Mr. Kaskel's total hours reduced to 11.3 (a reduction of 33.1 hours); Ms. Herrara's total hours reduced to 14.6 (a reduction of 77.4 hours); and Ms. Guzman's hours reduced to 288.3 (a reduction of 97.1 hours).

     *5.  Garbett, Allen & Roza – Time Spent Litigating Fees Issues*

    Under the deposit agreements, Regions is entitled to recoup its attorneys' fees incurred in litigating this fee dispute, which total 21.6 hours.  *See Apple Glen Investors, L.P. v. Express Scripts, Inc.*, No. 8:14-cv-1527-T-33TGW, 2018 WL 2945629, at *13 (M.D. Fla. May 25, 2018) (recommending under Florida law that fees for litigating fees be awarded pursuant to contract provision), adopted on June 11, 2018; *see also Trial Practices, Inc. v. Hahn Loeser & Parks, LLP*, 228 So.3d 1184 (Fla. 2d DCA 2017); *Waverly at Las Olas Condo. Ass'n, Inc. v. Waverly Las Olas, LLC*, 88 So.3d 386 (Fla. 4th DCA 2012).   Neither the Kaplan Entities' response to Regions's fees motion (doc. 913) nor their supplemental filings (doc. 953) addresses this category of fees, and they did not specifically object to them at the hearing.  I find the 21.6 hours Garbett, Allen & Roza expended in this category are reasonable and compensable and properly included in the hours the

18

firm requests.

6.    *Garbett, Allen & Roza – Total Number of Reasonable Hours*

Applying the above analysis and deductions, the total number of reasonable hours expended by the three attorneys and three paralegals at Garbett, Allen & Roza are as follows:

| Legal Professional | Hours Requested | Reasonable Hours |
|---|---|---|
| Mr. Garbett | 1,395.90 | 750.5 |
| Mr. Perkins | 2,167.80 | 1,087.8 |
| Mr. Kaskal | 66.20 | 11.3 |
| Ms. Herrara | 154.80 | 14.6 |
| Ms. Guzman | 583.70 | 288.3 |
| Ms. Baskerville | 8.7 | 8.7 |
| **Total:** | 4,368.40 | **2,161.20** |

7.    *Trenam Law – Reasonable Number of Hours Expended*

Trenam Law presented a declaration of Ms. Drushal and billing invoices dating from January 2012 through October 2012, totaling 368.1 hours.  Some of these hours – especially those billed between July 2012 through October 2012 – appear redundant of time billed by Garbett, Allen & Roza, whose representation of Regions began in July 2012.  Additionally, Trenam Law's invoices are heavily redacted, rendering it impossible to determine if they are for compensable services under the deposit agreements.  I cannot tell what the lawyers were researching, why they were conferencing, the topics of their numerous telephone conferences, or what they were analyzing and reviewing.[16]  I find that a 50% reduction of Trenam Law's hours is appropriate under the

---

[16]  The entries are so redacted many of them read simply, "review," analyze," "conduct research," or sometimes "review and analyze," or "continue conducting research."

19

circumstances.  The number of hours Trenam Law reasonably expended on this litigation is reduced to 184.05, as shown in the following chart:

| Legal Professional | Hours Requested | Reasonable Hours |
|---|---|---|
| Ms. Drushal | 109.4 | 54.7 |
| Mr. Cravey | 150.5 | 75.25 |
| Ms. Cronin | 52.7 | 26.35 |
| Ms. Taylor | 35.3 | 17.65 |
| Mr. Collison | 14.0 | 7.0 |
| Ms. Hoeppner | 6.2 | 3.1 |
| **Total:** | 368.1 | **184.05** |

### B.   Hourly Rates

The second half of the lodestar equation requires the court to determine a reasonable hourly rate for the services of the prevailing party's attorneys.  A reasonable hourly rate is "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299 (citations omitted).  The moving party bears the burden of "producing satisfactory evidence that the requested rate is in line with prevailing market rates." *Id*.  Satisfactory evidence "necessarily must speak to rates actually billed and paid in similar lawsuits" and requires more than affidavits from the attorney attesting that the requested fee is reasonable. *Id*. at 1303.

Earlier in the case, in an order related to a discovery dispute the Court resolved in Regions's favor, the District Judge awarded Mr. Garbett the hourly rate of $525 and his partner Joseph Perkins $310 (doc. 815).  These are the hourly rates Mr. Garbett requests here.  He also requests hourly rates for associate Mr. Kaskel ranging from $325 to $335, and paralegals Ms. Herrara, Ms. Guzman, and

Ms. Baskerville ranging from $125 to $220 (doc. 896-1 at 5-6).   But a close look at the invoices confirms that these rates are not what the firm actually charged Regions.  The law firm and Regions entered into a fee agreement in September 2011, under which Regions receives a 25% discount (doc. 614-2 at 2).  The agreement has an alternative fee clause providing that where a third party (including a customer) is responsible to reimburse Regions for reasonable attorneys' fees, the firm is entitled to the *greater of* the charged rates *or* the reasonable hourly rate as determined by a court (*Id.* at 3).  According to Regions, the District Judge impliedly upheld this provision when she compensated him at the hourly rate of $525 for winning the discovery dispute.

But the District Judge's fee award represented a discovery sanction under Rule 30(b)(1) for opposing counsel's conduct in cancelling depositions at the last minute (*see* doc. 531).  The fees determination the District Judge has tasked me with making here is based on the attorneys' fees provision in the deposit agreements, which shifts the responsibility of paying for Regions's reasonable attorneys' fees to the Kaplan Entities.  Regions paid a reduced hourly rate over the life of this case.  If I were to find Mr. Garbett's and his firm's proposed hourly rates reasonable, I would be awarding Regions more in fees than it actually paid.

To be sure, I am not limited by the contractual fee agreement between Regions and Garbett, Allen & Roza, and am free to award a higher fee than the one the firm actually charged Regions. *See First Baptist Church of Cape Coral, Fla. v. Compass Constr., Inc.*, 115 So.3d 978 (Fla. 2013) (alternative fee clause is valid and enforceable in Florida).  But neither am I bound to the Court's prior hourly rate determination. *See Thermoset Corp. v. Building Materials Corp. of Am.*, No. 14-60268-CIV-Cohn/Seltzer, 2016 WL 3944033, at *5 (S.D. Fla. Jan. 15, 2016) (court not required to calculate fees based on claimed hourly rates merely because an alternative fee agreement exists; the

fee still must be reasonable).  Mr. Garbett and Mr. Perkins are no doubt established, accomplished attorneys who obtained a satisfactory result for Regions.  But my job remains to determine their reasonable hourly rate, and I find the rates they request miss that mark.  *See Norman*, 836 F.2d at 1303 (the court itself is an expert).

Based on the Court's own knowledge as to prevailing hourly rates charged in similar commercial litigation cases in this district, I conclude that the reasonable hourly rates approximate those actually paid by Regions:  Mr. Garbett, $435 for work performed up to January 1, 2017, and $485 thereafter; Mr. Perkins, $220 for work performed up to January 1, 2017, and $310 thereafter; Mr. Kaskel, $240 for all work; Ms. Herrara, $116.25 for all work; Ms. Guzman, $112.50 for all work performed up to January 1, 2017, and $160 thereafter; and Ms. Baskerville, $85 for all work.[17]  *See Dillard v. City of Greensboro*, 213 F.3d 1347, 1354-55 (11th Cir. 2000) (what a lawyer charges his fee-paying clients "is powerful, and perhaps the best, evidence of his market rate"); *see also Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1336-37 (11th Cir. 2001) (holding that the agreed upon billing rate is a strong indication of a reasonable rate but does not necessarily act as the cap).

C.     *Total Lodestar*

The product of the reasonable hours expended and the reasonable hourly rates results in the following lodestar amount for Garbett, Allen & Roza:

---

[17] The firm's rates increased across-the-board on January 1, 2017.  The invoices before this date reflect each timekeeper's full hourly rate and then discount the total fees by 25%.  The firm's invoices after January 1, 2017, charge Regions at the reduced rates (in other words, a built-in discount).  Mr. Kaskel, Ms. Herrara, and Ms. Baskerville left the firm prior to the rate increase.

| Legal Professional | Reasonable Hourly Rate | Reasonable Number of Hours | Lodestar |
|---|---|---|---|
| Mr. Garbett | $435 until Jan. 1, 2017<br><br>$485 thereafter | 735.3<br><br>15.2 | $319,855.50<br><br>$7,372.00 |
| Mr. Perkins | $220 until Jan. 1, 2017<br><br>$310 thereafter | 1,082.35<br><br>5.45 | $238,117<br><br>$1,689.50 |
| Mr. Kaskel | $240 | 11.3 | $2,712.00 |
| Ms. Herrara | $116.25 | 14.6 | $1,697.25 |
| Ms. Guzman | $112.50 until Jan. 1, 2017<br><br>$160 thereafter | 286.7<br><br>1.6 | $32,253.75<br><br>$256 |
| Ms. Baskerville | $85 | 8.7 | $739.50 |
| **Total Lodestar** | | | **$604,692.50** |

The lodestar for Trenam Law is below:

| Legal Professional | Reasonable Hourly Rate[18] | Reasonable Number of Hours | Lodestar |
|---|---|---|---|
| Ms. Drushal | $249.64 | 54.7 | $13,655.31 |
| Mr. Cravey | $316.56 | 75.25 | $23,821.14 |
| Ms. Cronin | $292.05 | 26.35 | $7,695.52 |
| Ms. Taylor | $212.50 | 17.65 | $3,750.63 |
| Mr. Collison | $178.12 | 7.0 | $1,246.84 |
| Ms. Hoeppner | $139.05 | 3.1 | $431.06 |
| **Total Lodestar** | | | **$50,600.50** |

Due to the reduction in the reasonable number of hours billed, I find that neither firm's lodestar figure requires additional downward or upward adjustment.

---

[18]  The Kaplan Entities do not dispute Trenam Law's hourly rates; I find them reasonable.

*IV.*   *Costs*

The final category is the costs to which Regions is entitled under the deposit agreements (broader than the costs compensable under 28 U.S.C. § 1920).  Garbett, Allen & Roza initially requested reimbursement of $168,052.09 in costs and expenses.  At the hearing, it agreed to subtract from its request the fees associated with its tax expert Richard Fechter – a reduction of $71,872.59. The total costs Regions now seeks is $96,179.50.  Although the Kaplan Entities do not offer precise objections, it argues that Regions's costs "appear excessive and high for purposes of this litigation, as a number of trips involved both Mr. Garbett and Mr. Perkins, where only one attorney would have sufficed.  This includes trips taken for witness depositions that were not related to the prosecution of Regions' contract and UCC claims." (doc. 953 at 9).  I concur and reduce Regions's costs by 50% from $96,179.50 to $48,089.75.  This reduction is especially appropriate because the documentation supporting Regions's significant costs is scant.  Mr. Garbett's declaration lists his firm's costs by category, and he attaches a spreadsheet that includes invoice dates and amounts.  I cannot verify that these amounts correspond to the claims on which Regions prevailed, however, because there are no supporting documents.

Trenam Law requests $932 in costs, including court filing fees and fees for service of summonses and subpoenas.  The Kaplan Entities do not object to these costs.  I find they are reasonable.

*V.*   *Conclusion*

I recommend as follows:

(1)     Regions's motion for supplemental final judgment (doc. 895) be GRANTED IN PART and DENIED IN PART as follows:

24

(a)     the judgment be amended to award Regions $655,293.00 in attorneys' fees payable by the Kaplan Entities as follows:  $358,445.27 payable by R1A Palms, LLC; $165,133.84 payable by Triple Net Exchange, LLC; $115,331.56 payable by MK Investing, LLC; and $16,382.33 payable by BNK Smith, LLC.  This reflects the parties' agreement that the fee award be divided between each of the Kaplan Entities' according to its pro rata share of the total judgment.

(b)     the judgment be amended to award Regions $49,021.75 in costs payable by the Kaplan Entities, according their pro rata shares as follows: R1A Palms, LLC, $26,814.90; Triple Net Exchange, LLC, $12,353.48; MK Investing, LLC, $8,627.83; and BNK Smith, LLC, $1,225.54; and

(2)     The Kaplan Entities' motion to bifurcate (doc. 914) be DENIED.

IT IS SO REPORTED in Tampa, Florida on June 25, 2018.


*Mark A. Pizzo*

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.